In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3841

CYRIL B. KORTE, JANE E. KORTE,
and KORTE & LUITJOHAN
CONTRACTORS, INC.,

*Plaintiffs-Appellants,*

*v.*

KATHLEEN SEBELIUS, Secretary of
Health & Human Services, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:12-CV-01072-MJR — **Michael J. Reagan,** *Judge.*

No. 13-1077

WILLIAM D. GROTE, III;
WILLIAM DOMINIC GROTE, IV; WALTER F.
GROTE, JR.; MICHAEL R. GROTE;
W. FREDERICK GROTE, III; JOHN R. GROTE;
GROTE INDUSTRIES, LLC; and
GROTE INDUSTRIES, INC.,

*Plaintiffs-Appellants,*

*v.*

KATHLEEN SEBELIUS, Secretary of
Health & Human Services, *et al.,*

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Southern District of Indiana, New Albany Division.
No. 4:12-cv-00134-SEB-DML — **Sarah Evans Barker,** *Judge.*

---

ARGUED MAY 22, 2013 — DECIDED NOVEMBER 8, 2013

---

Before FLAUM, ROVNER, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* These consolidated appeals challenge
the federal government's "contraception mandate," a regula-
tory requirement imposed by the Department of Health and
Human Services ("HHS") to implement the terms of the 2010

Patient Protection and Affordable Care Act. The mandate requires employers to provide coverage for contraception and sterilization procedures in their employee health-care plans on a no-cost-sharing basis. Noncompliance carries heavy financial penalties and the risk of enforcement actions.

The plaintiffs are two Catholic families and their closely held corporations—one a construction company in Illinois and the other a manufacturing firm in Indiana. The businesses are secular and for profit, but they operate in conformity with the faith commitments of the families that own and manage them. The plaintiffs object for religious reasons to providing the mandated coverage. They sued for an exemption on constitutional and statutory grounds.

Center stage at this juncture is the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.*, which prohibits the federal government from placing substantial burdens on "a person's exercise of religion," *id.* § 2000bb-1(a), unless it can demonstrate that applying the burden is the "least restrictive means of furthering … [a] compelling governmental interest," *id.* § 2000bb-1(b). Focusing primarily on their RFRA claims, the plaintiffs in each case moved for a preliminary injunction. The district judges denied relief, holding that the claims were not likely to succeed. We provisionally disagreed and enjoined enforcement of the mandate pending appeal.

The appeals have now been briefed and argued and are ready for decision. Plenary review has confirmed our earlier judgment. These cases—two among many currently pending in courts around the country—raise important questions about

whether business owners and their closely held corporations may assert a religious objection to the contraception mandate and whether forcing them to provide this coverage substantially burdens their religious-exercise rights. We hold that the plaintiffs—the business owners *and* their companies—may challenge the mandate. We further hold that compelling them to cover these services substantially burdens their religious-exercise rights. Under RFRA the government must justify the burden under the standard of strict scrutiny. So far it has not done so, and we doubt that it can. Because the RFRA claims are very likely to succeed and the balance of harms favors protecting the religious-liberty rights of the plaintiffs, we reverse and remand with instructions to enter preliminary injunctions barring enforcement of the mandate against them.

## I. Background

### A. The Contraception Mandate

On March 23, 2010, Congress adopted the Affordable Care Act, a sweeping legislative and regulatory overhaul of the nation's health-care system. The Act "aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius ("NFIB")*, 132 S. Ct. 2566, 2580 (2012). One feature of the Act is a requirement that employee health-care plans governed by ERISA[1] provide certain minimum levels of coverage to plan participants and beneficiaries. *See* 29 U.S.C.

---

[1] The Employment Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.*

§ 1185d (applying the requirements of part A of Title XXVII of the Public Health Services Act as amended by the Affordable Care Act to ERISA-governed group health plans). More specifically, the Affordable Care Act establishes a general requirement that employer-sponsored group health-care plans cover "preventive care and screenings" for women on a no-cost-sharing basis; Congress instructed HHS to fill in the details:

> A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for—
>
> …
>
> **(4)** with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration ["HRSA," an agency within HHS] for purposes of this paragraph.

42 U.S.C. § 300gg-13(a); *see also* 29 U.S.C. § 1185d.

Before promulgating regulations pursuant to this statutory directive, the HRSA sought advice from the Institute of Medicine at the National Academy of Science about what services to include in the preventive-care mandate. Based on the Institute's recommendations, the HRSA issued

comprehensive guidelines requiring coverage of (among other things) "[a]ll Food and Drug Administration ["FDA"] approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." Health Res. & Servs. Admin., *Women's Preventive Services Guidelines: Affordable Care Act Expands Prevention Coverage for Women's Health and Well-Being*, http://www.hrsa.gov/womensguidelines/ (last visited Nov. 7, 2013). These include oral contraceptives ("the pill"), barrier methods, implants and injections, emergency oral contraceptives ("Plan B" and "Ella"), and intrauterine devices.[2] On February 15, 2012, HHS published final regulations incorporating the HRSA guidelines. *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services, 77 Fed. Reg. 8725 (Feb. 15, 2012). The agency made the mandate effective in the first plan year on or after August 1, 2012.[3] *See* 45 C.F.R. § 147.130(b)(1).

---

[2] *See* FDA, BIRTH CONTROL: MEDICINES TO HELP YOU, http://www.fda.gov/ForConsumers/ByAudience/ForWomen/FreePublications/ucm313215.htm (last visited Nov. 7, 2013).

[3] In July the Treasury Department announced a one-year delay in the implementation of the so-called employer mandate. *See* Mark J. Mazur, *Continuing to Implement the ACA in a Careful, Thoughtful Manner*, TREASURY NOTES (July 2, 2013), http://www.treasury.gov/connect/blog/pages/continuing-to-implement-the-aca-in-a-careful-thoughtful-manner-.aspx. The announcement did not mention the contraception mandate, which was already in effect. We assume that the postponement of the employer mandate has no effect on the contraception mandate; the government has not advised otherwise.

Noncompliance with the contraception mandate is punished by steep financial penalties and other civil remedies. For example, failure to provide the mandated coverage brings a tax penalty of $100 per day per employee—$36,500 per year per employee. *See* 26 U.S.C. § 4980D(a), (b)(1). If an employer discontinues offering a health plan altogether, the penalty is $2,000 per year per employee. *See id.* § 4980H(a), (c). In addition, noncomplying employers face potential enforcement actions by the Secretary of Labor and plan participants and beneficiaries under ERISA. *See* 29 U.S.C. §§ 1132, 1185d.

Like many of the other employer mandates in the Affordable Care Act, the contraception mandate applies to employers with 50 or more full-time employees. *See* 26 U.S.C. § 4980H. Smaller employers—those with fewer than 50 full-time employees—are not required to provide a health plan for their employees and apparently are not subject to the coverage minimums, including the contraception mandate. *See id*. We say "apparently" because it's not entirely clear that the mandate is categorically inapplicable to small employers; the government takes the position that if a small employer not otherwise required to provide an employee health-care plan nonetheless chooses to do so, the regulatory scheme requires inclusion of the mandated contraception coverage.

Health plans in existence when the Act was adopted are "grandfathered" and do not need to comply with the coverage minimums—including the contraception mandate—unless the plan sponsor makes certain changes to the terms of the plan. *See* 42 U.S.C. § 18011. Grandfathering is a transitional measure; this category will shrink as employer-based plans existing

prior to March 23, 2010, undergo changes. The government estimates that the number of plans in grandfathered status will dwindle fairly rapidly as older health-care plans are updated and renewed. *See* Interim Final Rules for Group Health Plans and Health Insurance Coverage Relating to Status as a Grandfathered Health Plan, 75 Fed. Reg. 34,538, 34,552 (June 17, 2010).

Finally, some religious employers are exempt from the contraception mandate, *see* 45 C.F.R. § 147.130(a)(1)(iv)(A), but "religious employer" was initially defined quite narrowly:

> [A] "religious employer" [for purposes of an exemption from the contraception mandate] is an organization that meets all of the following criteria:
>
> > (1) The inculcation of religious values is the purpose of the organization.
> >
> > (2) The organization primarily employs persons who share the religious tenets of the organization.
> >
> > (3) The organization serves primarily persons who share the religious tenets of the organization.
> >
> > (4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended [covering the tax status of churches and their integrated auxiliaries,

> conventions or associations of churches,
> and the exclusively religious activities of
> religious orders].

*Id.* § 147.130(a)(1)(iv)(B).

## B. The Religious-Employer Controversy

The contraception mandate was instantly controversial.[4] The religious-employer exemption did not leave room for conscientious religious objectors other than houses of worship, their integrated affiliate organizations, and religious orders acting as such. In other words, the definition of "religious employer" was so circumscribed that it left out religious colleges and universities; religious hospitals and clinics; religious charities and social-service organizations; other faith-based nonprofits; and for-profit, closely held businesses managed in accordance with a religious mission or creed.

HHS responded to the outcry from these left-out employers by establishing a temporary "safe harbor" for certain nonprofit religious organizations not covered by the exemption. *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services, 77 Fed. Reg. at 8728. Eventually the agency proposed a revised definition of "religious employer" and an "accommodation" of a broader class of

---

[4] The mandate prompted a proliferation of lawsuits by employers seeking exemptions on religious-liberty grounds. By one count more than 70 suits challenging the mandate are currently pending. *See* The Becket Fund for Religious Liberty, *HHS Mandate Information Central*, THEBECKETFUND.ORG, http://www.becketfund.org/hhsinformationcentral.

nonprofit religious organizations with objections to the mandated coverage. The new rules were proposed in final form on February 6, 2013, *see* Coverage of Certain Preventive Services, 78 Fed. Reg. 8456, published in final form on July 2, 2013, *see* 78 Fed. Reg. 39,870, and became effective August 1, 2013, *see id.*

As revised, the exemption drops the first three requirements of the earlier definition of "religious employer," but the change is not intended to alter the exemption's scope. "Religious employer" is now defined as "an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 45 C.F.R. § 147.131(a). The cross-reference is the tax exemption for churches and their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of religious orders. *See* 26 U.S.C. § 6033(a)(3)(A)(i), (iii). HHS has explained that "the simplified and clarified definition of religious employer does not expand the universe of religious employers that qualify for the exemption beyond that which was intended in the 2012 final regulations." Coverage of Certain Preventive Services, 78 Fed. Reg. at 39,874. In other words, the exemption remains limited to "[h]ouses of worship and their integrated auxiliaries." *Id.*

Under the revised rule, certain nonprofit religiously affiliated employers may receive an "accommodation"—essentially, an attempted workaround whereby the objecting employer gives notice to its insurance carrier and the insurer issues a separate policy with the mandated coverage.

The accommodation is limited to organizations that meet the following requirements:

> (1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.
>
> (2) The organization operates as a nonprofit entity.
>
> (3) The organization holds itself out as a religious organization.
>
> (4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section … .

45 C.F.R. § 147.131(b). Notably for our purposes, neither the final religious-employer exemption nor the accommodation applies to for-profit employers with conscientious religious objections to providing the mandated coverage.

### C. The Plaintiffs

#### 1. *The Kortes and K & L Contractors*

Cyril and Jane Korte own and operate Korte & Luitjohan Contractors, Inc. ("K & L Contractors"), a construction company located in Highland, Illinois. K & L Contractors has approximately 90 full-time employees, 70 of whom belong to a union that sponsors their health-insurance plan. The company provides a health-care plan for the remaining 20 or so

nonunion employees. Together, Cyril and Jane own about 87% of the stock of the corporation and are its only directors. Cyril is the president and Jane is the secretary of the company. As officers and directors, they set all company policy.

The Kortes are Catholic and follow the teachings of the Catholic Church regarding the sanctity of human life from conception to natural death and the moral wrongfulness of abortion, sterilization, and the use of abortifacient drugs and artificial means of contraception. They seek to manage their company in accordance with their faith commitments. In August 2012 when the contraception mandate was finalized, the Kortes discovered that their then-existing health plan covered sterilization and contraception—coverage that they did not realize they were carrying. Because providing this coverage conflicts with their religious convictions, they began to investigate alternative health-care plans with the intention of terminating their existing plan and substituting one that conforms to the requirements of their faith.

The contraception mandate stood in their way. The company's existing health-care plan was set to renew on January 1, 2013, triggering the requirements of the mandate and the large financial penalties and possible enforcement actions if they did not comply. As the Kortes understand their religious obligations, providing the mandated coverage would facilitate a grave moral wrong. On the other hand, following the teachings of their faith and refusing to comply would financially devastate K & L Contractors and the Kortes as its owners; at $100 per day per employee, the monetary penalties would total $730,000 per year.

The Kortes responded to the conflict between their legal and religious duties in two ways. First, they promulgated ethical guidelines for K & L Contractors memorializing the faith-informed moral limitations on the company's provision of health-care benefits, including its inability to provide insurance coverage for abortion, abortifacient drugs, artificial contraception, and sterilization.[5] Second, the Kortes and K & L

---

[5] The company's ethical guidelines are as follows:

> 1. As adherents of the Catholic faith, we hold to the teachings of the Catholic Church regarding the sanctity of human life from conception to natural death. We believe that actions intended to terminate an innocent human life by abortion, including abortion-inducing drugs, are gravely sinful. We also adhere to the Catholic Church's teaching regarding the immorality of artificial means of contraception and sterilization.

> 2. As equal shareholders who together own a controlling interest in Korte & Luitjohan Contractors, Inc., we wish to conduct the business … in a manner that does not violate our religious faith and values.

> 3. Accordingly, we and Korte & Luitjohan Contractors, Inc. cannot arrange for, pay for, provide, facilitate, or otherwise support employee health plan coverage for contraceptives, sterilization, abortion, abortion-inducing drugs, or related education and counseling, except in the limited circumstances where a physician certifies that certain sterilization procedures or drugs commonly used as contraceptives are being prescribed with the intent to treat certain medical conditions, not with the intent to prevent or terminate pregnancy, without violating our religious beliefs.

Contractors filed suit in the Southern District of Illinois for a religious exemption from the mandate.


## 2. *The Grotes and Grote Industries*

The Grote Family owns and manages Grote Industries, Inc., a manufacturer of vehicle safety systems headquartered in Madison, Indiana.[6] Like the Kortes, the members of the Grote Family are Catholic and they manage Grote Industries in accordance with their religious commitments, including Catholic moral teaching regarding the sanctity of human life and the wrongfulness of abortion, abortifacient drugs, artificial contraception, and sterilization.

Grote Industries has 1,148 full-time employees at various locations, including 464 in the United States. The company provides a health-care plan that is self-insured and renews annually on the first of every year. Consistent with the Grote Family's Catholic faith, prior to January 1, 2013, the employee health-care plan did not cover contraception and sterilization

---

[6] The Grote Family includes individual plaintiffs William D. Grote, III; William Dominic Grote, IV; Walter F. Grote, Jr.; Michael R. Grote; W. Frederick Grote, III; and John R. Grote. Together with other family members not named as plaintiffs, they fully own Grote Industries, Inc., which in turn is the managing member of Grote Industries, LLC, the manufacturing firm. For ease of reference, we refer to the two companies as "Grote Industries." William D. Grote, III is Chairman and CEO; William Dominic Grote, IV is President and Chief Operating Officer; Walter F. Grote, Jr. is a board member; Michael R. Grote is the Assistant Treasurer; W. Frederick Grote, III is the Secretary; and John R. Grote is the Assistant Secretary.

procedures. Starting on that date, however, the requirements of the contraception mandate kicked in.

Like the Kortes and K & L Contractors, the Grote Family and Grote Industries object on religious grounds to providing coverage for contraception, abortion-inducing drugs, and sterilization procedures. But with its large full-time workforce, the company faced an annual penalty of almost $17 million if it did not comply with the mandate. The Grotes and Grote Industries filed suit in the Southern District of Indiana for a religious exemption from the mandate.

## D. The Litigation

Both complaints name the Secretaries of HHS, Labor, and the Treasury as defendants and seek declaratory and injunctive relief against the contraception mandate. Both sets of plaintiffs allege that the mandate violates their rights under RFRA; the Free Exercise Clause, the Establishment Clause, and the Free Speech Clause of the First Amendment; and the Administrative Procedure Act. The Grote complaint adds a due-process claim. In both cases the plaintiffs moved for a preliminary injunction the day after filing suit, focusing primarily though not exclusively on their RFRA claims.

In *Korte* the district court in Southern Illinois denied the motion, concluding that the Kortes and K & L Contractors had not demonstrated a likelihood of success on the merits. Regarding the RFRA claim in particular, the judge held that although the Kortes and K & L Contractors are "persons" within the meaning of RFRA and may invoke the statute's

protection, the contraception mandate does not substantially
burden their religious-exercise rights. This is so, the judge held,
because the link between the mandated coverage and the acts
condemned by the Kortes' religion is too attenuated. In other
words, the burden on religious exercise is insubstantial because
the compelled provision of contraception coverage is too far
removed from the independent decisions by plan participants
and beneficiaries to use contraception. The court also found the
free-exercise claim unlikely to succeed.

In *Grote* the district court in Southern Indiana likewise
denied the motion, also concluding that the plaintiffs were not
likely to succeed on their RFRA claim. Unlike her colleague in
Southern Illinois, however, the Indiana judge doubted that a
secular, for-profit corporation like Grote Industries has
religious-exercise rights under RFRA. The judge did not decide
the question, however, concluding instead that any burden on
the Grotes *or* Grote Industries is insignificant because too many
independent decisions separate the provision of the mandated
coverage and the practices deemed immoral by the Catholic
Church. The court also found the constitutional and Adminis-
trative Procedure Act claims unlikely to succeed.

The case from Southern Illinois reached us first, just before
the January 1, 2013 deadline for compliance with the mandate.
The plaintiffs sought an injunction pending appeal. In a brief
order and based on our early review of the merits, we provi-
sionally held that the RFRA claim is likely to succeed and the
balance of harms weighs in favor of the religious-liberty rights
of the plaintiffs. *See Korte v. Sebelius*, No. 12-3841, 2012 WL
6757353, *4–5 (7th Cir. Dec. 28, 2012). We enjoined enforcement

of the mandate pending appeal. *Id.* at \*5. Our colleague dissented. *Id.* at \*5–6 (Rovner, J., dissenting).

On the strength of our provisional decision in *Korte,* the Grotes and Grote Industries returned to the district court in Southern Indiana and asked for reconsideration. The judge acknowledged the similarity between the two cases but declined to reconsider because our order in *Korte* had no precedential effect. The plaintiffs appealed and asked for an injunction pending appeal. Tracing our analysis in *Korte,* we granted the request and enjoined enforcement of the mandate pending appeal. *Grote v. Sebelius*, 708 F.3d 850, 853–55 (7th Cir. 2013). Again, our colleague disagreed, filing a thoughtful dissent explaining her contrary position. *Id.* at 855–67 (Rovner, J., dissenting).

The appeals proceeded to full briefing, and we heard argument at the end of May. Since then, four circuits have reached decision in similar cases. The Tenth Circuit held that two closely held, for-profit businesses and their owners are likely to succeed on a claim for an exemption from the mandate under RFRA. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013). The Sixth and Third Circuits disagree. *Autocam Corp. v. Sebelius*, 730 F.3d 618 (6th Cir. 2013)*; Conestoga Wood Specialties Corp. v. Sec'y of the U.S. Dep't of Health & Human Servs.*, 724 F.3d 377 (3d Cir. 2013). The D.C. Circuit recently held that the owners of two closely held, for-profit businesses are likely to succeed on a RFRA challenge to the mandate, although their companies are not. *Gilardi v. U.S. Dep't of Health & Human Servs.*, No. 13-5069, 2013 WL 5854246 (D.C. Cir. Nov. 1, 2013).

## II. Analysis

These cases come to us on appeals from orders denying preliminary injunctive relief. *See* 28 U.S.C. § 1291. To win a preliminary injunction, the moving party must demonstrate that (1) it has no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied; and (2) there is some likelihood of success on the merits of the claim. *See Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). If the moving party meets this threshold burden, the court weighs the competing harms to the parties if an injunction is granted or denied and also considers the public interest. *See Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012); *Ezell*, 651 F.3d at 694. This equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor. *See Planned Parenthood*, 699 F.3d at 972. The aim is to minimize the costs of a wrong decision. *See Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012). Our review proceeds on a split standard of review: We review legal conclusions de novo, findings of fact for clear error, and equitable balancing for abuse of discretion. *Ezell*, 651 F.3d at 694.

Here, the analysis begins and ends with the likelihood of success on the merits of the RFRA claim. On the strength of that claim alone, preliminary injunctive relief is warranted; there is no need to remand for the district courts to weigh the injunction equities. Although the claim is statutory, RFRA protects First Amendment free-exercise rights, and "in First

Amendment cases, 'the likelihood of success on the merits will often be the determinative factor.' " *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (quoting *Joelner v. Village of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004)). "This is because the 'loss of First Amendment freedoms … unquestionably constitutes irreparable injury … .' " *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Moreover, once the moving party establishes a likelihood of success on the merits, the balance of harms "normally favors granting preliminary injunctive relief" because " 'injunctions protecting First Amendment freedoms are always in the public interest.' " *Id.* at 590 (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)). The government hasn't addressed equitable balancing, conceding the point to the plaintiffs. So the appeals turn entirely on whether the plaintiffs' RFRA claims are likely to succeed.

Two legal questions are contested: (1) is a secular, for-profit corporation a "person" under RFRA; and (2) does the contraception mandate substantially burden the religious-exercise rights of *any* of the plaintiffs, individual *or* corporate? If the answer to these questions is "yes," the government must discharge its burden of justifying the mandate under strict scrutiny. We conclude as follows: The corporate plaintiffs are "persons" under RFRA and may invoke the statute's protection; the contraception mandate substantially burdens the religious-exercise rights of all of the plaintiffs; and the government has not carried its burden under strict scrutiny.

First, however, we clear away some possible jurisdictional objections.

## A. Jurisdiction

Although the government never challenged jurisdiction, either in the district court or here, we have an independent obligation to satisfy ourselves that jurisdiction is secure before proceeding to the merits. *See Minn-Chem, Inc. v. Agrium Inc.*, 683 F.3d 845, 853 (7th Cir. 2012) (en banc); *Carroll v. Stryker Corp.*, 658 F.3d 675, 680 (7th Cir. 2011). There are two arguable jurisdictional issues lurking here: standing and the Anti-Injunction Act.[7]

---

[7] Just before oral argument, the government filed a "Notice of Supplemental Briefing on Jurisdictional Issues," drawing our attention to a brief it filed in response to a jurisdictional order from the Tenth Circuit in *Hobby Lobby*. The plaintiffs moved to strike this "notice." Although the government's approach is unorthodox, we have reviewed its supplemental brief in the Tenth Circuit case. In it the government argued that the corporate plaintiffs in *Hobby Lobby* have standing but the owners of the corporations do not. Supplemental Brief for Appellees at 3–9, *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013), 2013 WL 1790515 at *3–9. The government also took the position that the Anti-Injunction Act does not apply. *Id.* at 12–15, 2013 WL 1790515 at *12–15. The Tenth Circuit, sitting en banc, unanimously held that the corporations have standing and that the Anti-Injunction Act does not apply; four members of the court also concluded that the individual plaintiffs have standing. *See Hobby Lobby*, 723 F.3d at 1121, 1126 (Tymkovich, J.); *id.* at 1154–56 (Gorsuch, J., concurring); *id.* at 1184–89 (Matheson, J., concurring in part and dissenting in part). We have conducted our own jurisdictional analysis and find no jurisdictional impediments to reaching the merits. Accordingly, the government's "Notice of Supplemental Briefing" is inconsequential, and we deny the plaintiffs' motion to strike.

## 1. *Standing*

Article III of the Constitution limits the judicial power to "Cases" and "Controversies," U.S. CONST. art. III, § 2, cl. 1; *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013), a limitation understood to confine the federal courts to "the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law," *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009). The doctrine of standing enforces this limitation. *Id.*; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To invoke the authority of a federal court, a litigant must have "an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged action; and redressable by a favorable ruling." *Horne v. Flores*, 557 U.S. 433, 445 (2009).

The contraception mandate inflicts a concrete and particularized injury on all of the plaintiffs.[8] The mandate operates directly on K & L Contractors and Grote Industries, forcing them to provide contraception coverage in their employee health-care plans on pain of onerous financial penalties and the possibility of enforcement actions by federal regulators

---

[8] We note that "[w]here at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not." *Ezell v. City of Chicago*, 651 F.3d 684, 696 n.7 (7th Cir. 2011) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977)).

charged with implementing the Affordable Care Act.[9] The threat of financial penalty and other enforcement action is easily sufficient to establish standing to challenge the mandate prior to its enforcement. The companies need not violate the mandate and risk enforcement of the regulatory scheme before bringing suit. *See Wis. Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 147 (7th Cir. 2011). The "existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper [under Article III] because a probability of future injury counts as 'injury' for purposes of standing." *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010).

The Kortes and Grotes also have Article III standing, although this conclusion requires a bit more elaboration. The contraception mandate injures the individual plaintiffs in two concrete ways. First, because corporate ownership is closely held, the mandate's indirect effect on the financial interests of the Kortes and Grotes as controlling shareholders is a concrete injury sufficient to support Article III standing under Supreme Court and circuit precedent. *See Franchise Tax Bd. of Calif. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990) (indirect sole shareholders have Article III standing to challenge taxes assessed against their wholly owned subsidiaries); *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 756 (7th Cir. 2008) (sole shareholder of a corporation operating a branded petroleum

---

[9] Whether the corporate plaintiffs are "persons" with religious-exercise rights within the meaning of RFRA is a merits question, not a jurisdictional question. *See Chafin v. Chafin,* 133 S. Ct. 1017, 1024 (2013); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–03 (1998); *Minn-Chem, Inc. v. Agrium Inc.*, 683 F.3d 845, 852–53 (7th Cir. 2012) (en banc).

franchise has Article III standing to challenge franchisor's termination of the franchise under the Petroleum Marketing Practices Act).

Second, the Kortes and the Grotes face an intangible but no less concrete injury to their religious-exercise rights. It is axiomatic that organizational associations, including corporations, act only through human agency. *See Reich v. Sea Sprite Boat Co.*, 50 F.3d 413, 417 (7th Cir. 1995) ("incorporeal abstractions act through agents"). As owners, officers, and directors of their closely held corporations, the Kortes and Grotes set all company policy and manage the day-to-day operations of their businesses. Complying with the mandate requires them to purchase the required contraception coverage (or self-insure for these services), albeit as agents of their companies and using corporate funds. But this conflicts with their religious commitments; as they understand the requirements of their faith, they must refrain from putting this coverage in place because doing so would make them complicit in the morally wrongful act of another.

Compelling a person to do an act his religion forbids, or punishing him for an act his religion requires, are paradigmatic religious-liberty injuries sufficient to invoke the jurisdiction of the federal courts. *See, e.g.*, *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 428 (2006); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993); *United States v. Lee*, 455 U.S. 252 (1982); *Thomas v. Review Bd. of the Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981); *Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Sherbert v. Verner*, 374 U.S. 398 (1963).

Finally, we note that the shareholder-standing rule does not block the Kortes and Grotes from challenging the mandate. The rule is an aspect of third-party standing doctrine, which implements the general principle that litigants may not sue in federal court to enforce the rights of others. *See Franchise Tax Bd.*, 493 U.S. at 336; *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Rawoof*, 521 F.3d at 757; *MainStreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 745 (7th Cir. 2007). Subject to certain exceptions, the rule "holds that a shareholder generally cannot sue for indirect harm he suffers as a result of an injury to the corporation." *Rawoof*, 521 F.3d at 757 (citing *Franchise Tax Bd.*, 493 U.S. at 336).

Like other rules of third-party standing, however, the shareholder-standing rule is a prudential limitation and does not affect the court's authority to hear the case. "Prudential-standing doctrine 'is not jurisdictional in the sense that Article III standing is.'" *Id.* at 756 (quoting *MainStreet Realtors*, 505 F.3d at 747). Unlike true jurisdictional rules, prudential limitations on standing can be waived. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 535, 540 (7th Cir. 2012); *MainStreet Realtors*, 505 F.3d at 747. By failing to raise the shareholder-standing rule in the district court or here, the government waived it. Although we have the discretion to overlook the waiver, *see Rawoof*, 521 F.3d at 756–57; *MainStreet Realtors*, 505 F.3d at 747, doing so here would be pointless. A well-established exception allows "a shareholder with a direct, personal interest in a cause of action to bring suit even if the corporation's rights are also implicated." *Franchise Tax Bd.*, 493 U.S. at 336. The Kortes and the Grotes fall comfortably within the exception; they have a direct and personal interest

in vindicating their individual religious-liberty rights, even though the rights of their closely held corporations are also at stake.

### 2. *The Anti-Injunction Act*

The Anti-Injunction Act provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). The Act "protects the Government's ability to collect a consistent stream of revenue[] by barring litigation to enjoin or otherwise obstruct the collection of taxes." *NFIB*, 132 S. Ct. at 2582; *see also Hibbs v. Winn*, 542 U.S. 88, 103 (2004); *Bob Jones Univ. v. Simon*, 416 U.S. 725, 736 (1974); *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7 (1962). By operation of the Act, a tax ordinarily may be challenged only in a suit for a refund after it is paid. *NFIB*, 132 S. Ct. at 2582; *Bob Jones Univ.*, 416 U.S. at 736–37.

The Anti-Injunction Act does not apply here.[10] These are not suits "for the purpose of" restraining the assessment or collection of a tax. The suits seek relief from a regulatory mandate that exists separate and apart from the assessment or collection of taxes. The contraception mandate is not itself a tax

---

[10] The Anti-Injunction Act is generally assumed to be a jurisdictional bar. *See Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 6–8 (1962). That may be incorrect. *See Hobby Lobby*, 723 F.3d at 1157–59 (Gorsuch, J., concurring).

provision; its location within the United States Code and corresponding HHS regulations underscores as much.

The mandate was promulgated by HHS pursuant to authority delegated to it by a section of the Affordable Care Act that amends the Public Health Services Act. *See* 42 U.S.C. § 300gg-13(a)(4). The statutory component of the mandate imposes a general preventive-care requirement on all group health-care plans (including employer-sponsored plans) and issuers of individual and group health-insurance policies. *See id.* The mandate is situated in the public-welfare title of the Code of Federal Regulations—more specifically, in the part containing regulations governing the group and individual health-insurance markets. *See* 45 C.F.R. § 147.130. The mandate is backed by stiff tax penalties against employers that fail to comply, *see* 26 U.S.C. §§ 4980D, 4980H, but there are additional consequences for noncompliance, including ERISA enforcement actions by the Secretary of Labor and plan participants and beneficiaries, *see* 29 U.S.C. §§ 1132, 1185d. Noncompliant health insurers are subject to the enforcement authority of the Secretary of HHS as well as the states in which they operate. *See* 42 U.S.C. § 300gg-22.

It should be clear from this description that the contraception mandate is not structured as a predicate to the imposition of a tax but is instead an independent regulatory mandate. These lawsuits target the mandate itself.

It is true that the complaints name the Treasury Secretary as a defendant in addition to the Secretaries of HHS and Labor, and the plaintiffs have asked the court to enjoin the enforcement of the mandate by *any* of them. If the plaintiffs win an

exemption from the mandate, they will not be liable for the tax penalty under § 4980D and will be insulated from other means of enforcement as well. In that sense these lawsuits, if successful, will incidentally affect the corporate plaintiffs' tax liability. But the Anti-Injunction Act does not reach "all disputes tangentially related to taxes." *Cohen v. United States*, 650 F.3d 717, 727 (D.C. Cir. 2011); *see also Pendleton v. Heard*, 824 F.2d 448, 451–52 (5th Cir. 1987) (restraining the assessment or collection of a tax must be the primary purpose of the lawsuit, not an incidental effect of it, for the Anti-Injunction Act to apply); *Linn v. Chivatero*, 714 F.2d 1278, 1282 (5th Cir. 1983) (same).

Still, there is no doubt that § 4980D, a provision in the Internal Revenue Code, is implicated in the remedial sweep of these cases, so we think it best to address whether it is properly classified as a "tax" within the meaning of the Anti-Injunction Act. It is not.

We acknowledge that Congress used the term "tax" in the text of § 4980D (and also in § 4980H, the alternative "shared responsibility payment" for employers that drop or otherwise go without an employee health-care plan). The language Congress uses to describe an exaction is ordinarily the best evidence of whether it meant the Anti-Injunction Act to apply. *See NFIB*, 132 S. Ct. at 2582–83. But Congress also called the payment specified in § 4980D a "penalty." The statute was originally adopted as part of the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936, and was titled "*Penalty* on Failure to Meet Certain Group Health Plan Requirements," *see id.* § 402, 110 Stat. 1936, 2084

(emphasis added). The language Congress used is contradictory and thus inconclusive.

Other features of § 4980D confirm that the provision is meant to penalize employers for noncompliance with the various mandates in the Affordable Care Act and its implementing regulations. The sheer size of the required payment fairly screams "penalty." Any failure to provide the mandated minimum coverage—no matter how significant the deviation—costs the employer a whopping $100 per day per employee. *See* 26 U.S.C. § 4980D(b). Exacting such a high price for noncompliance suggests that the congressional objective is punitive. *See Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722, 729 (7th Cir. 2011) ("[A] tax might be so totally punitive in purpose and effect that, since nomenclature is unimportant, it should be classified as a fine rather than a tax.") (applying the parallel Tax Injunction Act, which protects the collection of state taxes).

When Congress regulates private conduct and makes noncompliance painful by exacting severe and disproportionate monetary consequences, the primary purpose of the scheme must be understood as regulatory and punitive rather than revenue raising. *See Robertson v. United States*, 582 F.2d 1126, 1128 (7th Cir. 1978) (the Anti-Injunction Act does not apply to "the exaction of a purely regulatory tax"). The obvious aim of § 4980D is not to raise revenue but to achieve broad compliance with the regulatory regime through deterrence and punishment. This is so even though the exaction generates some revenue because "deterrence is never perfect." *Empress Casino*, 651 F.3d at 728–29; *see also Retail Indus. Leaders*

*Ass'n v. Fielder*, 475 F.3d 180, 189 (4th Cir. 2007) (the Tax Injunction Act does not apply to a challenge to Maryland's "Fair Share Act" requiring a minimum level of spending on employee health-care benefits).

The statute also contains several exceptions based on the employer's scienter, *see* 26 U.S.C. § 4980D(c), a key indication that the payment is a penalty, not a tax. *See NFIB*, 132 S. Ct. at 2595 ("[S]cienter requirements are typical of punitive statutes, because Congress often wishes to punish only those who intentionally break the law."); *Bailey v. Drexel Furniture Co.* (*Child Labor Tax Case*), 259 U.S. 20, 37 (1922) ("Scienter[] [is] associated with penalties, not with taxes."). Finally, the $100-per-day-per-employee formula is repeated verbatim in 42 U.S.C. § 300gg-22(b)(2)(C)(ii), which authorizes the Secretary of HHS to impose the same sort of penalty on noncompliant insurers that § 4980D(b)(1) imposes on noncompliant employers.

Together, these aspects of the regulatory scheme all point in the same direction: Section 4980D is a penalty for noncompliance with the regulatory mandates on employer-based health-care plans. It is not a tax for purposes of the Anti-Injunction Act. By parallel reasoning the same is true of the alternative payment in § 4980H. This conclusion comports with the Supreme Court's decision in *NFIB*, which held that the Affordable Care Act's "shared responsibility payment" for noncompliance with the individual insurance mandate is not a tax for purposes of the Anti-Injunction Act. 132 S. Ct. at 2582–84. Here, as in *NFIB*, the Anti-Injunction Act does not block a decision on the merits.

**B. The RFRA Claim**

In *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 883–90 (1990), the Supreme Court held that the religious freedom guaranteed by the Free Exercise Clause of the First Amendment does not require religious exemptions from facially neutral laws of general applicability.[11] *Smith* altered the then-prevailing standard of *Sherbert v. Verner*, 374 U.S. at 406–07, and *Wisconsin v. Yoder*, 406 U.S. at 220–21, which applied strict scrutiny to laws that had the effect of burdening religious practices. Under *Sherbert* and *Yoder*, a substantial burden on religious exercise—even one arising from the application of a religion-neutral, generally applicable law—was unconstitutional unless the government could show that the burden was the least restrictive means of furthering a compelling public interest. *Smith* changed that understanding of the free-exercise right. The Court held that neutral laws of general applicability need only satisfy the basic test for rationality that applies to all laws; if a law incidentally burdens the exercise of religion, the Constitution does not require an exemption. *Smith*, 494 U.S. at 878–79, 888–90.

Congress responded to this shift in free-exercise doctrine by enacting RFRA, "a statutory rule comparable to the constitutional rule rejected in *Smith*." *O Centro Espirita*, 546 U.S. at 424; *see also Cutter v. Wilkinson*, 544 U.S. 709, 714–15 (2005); *City of Boerne v. Flores*, 521 U.S. 507, 512 (1997). RFRA creates a broad

---

[11] The First Amendment provides, in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof … ." U.S. CONST. amend. I.

statutory right to case-specific exemptions from laws that substantially burden religious exercise *even if* the law is neutral and generally applicable, *unless* the government can satisfy the compelling-interest test. RFRA represents a congressional judgment that the rule of *Smith* is insufficiently protective of religious liberty.[12] Congress filled the gap by expressly

---

[12] Congress's findings and purposes in enacting RFRA are as follows:

**(a) Findings**

The Congress finds that—

(1) the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;

(2) laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;

(3) governments should not substantially burden religious exercise without compelling justification;

(4) in Employment Division v. Smith, 494 U.S. 872 (1990)[,] the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; … .

**(b) Purposes**

The purposes of this chapter are—

(1) to restore the compelling interest test

(continued...)

"requir[ing] accommodation rather than neutrality." *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003).

RFRA's general rule is as follows:

> **Free exercise of religion protected**
>
> **(a) In general**
>
> Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

42 U.S.C. § 2000bb-1. The exception is as follows:

> **(b) Exception**
>
> Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

---

[12] (...continued)

> as set forth in Sherbert v. Verner, 374 U.S. 398 (1963)[,] and Wisconsin v. Yoder, 406 U.S. 205 (1972)[,] and to guarantee its application in all cases where free exercise of religion is substantially burdened; and
>
> **(2)** to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

42 U.S.C. § 2000bb.

> **(1)** is in furtherance of a compelling governmental interest; and
>
> **(2)** is the least restrictive means of furthering that compelling governmental interest.

*Id.*[13] Any "person whose religious practices are burdened in violation of RFRA 'may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief.' " *O Centro Espirita*, 546 U.S. at 424 (quoting 42 U.S.C. § 2000bb-1(c)).

RFRA applies retrospectively and prospectively to "all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after" its effective date. 42 U.S.C. § 2000bb-3(a). Prospective application is qualified by the rule that "statutes enacted by one Congress cannot bind a later Congress, which remains free to repeal the earlier statute, to exempt the current statute from the earlier statute, to modify the earlier statute, or to apply the earlier statute as modified." *Dorsey v. United States*, 132 S. Ct. 2321, 2331 (2012). RFRA accounts for this principle too; the statute does not apply to a subsequently enacted law if it

---

[13] In *City of Boerne v. Flores*, 521 U.S. 507, 532–36 (1997), the Supreme Court held that as applied to the States, RFRA exceeded Congress's legislative authority under § 5 of the Fourteenth Amendment. This did not call into question Congress's authority to "determine how the national government will conduct its own affairs," *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003), so RFRA remains in full force against the federal government, *see Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418 (2006); *see also O'Bryan*, 349 F.3d at 401.

"explicitly excludes such application by reference to this chapter." 42 U.S.C. § 2000bb-3(b). We note the qualifier only to explain how RFRA works; it has no bearing here. The Affordable Care Act does not explicitly exclude application of RFRA.

* * *

Congress's protective stance in favor of religious accommodation could not be clearer. RFRA's statement of purpose explicitly reaffirms our national commitment to the "free exercise of religion as an unalienable right," *id.* § 2000bb(a)(1), existing prior to and above ordinary law. RFRA is structured as a "sweeping 'super-statute,' cutting across all other federal statutes (now and future, unless specifically exempted) and modifying their reach." Michael Stokes Paulsen, *A RFRA Runs Through It: Religious Freedom and the U.S. Code*, 56 MONT. L. REV. 249, 253 (1995). It is "both a rule of interpretation" and "an exercise of general legislative supervision over federal agencies, enacted pursuant to each of the federal powers that gives rise to legislation or agencies in the first place." Douglas Laycock & Oliver S. Thomas, *Interpreting the Religious Freedom Restoration Act*, 73 TEX. L. REV. 209, 211 (1994); *see also* Nicholas Quinn Rosenkranz, *Federal Rules of Statutory Interpretation*, 115 HARV. L. REV. 2085, 2110 (2002) (explaining the function of generally applicable statutory rules of interpretation).

In short, RFRA operates as a kind of utility remedy for the inevitable clashes between religious freedom and the realities of the modern welfare state, which regulates pervasively and touches nearly every aspect of social and economic life. *See* Thomas C. Berg, *What Hath Congress Wrought? An Interpretative*

*Guide to the Religious Freedom Restoration Act*, 39 VILL. L. REV. 1, 25–26 (1994). Judges are assigned the task of mediating these conflicts. RFRA makes that role clear, "mandating consideration, under the compelling interest test, of exceptions to rules of general applicability." *O Centro Espirita*, 546 U.S. at 436 (internal quotation marks and alteration marks omitted). Congress has instructed the judiciary to hold the entire federal regulatory apparatus to the standard of *Sherbert*, unless a statute specifically says otherwise.

* * *

Once a RFRA claimant makes a prima facie case that the application of a law or regulation substantially burdens his religious practice, the burden shifts to the government to justify the burden under strict scrutiny. *O Centro Espirita*, 546 U.S. at 428. "Congress's express decision to legislate the compelling interest test indicates that RFRA challenges should be adjudicated in the same manner as constitutionally mandated applications of the test … ." *Id.* at 430. Thus, in RFRA litigation, as in First Amendment litigation, "the burdens at the preliminary injunction stage track the burdens at trial." *Id.* at 429.

### 1. *For-Profit Corporations as RFRA "Persons"*

RFRA's general rule prohibits the federal government from placing substantial burdens on *"a person's* exercise of religion" absent compelling justification, and only then if the burden is the least restrictive means of furthering the compelling

governmental objective. As originally enacted, RFRA defined "exercise of religion" as "the exercise of religion under the First Amendment to the Constitution." Pub. L. No. 103-141, § 5, 107 Stat. 1488, 1489 (1993). Congress amended the definition in 2000 with the enactment of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.*, making the definitions in the two statutes uniform. The term "exercise of religion" in RFRA is now defined by cross-reference to the definition of "religious exercise" in RLUIPA: "The term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* §§ 2000cc-5(7)(A), 2000bb-2(4). This definition is undeniably very broad, so the term "exercise of religion" should be understood in a generous sense.

RFRA does not define "person." This brings the Dictionary Act into play.[14] The definition there expressly includes corporations: "In determining the meaning of any Act of Congress, unless the context indicates otherwise[,] … the word[] 'person' … include[s] *corporations*, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals … ." 1 U.S.C. § 1 (emphasis added). By operation of this omnibus definition, the term "person" in RFRA includes corporations, unless the context indicates otherwise.

---

[14] The Dictionary Act is notable for its breadth. It contains general definitions and rules of construction that apply across the United States Code, prospectively and retrospectively unless otherwise indicated. *See* Nicholas Quinn Rosenkranz, *Federal Rules of Statutory Interpretation*, 115 HARV. L. REV. 2085, 2110 (2002).

To determine whether the context "indicates otherwise," the Supreme Court has instructed us not to stray too far from the statutory text. *See Rowland v. Calif. Men's Colony, Unit II Men's Advisory Council,* 506 U.S. 194, 199–200 (1993). " 'Context' here means the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional Acts … ." *Id.* at 199. The inquiry basically asks whether the definition in the Dictionary Act is a "poor fit" with the text of the statute:

> Where a court needs help is in the awkward case where Congress provides no particular definition, but the definition in 1 U.S.C. § 1 seems not to fit. There it is that the qualification "unless the context indicates otherwise" has a real job to do, in excusing the court from forcing a square peg into a round hole.
>
> The point at which the indication of particular meaning becomes insistent enough to excuse the poor fit is of course a matter of judgment … .

*Id.* at 200.

Nothing in RFRA suggests that the Dictionary Act's definition of "person" is a "poor fit" with the statutory scheme. To use the Supreme Court's colloquialism, including corporations in the universe of "persons" with rights under RFRA is not like "forcing a square peg into a round hole." *Id.* A corporation is just a special form of organizational association. No one doubts that organizational associations can engage in religious practice. The government accepts that *some* corporations—religious nonprofits—have religious-exercise rights

under both RFRA and the Free-Exercise Clause. As evidence of this, the contraception mandate exempts a class of religious organizations—i.e., churches and their integrated auxiliaries, *see* 45 C.F.R. § 147.131(a)—*whether or not* they conduct their activities in the corporate form (as many of them do). HHS also extends its "accommodation" to a broader set of religiously affiliated nonprofit corporations. *See id.* § 147.131(b).

Indeed, the Supreme Court has enforced the RFRA rights of an incorporated religious sect, *see O Centro Espirita*, 546 U.S. at 439, *aff'g* 389 F.3d 973, 973 (10th Cir. 2004) (en banc) (identifying the plaintiff church as "a New Mexico corporation"), and the free-exercise rights of an incorporated church, *see Lukumi*, 508 U.S. at 525, 547. The church corporations in these cases were not in court solely asserting the rights of their members based on associational standing; they were asserting their own rights, too.[15] Accordingly, we take it as both conceded and noncontroversial that the use of the corporate form and the associated legal attributes of that status—think separate legal personhood, limitations on owners' liability, special tax treatment—do not disable an organization from engaging in the exercise of religion within the meaning of RFRA (or the Free Exercise Clause, for that matter).

The government draws the line at religiously affiliated nonprofit corporations. That line is nowhere to be found in the

---

[15] For the rules of associational standing, see *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 553 (1996); *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977); and *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011).

text of RFRA or any related act of Congress. Nor can it be found in the statute's broader contextual purpose, assuming we were to venture beyond the textual inquiry envisioned by the Supreme Court for resolving Dictionary Act questions. The government argues that a religious/nonprofit limitation can be found by implication from judicial interpretations of two unrelated employment-discrimination statutes—namely, Title VII and the Americans with Disabilities Act ("ADA")— both of which contain targeted exemptions for religious employers. We are not convinced.

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of religion. *See* 42 U.S.C. § 2000e-2. Certain religious employers are exempt from this part of Title VII and may take religion into account in making employment decisions: "This subchapter shall not apply … to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion … ." *Id.* § 2000e-1(a). The ADA, which prohibits employment discrimination on the basis of disability, contains a similar exemption for religious employers. *See id.* § 12113(d)(1)–(2). Some lower courts have developed multifactor tests to determine when Title VII's religious-employer exemption applies; the nonprofit status of the employer is considered a relevant factor. *See, e.g., Spencer v. World Vision, Inc.*, 633 F.3d 723, 727 (9th Cir. 2011) (en banc) (per curiam); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 226 (3d Cir. 2007); *Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1343–44 (D.C. Cir. 2002) (applying a religious-employer exemption implied by the Supreme Court as a matter of constitutional avoidance to limit the reach of the National

Labor Relations Act); *Killinger v. Samford Univ.*, 113 F.3d 196, 198–99 (11th Cir. 1997); *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 618–19 (9th Cir. 1988). Relying on this line of cases, the government argues that Congress "carried forward" a nonprofit limitation when it enacted RFRA.

Never mind that much of this caselaw postdates the enactment of RFRA. The more important point is that a handful of lower-court decisions applying an interpretive gloss to Title VII's religious-employer exemption hardly implies that Congress meant to limit RFRA in the same way. As the Tenth Circuit noted in *Hobby Lobby*, the government asks us to infer from congressional silence that a "similar narrowing construction[] should be imported into" RFRA. 723 F.3d at 1130. The Tenth Circuit found this argument "strained," *id.*, and so do we. If Congress intended a nonprofit limitation in RFRA, surely there would be some hint of it in the statutory text.

The government also relies on the Supreme Court's decision in *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327 (1987). We do not understand why. *Amos* rejected an Establishment Clause challenge to Title VII's religious-employer exemption. *Id.* at 335–39. The case does not advance the government's position here.

To the contrary, the church labor-relations cases illuminate a fundamental flaw in the government's argument—its failure to recognize that RFRA protects religious liberty more broadly than the religious-employer exemptions in Title VII and the ADA. To see how, it's helpful to return to some first principles of free-exercise doctrine.

It's well understood that the Free Exercise Clause protects "first and foremost, the right to believe and profess," but also the right to engage in religiously motivated conduct. *Smith*, 494 U.S. at 877. ("The 'exercise of religion' often involves not only belief and profession but the performance of (or abstention from) physical acts … ."); *see also Bob Jones Univ. v. United States*, 461 U.S. 574, 603 (1983) ("[T]he Free Exercise Clause provides substantial protection for lawful conduct grounded in religious belief … ."); *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (The "[First] Amendment embraces two concepts[]—[the] freedom to believe and freedom to act."). This doctrine reflects the original understanding of the right. *See* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 HARV. L. REV. 1409, 1488 (1990) ("[T]he term 'free exercise' makes clear that the clause protects religiously motivated conduct as well as belief.").

The right to believe and profess is absolute. *See Bob Jones Univ. v. United States*, 461 U.S. at 603 (the Free Exercise Clause is "an absolute prohibition against governmental regulation of religious beliefs"); *Sherbert*, 374 U.S. at 402 ("The door of the Free Exercise Clause stands tightly closed against any governmental regulation of religious *beliefs* as such … ." (emphasis added)); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by work or act their faith therein."). Religiously motivated conduct is necessarily subject to some regulation for the essential public good. *Sherbert*, 374 U.S. at 403 (religiously motivated conduct may be

regulated to prevent "substantial threat[s] to public safety, peace or order").

Free-exercise problems usually arise when a law, regulation, or some action of a public official interferes with a religiously motivated practice, forbearance, or other conduct. These claims present in distinct ways, reflecting different dimensions of the right. *See generally* Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 COLUM. L. REV. 1373, 1388–89 (1981); Eugene Volokh, *A Common-Law Model for Religious Exemptions*, 46 UCLA L. REV. 1465, 1505–08 (1999).

One obvious and intuitive aspect of religious liberty is the right of conscientious objection to laws and regulations that conflict with conduct prescribed or proscribed by an adherent's faith. *Sherbert*, *Yoder*, and *Thomas* are the paradigm cases in this category. In *Sherbert* a Seventh-day Adventist was denied unemployment compensation benefits after she lost her job for refusing to work on her Sabbath day. 374 U.S. at 399–400. In *Yoder* Amish families challenged the application of a state compulsory-education law requiring their children to attend public school through age 16. 406 U.S. at 207–09. In *Thomas* a Jehovah's Witness was denied unemployment compensation benefits after he was fired for declining a job transfer to a department that produced war materials. 450 U.S. at 709–12. In all three cases, the claimants asserted a conscientious objection to legal burdens placed on their religiously motivated conduct. In all three the Supreme Court held that the Free Exercise Clause required an exemption. *See id.* at 718–19; *Yoder*, 406 U.S. at 234–36; *Sherbert*, 374 U.S. at 398–99.

A different aspect of religious liberty protects, broadly speaking, the autonomy of the church. As the Supreme Court explained in *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 132 S. Ct. 694, 706 (2012), this strand of religious-liberty doctrine "gives special solicitude to the rights of religious organizations" *as* religious organizations, respecting their autonomy to shape their own missions, conduct their own ministries, and generally govern themselves in accordance with their own doctrines as religious institutions. *Id.* at 704–06. The paradigm cases in this category are *Hosanna-Tabor* itself, which recognized the right of churches to choose their own ministers (broadly understood) and adopted a constitutional ministerial exception to laws regulating employment discrimination, *see id.* at 705–06, and the church-property cases, *see Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich*, 426 U.S. 696 (1976); *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440 (1969); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94 (1952).

The church-autonomy doctrine respects the authority of churches to "select their own leaders, define their own doctrines, resolve their own disputes, and run their own institutions" free from governmental interference. Laycock, *Towards a General Theory of the Religion Clauses, supra,* at 1389. This dimension of religious liberty has a foothold in both Religion Clauses, *see Hosanna-Tabor*, 132 S. Ct. at 702, and is perhaps best understood as marking a boundary between two separate polities, the secular and the religious, and acknowledging the prerogatives of each in its own sphere. For example, in *Milivojevich*, a church-property case, the Court explained that

the First Amendment "permit[s] hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters." 426 U.S. at 724. When a church tribunal or other religious authority decides an internal dispute, "the Constitution requires … civil courts [to] accept th[at] decision[] as binding." *Id.* at 725; *see also* Richard W. Garnett, *A Hands-Off Approach to Religious Doctrine: What Are We Talking About?*, 84 NOTRE DAME L. REV. 837, 861 (2009) (explaining that the church-autonomy doctrine recognizes that secular tribunals "lack the power to answer some questions—religious questions—whose resolution is, under an appropriately pluralistic political theory, left to other institutions").

Two related principles are at work in these cases. First, civil authorities have no say over matters of religious governance; and second, secular judges must defer to ecclesiastical authorities on questions properly within their domain. These limitations arise from the justification for the different aspects of religious liberty secured by the Religion Clauses. *See* Douglas Laycock, *Church Autonomy Revisited*, 7 GEO. J.L. & PUB. POL'Y 253, 260–65 (2009). As the Supreme Court explained in *Hosanna-Tabor*:

> Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those

> who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits governmental involvement in such ecclesiastical decisions.

132 S. Ct. at 706.

In this way the Religion Clauses work together to protect the institutional freedom of the church "for itself, and not simply as a proxy for the religious-liberty rights of individuals," in light of the Constitution's ordering of the relationship between religion and government. Richard W. Garnett, *Standing, Spending, and Separation: How the No-Establishment Rule Does (and Does Not) Protect Conscience*, 54 VILL. L. REV. 655, 674 (2009); *see also* Paul Horwitz, *Churches as First Amendment Institutions: Of Sovereignty and Spheres*, 44 HARV. C.R.-C.L. L. REV. 79, 116–22 (2009).[16]

---

[16] *See also* Thomas C. Berg, *The Voluntary Principle and Church Autonomy, Then and Now*, 2004 BYU L. REV. 1593 (2004); Gerard V. Bradley, *Church Autonomy in the Constitutional Order: The End of Church and State?*, 49 LA. L. REV. 1057 (1989); Kathleen A. Brady, *Religious Organizations and Free Exercise: The Surprising Lessons of Smith*, 2004 BYU L. REV. 1633 (2004); Richard W. Garnett, *Do Churches Matter? Towards an Institutional Understanding of the Religion Clauses*, 53 VILL. L. REV. 273 (2008); Christopher C. Lund, *In Defense of the Ministerial Exception*, 90 N.C. L. REV. 1 (2011); Howard M. Wasserman, *Prescriptive Jurisdiction, Adjudicative Jurisdiction, and*

(continued...)

The religious-employer exemptions in Title VII and the ADA are legislative applications of the church-autonomy doctrine. By their terms the exemptions are limited to religiously affiliated employers, a limitation that makes sense in light of the rationale for the rule. The exemption is categorical, not contingent; there is no balancing of competing interests, public or private. In other words, where it applies, the church-autonomy principle operates as a complete immunity, or very nearly so. Such a strong hands-off principle isn't justified for organizational associations that are not religiously affiliated.

In contrast, the judicial remedy in RFRA is both broader and more flexible. It covers religious organizations as such, but it does not stop there. The remedy is available to *any* sincere religious objector—individuals and organizations alike—and its organizational applications are not limited to religiously affiliated organizations. The exemption is comprehensive in that it applies across the United States Code and Code of Federal Regulations and restrains the conduct of all federal officials. But it can be overridden by a sufficiently strong governmental interest.

For these reasons, the cases interpreting the Title VII and ADA exemptions do not shed light on the scope of the RFRA exemption. The government's proposed exclusion of secular, for-profit corporations finds no support in the text or relevant context of RFRA or any related statute.

---

[16] (...continued)
*the Ministerial Exemption*, 160 U. Pa. L. Rev. PENNumbra 289 (2012).

\* \* \*

That's enough to resolve the matter, but it's worth briefly exploring whether RFRA's animating purpose provides a clue that it is not meant to apply to secular, for-profit corporations. Congress was clear that RFRA codifies pre-*Smith* free-exercise jurisprudence—in particular, the rule of *Sherbert* and *Yoder*—so if the Supreme Court's pre-*Smith* free-exercise cases categorically excluded secular, for-profit corporations, then perhaps RFRA should be understood that way, too.

We begin by reiterating two doctrinal points we made a moment ago: (1) the Free Exercise Clause protects not just belief and profession but also religiously motivated conduct; and (2) individuals *and* organizations—whether incorporated or not—can exercise religion. It's common ground that *nonprofit* religious corporations exercise religion in the sense that their activities are religiously motivated. So unless there is something disabling about mixing profit-seeking and religious practice, it follows that a faith-based, for-profit corporation can claim free-exercise protection to the extent that an aspect of its conduct is religiously motivated.

We acknowledge the novelty of the question; the Supreme Court has never considered whether a for-profit corporation may assert a free-exercise claim. *See Hobby Lobby Stores, Inc. v. Sebelius*, 133 S. Ct. 641, 643 (Sotomayor, Circuit Justice 2012) ("This Court has not previously addressed similar RFRA or free exercise claims brought by closely held for-profit corporations and their controlling shareholders … ."). But the Court has on several occasions addressed the free-exercise rights of individuals engaged in commercial or profit-making activity.

We have already mentioned *Thomas* and *Sherbert*, both of which involved claimants who lost their jobs for refusing to work on days or in ways that would violate their faith. *See Thomas*, 450 U.S. at 709–11; *Sherbert*, 374 U.S. at 399–400. The cases challenged the denial of unemployment compensation benefits, but the background facts involved the loss of remunerative employment at a foundry and a mill. In other words, Eddie Thomas and Adell Sherbert were working for money yet they retained their free-exercise rights and were permitted to assert them against the denial of unemployment benefits. The Court held that Thomas and Sherbert could not be compelled to choose between their livelihoods and their faith. *See Thomas*, 450 U.S. at 717 ("Here, as in *Sherbert*, the employee was put to a choice between fidelity to religious belief or cessation of work; the coercive impact on Thomas is indistinguishable from *Sherbert* … ."); *Sherbert*, 374 U.S. at 404 ("The [unemployment compensation] ruling forces [Adell Sherbert] to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand."). If the government is correct that entering the marketplace and earning money forfeits free-exercise rights, then *Thomas* and *Sherbert* would have been decided differently.

In *Braunfeld v. Brown*, 366 U.S. 599, 600–02 (1961), Jewish merchants brought a free-exercise challenge against Pennsylvania's Sunday-closing law, which put them at a competitive disadvantage based on their Sabbath. Again, if profit-making alone was enough to disqualify the merchants from bringing the claim, the Court surely would have said so. It did not.

Instead, the Court addressed and rejected their free-exercise claim on the merits. *Id.* at 608–09.

In *United States v. Lee*, 455 U.S. 252 (1982), an Amish farmer sought a religious exemption from the obligation to withhold and pay Social Security taxes for his employees, coreligionists who worked on his farm and in his carpentry shop. *Id.* at 254–55. The Amish religion holds that members of the religious community must provide for their own needy and elderly. *Id.* The Social Security system exempts self-employed religious objectors but not employers, so the farmer asserted a constitutional right to an exemption. *Id.* at 255–56. The Court held that "compulsory participation in the social security system interferes with the[] free exercise rights" of the Amish. *Id.* at 257. But the Court concluded that the strong public interest in the financial soundness of the Social Security system was enough to defeat the farmer's claim for an exemption:

> The tax system could not function if denominations were allowed to challenge the … system because tax payments were spent in a manner that violates their religious belief[s]. … Because the broad public interest in maintaining a sound tax system is of such a high order, religious belief in conflict with the payment of taxes affords no basis for resisting the tax.

*Id.* at 260.

Like the merchants in *Braunfeld*, the Amish farmer in *Lee* was engaged in farming and furniture-making not for subsistence but for profit. If moneymaking were enough to foreclose

the claim, the Court would not have addressed the burden on his free-exercise rights or the public interest in the sound administration of the Social Security system. Instead, the Court gave the claim plenary review and found a compelling reason to deny an exemption.

These cases show that far from categorically excluding profit-seekers from the scope of the free-exercise right, the Supreme Court has considered their claims on the merits, granting exemptions in some and not others based on the compelling-interest test.

The government relies on a concluding statement in *Lee* as support for its position that profit-making is incompatible with free-exercise rights:

> Congress and the courts have been sensitive to the needs flowing from the Free Exercise Clause, but every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs. *When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity*.

*Id.* at 261 (emphasis added).

The government apparently reads this passage as foreclosing all religious-exercise claims arising in the course of commercial activity *merely because* the context is commercial. That reading is both unsound and extraordinary. Unsound

because it would nullify the rest of the Court's opinion, which considered the Amish farmer's claim on the merits even though his activities were for profit; the commercial context did not defeat the claim. And extraordinary because it would leave religious exercise wholly unprotected in the commercial sphere. At bottom, the government's argument is premised on a far-too-narrow view of religious freedom: Religious exercise is protected in the home and the house of worship but not beyond. Religious people do not practice their faith in that compartmentalized way; free-exercise rights are not so circumscribed.

If the government's view is correct, commonplace religious practices normally thought protected would fall outside the scope of the free-exercise right. The Jewish deli is the usual example. On the government's understanding of religious liberty, a Jewish restaurant operating for profit could be denied the right to observe Kosher dietary restrictions. That cannot be right. There is nothing inherently incompatible between religious exercise and profit-seeking. The better reading of the concluding dictum in *Lee* is that it foreshadowed the coming holding in *Smith* eight years later. The references to "incidental burdens" and "statutory schemes binding on others" suggest as much.

In short, nothing in the Supreme Court's free-exercise jurisprudence prior to *Smith* categorically forecloses RFRA claims by profit-seeking entities.

* * *

For the sake of completeness, we note as well that nothing in the Court's general jurisprudence of corporate constitutional rights suggests a nonprofit limitation on organizational free-exercise rights. Prior to *Smith,* and continuing to the present day, the Court has held that corporations may claim some but not all constitutional rights. *See* Darrell A. H. Miller, *Guns, Inc.:* Citizens United, McDonald, *and the Future of Corporate Constitutional Rights,* 86 N.Y.U. L. REV. 887, 908–11 (2011) (collecting cases).

For example, long before *Citizens United* reinvigorated the political-speech rights of corporations, *see Citizens United v. FEC,* 558 U.S. 310 (2010), the Court confirmed that corporations have free-speech rights, *see, e.g., Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989); *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (plurality opinion); *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980); *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964). Prior to *Smith* the Court held that the Fourth Amendment protected corporations from unreasonable searches and seizures. *See Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920); *Hale v. Henkel*, 201 U.S. 43, 76 (1906), *overruled on other grounds by Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52 (1964). Corporations qualify as persons for at least some purposes under the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *See Grosjean v. Am. Press Co.*, 297 U.S. 233, 244 (1936); *Covington & Lexington Tpk. Rd. Co. v. Sandford*, 164 U.S. 578, 592 (1896). *But see Nw. Nat'l Life Ins. Co. v. Riggs,* 203 U.S. 243, 255 (1906) ("The liberty referred to in

th[e] [Fourteenth] Amendment is the liberty of natural, not artificial, persons."). On the other hand, prior to *Smith* the Court excluded corporations from the Fifth Amendment privilege against self-incrimination, *see Wilson v. United States*, 221 U.S. 361, 383–84 (1911), and the emerging right of privacy, *see United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950).

These cases do not yield a unifying theory of corporate constitutional rights, but *Bellotti* contains some language that might be read to suggest a general decisional approach: "Certain 'purely personal' guarantees, such as the privilege against compulsory self-incrimination, are unavailable to corporations and other organizations because the 'historic function' of the particular guarantee has been limited to the protection of individuals." 435 U.S. at 778 n.14 (quoting *United States v. White*, 322 U.S. 694, 698–701 (1944)). And this: "Whether or not a particular guarantee is 'purely personal' or is unavailable to corporations for some other reason depends upon the nature, history, and purpose of the particular constitutional provision." *Id.* But the Court has never elaborated.

Ultimately, we don't need to parse the cases on corporate constitutional rights too finely. We are confronted here with a question of statutory interpretation. Our task is to determine whether prior to *Smith* it was established that a closely held, for-profit corporation could *not* assert a free-exercise claim. It was not so established. We conclude that K & L Contractors

and Grote Industries are "persons" within the meaning of RFRA.[17]

## 2. *Substantial Burden*

Our next question is whether the contraception mandate substantially burdens the plaintiffs' exercise of religion. Recall that "exercise of religion" means "*any* exercise of religion, *whether or not compelled by, or central to*, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A) (emphases added). At a minimum, a substantial burden exists when the government compels a religious person to "perform acts undeniably at odds with fundamental tenets of [his] religious beliefs." *Yoder*, 406 U.S. at 218. But a burden on religious exercise also arises when the government "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas*, 450 U.S. at 718; *see also Nelson v. Miller*, 570 F.3d 868, 878 (7th Cir. 2009); *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2008). Construing the parallel provision in RLUIPA, we have held that a law, regulation, or other governmental command

---

[17] We deal here with two corporations that are both closely held and managed by the families that own them. As we have explained, the Kortes and Grotes as controlling shareholders and directors set all company policy and personally direct the activities of their corporations; as such, they are in a position to operate their businesses in a manner that conforms to their religious commitments. The same normally will not be the case when it comes to large publicly traded corporations, two hallmarks of which are the separation of ownership from control and multimember boards of directors. *See* 1A William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 70.10 (2006 rev.).

substantially burdens religious exercise if it "bears direct, primary, and fundamental responsibility for rendering [a] religious exercise … effectively impracticable." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003). The same understanding applies to RFRA claims.

Importantly, the substantial-burden inquiry does *not* invite the court to determine the centrality of the religious practice to the adherent's faith; RFRA is explicit about that. And free-exercise doctrine makes it clear that the test for substantial burden does not ask whether the claimant has correctly interpreted his religious obligations. *See Lee*, 455 U.S. at 257; *Thomas*, 450 U.S. at 715–16. Indeed, that inquiry is prohibited. "[I]n this sensitive area, it is not within the judicial function and judicial competence to inquire whether the [adherent has] … correctly perceived the commands of [his] … faith. Courts are not arbiters of scriptural interpretation." *Thomas*, 450 U.S. at 716. It is enough that the claimant has an "honest conviction" that what the government is requiring, prohibiting, or pressuring him to do conflicts with his religion. *Id.*; *see also id.* at 715 ("Thomas drew a [religious] line, and it is not for us to say that the line he drew was an unreasonable one.").

Checking for sincerity and religiosity is important to weed out sham claims. The religious objection must be both sincere and religious in nature. *Cf. United States v. Seeger*, 380 U.S. 163, 184–86 (1965) (military-conscription exemption applies only to objections based on sincerely held religious beliefs as opposed to philosophical views or a personal moral code). These are factual inquiries within the court's authority and competence. But we agree with our colleagues in the Tenth Circuit that the

substantial-burden test under RFRA focuses primarily on the *"intensity of the coercion* applied by the government to act contrary to [religious] beliefs." *Hobby Lobby*, 723 F.3d at 1137. Put another way, the substantial-burden inquiry evaluates the coercive effect of the governmental pressure on the adherent's religious practice and steers well clear of deciding religious questions.

On this understanding of substantial burden, there can be little doubt that the contraception mandate imposes a substantial burden on the plaintiffs' religious exercise. K & L Contractors and Grote Industries must pay $100 per day per employee if they do not include coverage for contraception and sterilization in their employee health-care plans. The Kortes and the Grotes as corporate owners and managers must arrange for their companies to provide the mandated coverage. They object on religious grounds to doing so, explaining that providing this coverage would make them complicit in a grave moral wrong and would undermine their ability to give witness to the moral teachings of their church. No one questions their sincerity or the religiosity of their objection.[18]

---

[18] The Catholic Church's teaching on the sanctity of human life and the moral wrongfulness of contraception, abortion-inducing drugs, and sterilization is well documented, as is its doctrine of moral complicity and the requirements of Christian witness. *See* Pope John Paul II, *Evangelium Vitae* [The Gospel of Life] ¶¶ 58–62 (1995), *available at* http://www.vatican.va/ holy_father/john_paul_ii/encyclicals/documents/hf_jp-ii_enc_25031995_ evangeliumvitae_en.html; CATECHISM OF THE CATHOLIC CHURCH ¶¶ 2258, 2270–75, 2284–87, 2366, 2370, 2399 (2d ed. 1997); Pontifical Council for Justice and Peace, *Compendium of the Social Doctrine of the Church* ¶¶ 62–64,

(continued...)

In short, the federal government has placed enormous pressure on the plaintiffs to violate their religious beliefs and conform to its regulatory mandate. Refusing to comply means ruinous fines, essentially forcing the Kortes and Grotes to choose between saving their companies and following the moral teachings of their faith. This is at least as direct and substantial a burden as the denial of unemployment compensation benefits in *Sherbert* and *Thomas*, and the obligation to withhold and pay Social Security taxes in *Lee*.

The government takes a different tack on this question, arguing that the mandate's burden on religious exercise is insubstantial because an employee's decision to use her insurance coverage to purchase contraception or sterilization services "cannot be attributed to" the Kortes or Grotes. In a different twist on the same argument, the government also insists that any burden on the plaintiffs' religious exercise is too "attenuated" to count as "substantial" because the provision of contraception coverage is several steps removed from an employee's independent decision to use contraception. For support the government relies on *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), and *Board of Regents of the University of Wisconsin System v. Southworth*, 529 U.S. 217 (2000). Neither case is relevant here.

---

[18] (...continued)
66–68, 230–33 (2005), *available at* www.vatican.va/roman_curia/pontifical_ councils/justpeace/documents/rc_pc_justpeace_doc_20060526_compendio-dott-soc_en.html.

*Zelman* upheld Ohio's school-voucher program against an Establishment Clause challenge because the public funds flowed to religious schools only through the private choice of the students' parents. 536 U.S. at 651–52. *Southworth* rejected a free-speech challenge to a public university's student-activity fee because the funds collected were allocated to student groups on a viewpoint-neutral basis, removing " 'any mistaken impression that the [student groups] speak for the [u]niversity' " or the objecting student. 529 U.S. at 233 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 841 (1993)). These cases raised questions about governmental endorsement of religion (*Zelman*) and unwanted speech (*Southworth*). The degree of separation between the government and the use of the funds was important to the constitutional analysis in each case, but it's not a relevant consideration here.[19]

Aside from its misplaced reliance on *Zelman* and *Southworth*, the government's insistence that the burden is trivial or nonexistent simply misses the point of this religious-

---

[19] At oral argument the government suggested for the first time that granting a preliminary injunction against the contraception mandate might create Establishment Clause concerns. That was far too late in the litigation to raise the argument. The Supreme Court has rejected a facial Establishment Clause challenge to RLUIPA, the parallel—albeit narrower—statutory religious exemption applicable to the States. *See Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) ("[W]e hold that § 3 of RLUIPA fits within the corridor between the Religion Clauses: On its face, the Act qualifies as a permissible legislative accommodation of religion that is not barred by the Establishment Clause."). The government has not advanced an argument that applying RFRA in this context violates the Establishment Clause.

liberty claim. The government focuses on the wrong thing—the employee's use of contraception—and addresses the wrong question—how many steps separate the employer's act of paying for contraception coverage and an employee's decision to use it.

To the first point: Although the plaintiffs object on religious grounds to the use of contraception, abortifacient drugs, and sterilization, it goes without saying that they may neither inquire about nor interfere with the private choices of their employees on these subjects. They can and do, however, object to being forced to provide insurance coverage for these drugs and services in violation of their faith. As we explained in our order granting an injunction pending appeal, "[t]he religious-liberty violation at issue here inheres in the *coerced coverage* of contraception, abortifacients, sterilization, and related services, *not*—or perhaps more precisely, *not only*—in the later purchase or use of contraception or related services." *Korte*, 2012 WL 6757353, at *3.

The government's "attenuation" argument posits that the mandate is too loosely connected to the use of contraception to be a substantial burden on religious exercise. Because several independent decisions separate the employer's act of providing the mandated coverage from an employee's eventual use of contraception, any complicity problem is insignificant or nonexistent. This argument purports to resolve the religious question underlying these cases: Does providing this coverage impermissibly assist the commission of a wrongful act in violation of the moral doctrines of the Catholic Church? No civil authority can decide that question.

To repeat, the judicial duty to decide substantial-burden questions under RFRA does not permit the court to resolve religious questions or decide whether the claimant's understanding of his faith is mistaken. *Lee*, 455 U.S. at 257; *Thomas*, 450 U.S. at 715–16. The question for us is not whether compliance with the contraception mandate can be reconciled with the teachings of the Catholic Church. That's a question of religious conscience for the Kortes and the Grotes to decide. They have concluded that their legal and religious obligations are incompatible: The contraception mandate forces them to do what their religion tells them they must not do. That qualifies as a substantial burden on religious exercise, properly understood.

The plaintiffs have established a prima facie case under RFRA. The government must justify the mandate under the compelling-interest test.


### 3. *Compelling-Interest Test*

RFRA requires the government to shoulder the burden of demonstrating that applying the contraception mandate "is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1(b). The Supreme Court has instructed us to look beyond "broadly formulated interests justifying the general applicability of government mandates" and "scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *O Centro Espirita*, 546 U.S. at 431. In other words, under RFRA's version of strict scrutiny, the government must establish a compelling and specific justification for burdening *these* claimants.

The compelling-interest test generally requires a "high degree of necessity." *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2741 (2011). The government must "identify an 'actual problem' in need of solving, and the curtailment of [the right] must be actually necessary to the solution." *Id.* at 2738 (citations omitted). In the free-exercise context, "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Yoder*, 406 U.S. at 215. "[I]n this highly sensitive constitutional area, only the gravest abuses, endangering paramount interests, give occasion for permissible limitation … ." *Sherbert*, 374 U.S. at 406 (internal quotation marks and alteration omitted). The regulated conduct must "pose[] some substantial threat to public safety, peace[,] or order." *Id.* at 403. Finally, "a law cannot be regarded as protecting an interest of the highest order … when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547 (internal quotation marks omitted).

The government identifies two public interests—"public health" and "gender equality"—and argues that the contraception mandate furthers these interests by reducing unintended pregnancies, achieving greater parity in health-care costs, and promoting the autonomy of women both economically and in their reproductive capacities. This argument seriously misunderstands strict scrutiny. By stating the public interests so generally, the government guarantees that the mandate will flunk the test. Strict scrutiny requires a substantial congruity—a close "fit"—between the governmental interest and the means chosen to further that interest. Stating the governmental interests at such a high level of generality makes it impossible

to show that the mandate is the least restrictive means of furthering them. There are many ways to promote public health and gender equality, almost all of them less burdensome on religious liberty.

We will translate a bit. The apparent aim of the mandate is to broaden access to free contraception and sterilization so that women might achieve greater control over their reproductive health. We accept this as a legitimate governmental interest. Whether it qualifies as an interest of surpassing importance is both contestable and contested.

In *Lee* the Supreme Court held that the sound financial administration of the Social Security system was a sufficiently compelling interest to override a religious objection to withholding Social Security taxes. 455 U.S. at 260. The government has not explained why free contraception deserves to be ranked as a governmental interest akin to the Social Security system in order of importance to the public good. Let's assume for the sake of argument that it is. Even with that generous assist, the government has not come close to carrying its burden of demonstrating that it cannot achieve its policy goals in ways less damaging to religious-exercise rights.

Indeed, the government has not even tried to satisfy the least-restrictive-means component of strict scrutiny, perhaps because it is nearly impossible to do so here. The regulatory scheme grandfathers, exempts, or "accommodates" several categories of employers from the contraception mandate and does not apply to others (those with fewer than 50 employees). Since the government grants so many exceptions already, it can

hardly argue against exempting these plaintiffs.[20] Moreover, there are many ways to increase access to free contraception without doing damage to the religious-liberty rights of conscientious objectors. The plaintiffs have identified a few: The government can provide a "public option" for contraception insurance; it can give tax incentives to contraception suppliers to provide these medications and services at no cost to consumers; it can give tax incentives to consumers of contraception and sterilization services. No doubt there are other options.

The government has no real response to this argument. It has not made *any* effort to explain how the contraception mandate is the least restrictive means of furthering its stated goals of promoting public health and gender equality. We noted this shortcoming in our orders granting injunctions pending appeal. *See Grote*, 708 F.3d at 855; *Korte*, 2012 WL 6757353, at *4. In light of this observation, we might have expected a better effort in the government's merits briefing. We did not get it. The best the government could do was to insist that the least-restrictive-means test "has never been interpreted to require the government to subsidize private religious practices."

That's just an evasion of RFRA. Lifting a regulatory burden is not necessarily a subsidy, and it's not a subsidy here. The plaintiffs are not asking the government to pay for anything.

---

[20] In contrast, in *Lee* the Social Security exemption for self-employed religious persons was extremely narrow. *See United States v. Lee*, 455 U.S. 252, 255–56 (1982).

They are asking for relief from a regulatory mandate that coerces *them* to pay for something—insurance coverage for contraception—on the sincere conviction that doing so violates their religion. They have made a strong case that RFRA entitles them to that relief.

Our conclusion aligns us with the Tenth Circuit majority and Judge Jordan in dissent in the Third Circuit, *Hobby Lobby*, 723 F.3d at 1137–44; *Conestoga Wood Specialties*, 724 F.3d at 407–15 (Jordan, J., dissenting), and in some respects with the majority opinion in the D.C. Circuit, *Gilardi*, 2013 WL 5854246, at *7–15. The Third Circuit analyzed the identical issues very differently, concluding that "a for-profit, secular corporation cannot engage in the exercise of religion," and its owners "do not have viable claims" against the contraception mandate because the mandate "does not actually require [them] to do anything." *Conestoga Wood Specialties*, 724 F.3d at 388–89. The Sixth Circuit reached a similar conclusion. *Autocam*, 730 F.3d at 624 ("The decision to comply with the mandate falls on Autocam, not the Kennedys."); *id.* at 627 ("Congress did not intend the term 'person' to cover entities like Autocam when it enacted RFRA."). For reasons that should be obvious by now, we respectfully disagree.

### III. Conclusion

For the foregoing reasons, we REVERSE and REMAND with instructions to enter preliminary injunctions barring enforcement of the contraception mandate against the plaintiffs.

ROVNER, *Circuit Judge,* dissenting. The court's holding in these cases is as remarkable for its reasoning as for its result. The Kortes and the Grotes are business owners: Korte & Luitjohan Contractors is a construction firm, and Grote Industries manufactures motor vehicle turn signals, reflectors, emergency lighting, and other safety systems. Neither company has a declared religious purpose or mission. Both are subject to the full range of regulatory demands and constraints that government imposes on all such businesses. These include the Affordable Care Act's (ACA's) requirement that employers provide comprehensive health insurance to their employees that includes fully subsidized access to contraceptive care for women who choose to use it. The Kortes and the Grotes are Catholic and, consistent with the teachings of their religion, view the use of contraceptives as immoral. Invoking the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb-1 ("RFRA"), they object to the contraception mandate of the ACA as a substantial burden on their right to the free exercise of religion.

In exempting (preliminarily) the two corporations from the contraception mandate, the court equates the business activities of these secular, for-profit firms with the religious exercise of its owners. Because the Kortes and the Grotes declare that they run the corporations in a manner consistent with their religious beliefs, the court views the burdens that government imposes on the corporations and the company health plans as burdens on the religious consciences and exercise of the individual owners. Not only that: the court attributes to the corporations religious exercise rights of their own, rights that the companies themselves can assert, as informed by the

religious beliefs of their owners. Because the Kortes and the
Grotes oppose the use of contraception, the companies'
obligation to include contraceptive coverage in their workplace
health insurance plans is understood as a burden on the
owners' free exercise rights and in turn on the companies' free
exercise rights. The court declares off-limits any inquiry into
the nature and degree of the burden imposed on these rights;
instead, rewriting both the terms of RFRA and free exercise
clause jurisprudence, the court declares it sufficient that the
ACA compels the two corporations to comply with a require-
ment to which its owners object on religious grounds. Thus
reasoning that the contraceptive mandate substantially
burdens the free exercise rights of the individuals and their
companies, the court then subjects the mandate to strict
scrutiny and concludes that it fails that demanding standard.

So it is that, in the name of free exercise of religion, the
court has relieved two secular corporations from a statutory
obligation to provide health insurance to their employees that
includes coverage of contraceptive care for the companies'
female employees. Realistically, the only religious interests at
stake are those of the corporations' owners—their faith is the
source of the objection to contraception. Yet the Affordable
Care Act in no way imposes on their beliefs, their worship
activities, or the conduct of their personal lives. They need not
use, endorse, or dispense contraception; they remain free to
speak out against the use of contraception whenever and
wherever they wish. In short, their own exercise of religion is
wholly undisturbed. It is the corporations, as employers, which
shoulder the obligations imposed by the ACA; and they need
not say or do anything with respect to contraception beyond

including it among the countless other medical goods and
services covered by their employee health plans. The plaintiffs
nonetheless object to this as facilitating the use of contracep-
tion. I would characterize it as facilitating an employee's choice
to use contraception. An employee's choice may be inconsis-
tent with the owners' religious beliefs, but it is not the owners'
choice, and it does not substantially burden the exercise of
their religious freedoms.

My esteemed colleagues have made the best case possible
for the notion that the contraception mandate interferes with
the plaintiffs' free exercise rights; but I believe the court's
holding and rationale represent an unprecedented and
unwarranted re-conception of both what the free exercise of
religion entails and what constitutes a substantial burden on
that exercise. The court extends a highly personal right to a
secular corporation, a man-made legal fiction that has no
conscience enabling belief or worship. It then deems a corpora-
tion's duty to cover contraceptive care as an impermissible
burden on the religious rights of both the corporation and its
owners. It does so without considering the directness and
degree of the burden on the plaintiffs' right to the free exercise
of their religion, in contravention of the plain terms of RFRA,
which proscribes only substantial burdens on that right. And
it permits the plaintiffs to invoke their free exercise rights
offensively rather than defensively, in a way that circumscribes
the rights Congress has given to employees, by permitting the
corporate employers to rewrite the terms of the statutorily-
mandated health plans they provide to their employees. As a
result, employees are left without a highly important form of
insurance coverage that Congress intended them to have.

**1.**

In order to place today's decision and its import in a broader perspective, I want to begin my analysis by posing several hypotheticals illustrating how the court's ruling in this case might play out in other factual scenarios. Part of our responsibility as an appellate court is to consider the ramifications our precedents will have for other cases and litigants. Contraception is the current focus of nationwide litigation challenging the ACA's employer mandate; and because the duty to include coverage for contraceptives in employee health plans implicates women, sexuality, and reproduction as well as religion, one might be tempted to assume that the issues raised in this case and the court's holding are confined, if not to the facts in this case, then to a narrow range of circumstances. But, as the court points out, RFRA applies to "all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after" RFRA's effective date. 42 U.S.C. § 2000bb-3(a); *ante* at 33. The court's holding today has the potential to reach far beyond contraception and to invite employers to seek exemptions from any number of federally-mandated employee benefits to which an employer might object on religious grounds. The following three hypotheticals are intended to show why I think this might be so. The names and facts in these hypotheticals are of my own invention; the legal provisions are not.

1. Tom Smith is the sole owner and chief executive officer of TS-Co, a software company that employs more than 50 people and is therefore subject to the ACA. TS-Co sponsors a self-insured health care plan for its employees. Joe Wilson is an employee of TS-Co who suffers from Amyotrophic Lateral

Sclerosis, or ALS, commonly known as Lou Gehrig's Disease. ALS is a progressive neurodegenerative disease that affects nerve cells in the brain and spinal cord; the disease destroys motor neurons and with them the ability of the brain to initiate and control muscle function. Eventually, the disease leads to total paralysis. Most people with ALS die of respiratory failure or pneumonia, typically within three to five years of the onset of symptoms.

From another TS-Co employee, Smith learns that Wilson has been accepted into a clinical trial testing the effectiveness of an embryonic stem-cell therapy on ALS. Smith is a devout Methodist who shares the United Methodist Church's disapproval of research and therapies based on stem cells derived from human embryos. Smith does not wish to manage his company's benefit plan in a way that conflicts with his religious beliefs; although he is concerned for Wilson's health, he is adamantly opposed to facilitating the use of embryonic stem cells in any way. He thinks it unlikely that the company health plan will pay for the care Wilson will receive during his participation in the clinical trial, but when he raises the issue with the plan administrator, he learns that under section 1201 of the ACA (which in turn created a new section 2709 of the Public Health Service Act ("PHA")), the health plan must cover the costs of routine patient care associated with clinical trials involving treatments for cancer and other life-threatening conditions. *See* 42 U.S.C. § 300gg-8. In this way, the ACA was meant to expand patient access to and participation in such

clinical trials.[1] Although the plan would cover only the costs of Wilson's routine care associated with the stem cell therapy, and not the costs of the stem cell therapy itself, Smith believes that by covering Wilson's routine care, the company plan would be facilitating his participation in a practice to which he objects on religious grounds.

Smith brings suit under RFRA a seeking declaratory and injunctive relief relieving the company of the obligation to comply with section 2709 of the PHA, insofar as it requires the coverage of costs associated with clinical trials employing embryonic stem cell therapies. Smith argues that requiring his company's health plan to cover the costs of any medical care associated with a treatment to which he objects on religious grounds interferes with his wish to run the company in a manner consistent with his religious convictions. Based on the court's decision today, Smith and TS-Co would have a colorable argument that the coverage required by section 2709 imposes a substantial burden on their free exercise rights. Although the government might have an argument that section 2709 is supported by a compelling interest in the development of effective therapies for life-threatening conditions such as ALS, based on this court's least-restrictive means analysis, a court might conclude that the government itself, in lieu of objecting employers, could pay for all costs associated with an

---

[1]  *See* American Cancer Society, Cancer Action Network, Fact Sheet: *Affordable Care Act: Clinical Trials* ("Nearly 20% of cancer patients are eligible for participation in cancer clinical trials, but enrollment among adults consistently ranges between 3-5%."), available at http://http:// acscan.org/pdf/healthcare/implementation/factsheets/hcr-clinical-trials.pdf (last visited Nov. 7, 2013).

individual's participation in a clinical trial. In the meantime, granting TS-Co an exemption from the PHA would mean that Wilson's workplace insurance would not cover any costs associated with his participation in the clinical trial; and that, as a practical matter, might render Wilson unable to participate in the trial.

2. Bill Blasdell is the sole owner and chief executive officer of Get Out!, a corporation which operates a small chain of three outdoor-gear stores. Prior to enactment of the ACA, the company did not provide health insurance to its employees; but with 75 employees, Get Out! is now subject to the ACA's employer mandate. Blasdell has been a life-long member of the Church of Christ, Scientist. Christian Science dogma postulates that illness is an illusion or false belief that can only be addressed through prayer which realigns one's soul with God. Consistent with that view, Christian Science historically has disapproved of most forms of conventional medicine. Nonetheless, in practice, many Christian Scientists have availed themselves of conventional medical treatments, and in recent years, the church itself has become more tolerant of conventional medicine. *See*, *e.g.*, Paul Vitello, *Christian Science Church Seeks Truce With Modern Medicine*, New York Times A20 (Mar. 24, 2010).

Earlier in his life, Blasdell was among those Christian Scientists who embraced traditional medicine. But after witnessing his wife suffer through a brutal treatment regimen for breast cancer at a premier medical center, only to die as a result of complications from the treatment and missteps by the medical staff, Blasdell came to believe, consistent with the teachings of his church, that conventional medicine does far

more harm than good. His belief was reinforced in the year following his wife's death, when his ulcerative colitis went into remission during prayer-centered treatment at a Christian Science nursing center.

As a result of his religious convictions, Blasdell is adamantly opposed to facilitating the use of conventional medical care by his employees. He is willing for Get Out! to sponsor an employee health plan that pays for care at Christian Science nursing centers, but he believes that his company's compliance with the ACA's mandate to cover traditional medical care would be a violation of his religious principles.

After Get Out!'s request for an exemption from the employer mandate is denied, Blasdell and the company bring suit under RFRA contending that the employer mandate is a substantial burden on the free exercise of their religious beliefs. Pursuant to the court's decision today, both Blasdell and Get Out! would have a colorable argument that compliance with the employer mandate, by facilitating company employees' use of conventional medical treatments to which Blasdell is opposed on religious grounds, represents a substantial burden on his religious freedom and that of the corporation. And although the government, again, would no doubt urge that it has a compelling interest in pursuing universal access to healthcare, Blasdell and his firm could invoke this court's decision for the argument that the ACA's exemptions belie that interest, and that, in any event, the government could pursue its goal through publicly-funded healthcare, individual tax credits, or other means that do not require employers to subsidize employee healthcare that is inconsistent with their own religious beliefs.

3. Red Pie, Inc., sells and ships to consumers nationwide a variety of frozen, specialty pizzas. Bill and Betty Ann Bowers and their three children own and operate the firm, which has over 100 full-time employees. The Bowers belong to a church which is affiliated with the Southern Baptist Convention. The Convention's position on marriage and sexuality may be summarized as follows:

> We affirm God's plan for marriage and sexual intimacy—one man, and one woman, for life. Homosexuality is not a "valid alternative lifestyle." The Bible condemns it as sin. It is not, however, unforgivable sin. The same redemption available to all sinners is available to homosexuals. They, too, may become new creations in Christ.

Southern Baptist Convention, Position Statement on Sexuality, available at http://www.sbc.net/aboutus/pssexuality.asp (last visited Nov. 7, 2013). The Bowers' local congregation endorses and promotes the same view; in the past several years, the pastor of their church has given several sermons condemning same-sex marriage, adoption by gay and lesbian parents, and the repeal of the military's "Don't Ask, Don't Tell" policy. The Bowers accept and follow their church's teaching on homosexuality. When same-sex marriage was recently legalized in their state as a result of a court decision, the Bowers, knowing that they had a number of gay and lesbian individuals in their employ and in keeping with their religious beliefs, amended the Red Pie employee benefits plan to make clear that spousal insurance benefits are not available to the same-sex spouses of Red Pie employees; as their state does not prohibit employment discrimination on the basis of sexual orientation, and

because the ACA does not require employers to provide insurance coverage to employee spouses, this change was legally permitted.

Mr. and Mrs. Bowers become alarmed when they learn that one of their employees, Stan Jones, has submitted a request to take three weeks of unpaid leave under the Family and Medical Leave Act (FMLA) so that he and his husband may attend the expected birth of their child via surrogacy in California, bring the baby home, and bond with the child. *See* 29 U.S.C. § 2612(a)(1). The Bowers view the idea of two gay men conceiving a child by surrogacy and bringing that child into their home as an abomination to the Lord. They instruct their office manager to deny Jones' leave request and inform him that neither they nor their company can in any way recognize or facilitate such an immoral arrangement; Jones in turn protests the denial, citing his FMLA rights. After thinking about the matter further, they decide the Bowers are so troubled that they can no longer keep Jones in their employ. The next day, they fire him.

After Jones contacts the Wages and Hours Division of the Department of Labor, the Department files suit against Red Pie under the FMLA contending that Jones was both wrongfully denied his right to parental leave under the statute and fired in retaliation for having requested FMLA leave. *See* 29 U.S.C. §§ 2615(a)(1), 2617(b)(2). Red Pie invokes RFRA as a defense to the Department's suit, contending that the FMLA as applied to Red Pie in this instance would constitute a substantial burden on the free exercise rights of the corporation and its owners, as it would force them either to recognize and facilitate a parental arrangement they view as sinful or suffer substantial penalties

under the FMLA for refusing to do so.[2] The leave mandated by the FMLA is, of course, unpaid, and to that extent it would arguably constitute no more than a minimal burden on Red Pie's asserted free exercise rights;[3] but Red Pie could readily invoke this court's decision for the proposition that the substantiality of the burden turns not on the degree of interference imposed on the company's religious exercise but rather

---

[2]  Whether RFRA may be invoked as a defense in a suit between private individuals is a developing issue which has produced a split among the circuits. Compare *Hankins v. Lyght*, 441 F.3d 96, 103–04 (2d Cir. 2006) (2–1 decision) (holding that RFRA may be invoked in such a suit), with *id.* at 114–15 (Sotomayor, J., dissenting); *Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410–12 (6th Cir. 2010); *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006), *abrogated on other grounds by Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 132 S. Ct. 694, 709 n.4 (2012); and *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834, 837–43 (9th Cir. 1999) (all holding that RFRA may not be invoked in such a suit). There is no doubt, however, that RFRA may be invoked as a defense in litigation with the government. *See* 42 U.S.C. § 2000bb-1(c) ("A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."); *Tomic*, 442 F.3d at 1042.

[3]  This is not to say that an employer incurs no costs as a result of the leave. Although FMLA leave is unpaid, an employer is required to continue providing health coverage to the absent employee on the same terms and conditions that would apply if he were still working, 29 U.S.C. § 2614(a)(2), and of course, the employer must bear the cost of having someone else fill in for the employee on leave even as he holds a position open for the employee in anticipation of his return from leave, § 2614(a)(1). In both respects, the employer lends considerable assistance to the employee taking leave.

solely on the coercive nature of the FMLA—compliance with which is mandatory on pain of litigation and significant penalties for the failure to do so. *Ante* at 56–57; *see* 26 U.S.C. §§ 4980D(a) & (b)(1), 4980H(a) & (c).

The Department of Labor potentially might fair better at the next, strict-scrutiny phase of the analysis. Certainly, in terms of the least restrictive means of supporting and promoting families, the Department would have a strong argument that there is no substitute for granting leave time to parents at critical times when their presence is most needed by their children. But that point aside, would a court deem the interests underlying the FMLA sufficiently compelling to constitute "interests of the highest order," *Wisconsin v. Yoder*, 406 U.S. 205, 215 , 92 S. Ct. 1526, 1533 (1972), or "paramount interest[s]" jeopardized by "the gravest abuses," *Sherbert v. Verner*, 374 U.S. 398, 406, 83 S. Ct. 1790, 1795 (1963), such that Jones' rights under the FMLA would trump the asserted religious interests of the corporation? And, in considering whether the government has "establish[ed] a compelling and specific justification for burdening *these* claimants," *ante* at 60 (emphasis in original), would a court assess the strength of the government's interest in promoting familial relationships generally, or its interest in promoting the bonds between same-sex parents and their children, as that is the interest which Red Pie contends is irreconcilable with its religious interests? And if the latter, would that more specific interest qualify as a compelling interest? The outcome of that analysis is far from clear to me under today's precedent.

These hypotheticals illustrate the uncertainty that the court's expansive interpretation and application of RFRA

brings to a number of statutory schemes in which Congress has accorded specific rights to employees (not to mention other parties), the recognition and accommodation of which a corporation, in addition to its owners, can now say burden their religious interests. By casting the mandatory provision of benefits to an employee as a substantial burden on the free exercise rights of a closely-held corporation and its owners, without considering whether compliance with the mandate directly interferes with the free exercise of religion or is at most a modest burden on a plaintiff's free exercise rights, the court's rationale subjects a potentially wide range of statutory protections to strict scrutiny, one of the most demanding standards known in our legal system. In some ways, this is reminiscent of the *Lochner* era, when an employer could claim that the extension of statutory protections to its workers constituted an undue infringement on the freedom of contract and the right to operate a private, lawful business as the owner wished. And by exempting employers from extending to employees the rights specified by statute, the government is forced to pick up the slack and take compensatory action to protect the rights of those employees; short of that, the employee of the religiously-motivated employer is left with no right at all. I doubt that this is what Congress intended when it enacted RFRA.

## 2.

I begin my discussion of the specific legal points presented by this appeal with where my colleagues and I agree. First, I agree that the Anti-Injunction Act poses no bar to this action. This is not a suit aimed at restraining the collection of a tax—in this case, the penalties for non-compliance with the ACA.

Rather, it is a direct challenge to a substantive provision of the ACA: the contraception mandate.

I am also in accord with my colleagues on standing. The government has not contested the standing of any of the plaintiffs in these cases, and I agree with my colleagues that both the corporations and their owners indeed do have standing. Because the burden of the contraception mandate falls directly on the two corporations as employers, and because the corporations contend that they have their own right to free exercise of religion which is burdened by the mandate, they have standing to challenge the mandate. *See generally Clapper v. Amnesty Int'l U.S.A.*, 133 S. Ct. 1138, 1147 (2013). And the Kortes and the Grotes, who as the owners of these closely-held corporations assert that they express their religious beliefs in the way in which they run these corporations, have standing to assert that their own free exercise rights are burdened by the contraception mandate notwithstanding the general rule against shareholder standing. *See Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336, 110 S. Ct. 661, 665 (1990) (exception to shareholder standing rule "allow[s] a shareholder with a direct, personal interest in a cause of action to bring suit even if the corporation's rights are also implicated"); *see also Gilardi v. U.S. Dep't of Health & Human Servs.*, 2013 WL 5854246, at *6–*7 (D.C. Cir. Nov. 1, 2013) (op of Brown, J.); *id.* at *19–*22 (Edwards, J., concurring in part & dissenting in part).

This is not to say that I believe that the respective interests of the corporations and their owners are congruent. The fact that the obligations imposed by the mandate fall upon the corporation, whereas it is the individual owners—and only the

individuals, in my view—who hold free exercise rights, matters a great deal to whether those rights are substantially burdened. But that is a point that goes to the merits of this lawsuit rather than the standing of either set of plaintiffs, as the court points out. *Ante* at 22 n.9; *see also Gilardi*, 2013 WL 5854246, at *19 (Edwards, J., concurring in part & dissenting in part). And that is why, as I proceed to explain, the plaintiffs—both corporate and individual—are unlikely to prevail on the merits of their RFRA claim.

**3.**

I turn first to the free exercise rights of the corporations. One premise underlying the RFRA claims advanced in these cases is that the interests, rights, and obligations of a closely-held corporation are identical to those of their owners. In fact, as I have argued previously, they are distinct. In electing to do business through the corporate form, the Kortes and the Grotes have separated themselves from their companies: the corporations are independent legal entities with legal rights and obligations independent of their individual owners. *Grote v. Sebelius*, 708 F.3d 850, 857 (7th Cir. 2013) (dissent). That is the *point* of incorporation: to create a separate legal person to shoulder some of the burdens of the business. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163, 121 S. Ct. 2087, 2091 (2001) ("[I]ncorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs."); *see also Autocam Corp. v. Sebelius*, 730 F.3d 618, 623–24 (6th Cir. 2013), *pet'n for cert. filed* (U.S. Oct. 15, 2013) (No. 13-482); *Conestoga Wood Specialties Corp. v. Sec'y U.S. Dep't of Health & Human*

*Servs.*, 724 F.3d 377, 387–88 (3d Cir. 2013), *pet'n for cert. filed*, 82 U.S.L.W. 3139 (U.S. Sep. 19, 1993) (No. 13-356). What that means here is that it is the two corporations which, as employers covered by the ACA, must provide health insurance to their employees that covers contraceptives. That, in turn, puts meaningful distance between the Kortes and the Grotes and the company health plans and undercuts the notion that the ACA forces the Kortes and the Grotes to facilitate a practice—the use of contraception—to which they object on religious grounds.

The distinction between a corporation and its owners explains why the plaintiffs have argued, and today the court holds, that a secular, for-profit corporation possesses its own right to the free exercise of religion. That novel idea is a way to get past the problem that the people whose faith leads them to object to the contraception mandate are not legally responsible for complying with the mandate: endow the corporate "persons" with their own right to exercise religion which they may invoke in conscientious objection to the mandate. It is an unprecedented holding, and one I believe is without legal or logical support.

I concede, as I must, that the Supreme Court has not restricted the invocation of free exercise rights solely to individuals, but has allowed—albeit with very little discussion—houses of worship, including those which have incorporated, to assert such rights. *See ante* at 38, citing *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 126 S. Ct. 1211 (2006), and *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S. Ct. 2217 (1993); *see also Gilardi*, 2013 WL 5854246, at *4 (op. of Brown, J.) (coll. cases); *cf. Harris*

*v. McRae*, 448 U.S. 297, 321, 100 S. Ct. 2671, 2690 (1980) (noting that a free exercise claim is "one that ordinarily requires individual participation").[4] Permitting a religious organization, incorporated or not, to invoke the Free Exercise Clause makes sense as a matter of pragmatism if not legal theory. A religious association is often as well if not better situated as the individuals who make up the association to assert the relevant religious interests: the association can speak on behalf of all of its members; it likely has resources to pursue legal relief that individual members do not; it can speak authoritatively on matters of religious dogma; it may be the association that owns property and other assets affected by the challenged government action; and in many instances, the law or other government action being challenged intrudes directly on the collective worship activities of the association itself. *E.g.*, *Church of the Lukumi Babalu Aye*, 508 U.S. at 534–35, 113 S. Ct. at 2227–28 (challenged ordinances restricted practices which were central to worship service); *see also Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1304 (11th Cir. 2006) (incorporated church had standing to assert, inter alia,

---

[4] Of the cases cited by this court and by the District of Columbia Circuit in *Gilardi*, only *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 105 S. Ct. 1953 (1985), actually says anything about standing. In a footnote, the Court in *Alamo Found.* said simply, "The Foundation also has standing to raise the free exercise claims of the associates, who are members of the religious organization as well as employees under the Act." *Id.* at 303 n.26, 105 S. Ct. 1962 n. 26. The Court was thus plainly relying on the doctrine of associational standing rather than on any notion that the Foundation possessed independent free exercise rights. The Court's citation to *N.A.A.C.P. v. Alabama ex rel. Patterson*, 357 U.S. 449, 458–59, 78 S. Ct. 1163, 1169–70 (1958), removes any doubt in that regard.

free exercise clause challenge to local zoning ordinance which interfered with church's relocation); *In re Young*, 82 F.3d 1407, 1416 (8th Cir. 1996) (church had standing to assert free exercise rights of debtors in challenge to bankruptcy court order which directed church to return funds debtors had donated to church prior to declaring bankruptcy; debtors were not party to adversary proceeding seeking return of funds and could not assert their free exercise rights in another forum, and interests of church and its members were sufficiently similar that church could effectively represent their free exercise rights), *judgment vacated & remanded on other grounds*, 521 U.S. 1114, 117 S. Ct. 2502 (1997), *judgment reinstated*, 141 F.3d 854 (8th Cir. 1998); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 521–23 (9th Cir. 1989) (church had standing to pursue free exercise challenge to government surveillance of its membership); *Peyote Way Church of God, Inc. v. Smith*, 742 F.2d 193, 199 (5th Cir. 1984) (incorporated church had personal stake in free exercise challenge to statute proscribing possession and use of peyote, "because enforcement of that statute will directly affect the freedom with which its members may fulfill their professed religious commitment"); *Church of Scientology of California v. Cazares*, 638 F.2d 1272, 1279–80 (11th Cir. 1981) (church had standing to assert free exercise rights of its membership in civil rights suit alleging town mayor had unlawfully harassed church and its members).

Still, although a religious organization enjoys associational standing to represent the free exercise rights of its members, *see United Food & Commercial Works Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 551–53, 116 S. Ct. 1529, 1534 (1996); *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333,

342–44, 97 S. Ct. 2434, 2441–42 (1977); *Warth v. Seldon*, 422 U.S. 490, 511, 95 S. Ct. 2197, 2211 (1975), I question whether it has free exercise rights of its own. Would a defunct church that no longer has any members but still owns property and other assets be able to claim free exercise rights in its own right, for example? The Supreme Court, while allowing incorporated religious bodies to assert free exercise rights, has yet to fully explain why, let alone delineate what types of corporations, if any, can independently assert free exercise rights. There are reasons to doubt that a corporation, whatever its nature, has such rights.

Not all rights that the Constitution accords to a person are extended to corporations. The Supreme Court has recognized that "[c]orporate identity has been determinative in several decisions denying corporations certain constitutional rights, such as the privilege against compulsory self-incrimination." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 778 n.14, 98 S. Ct. 1407, 1416–17 n.14 (1978). *Bellotti* went on to explain:

> [C]ertain "purely personal" guarantees … are unavailable to corporations and other organizations because the "historic function" of the particular guarantee has been limited to the protection of individuals. *United States v. White*, 322 U.S. 694, 698–701, 64 S. Ct. 1248, 1251–52 (1944). Whether or not a particular guarantee is "purely personal" or is unavailable to corporations for some other reason depends on the nature, history, and purpose of the particular constitutional provision.

*Ibid; see also Browning-Ferris. Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 284–85, 109 S. Ct. 2909, 2925–26 (1989).

I have been struck in reviewing the handful of decisions granting corporations free exercise rights (and for that matter, the plaintiffs' briefs in this case) by how wanting they are in articulating a substantive, affirmative explanation for why any type of corporation, let alone a secular, for-profit corporation, should be accorded religious rights. *E.g.*, *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1135 (10th Cir. 2013) ("[W]e cannot see why an individual operating for-profit retains Free Exercise protections but an individual who incorporates—even as the sole shareholder—does not, even though he engages in the exact same activities as before."), *pet'n for cert. filed*, 82 U.S.L.W. 3139 (U.S. Sep. 19, 2013) (No. 13-354). My colleagues see no reason to think that Congress meant to preclude such corporations from asserting rights under RFRA, *ante* at 53–54, but I think this gets things backward. Given that the Supreme Court has never recognized that secular corporations have free exercise rights, I think it is more accurate to say that there is no reason to think Congress meant to take the novel step of extending free exercise rights to such corporations when it enacted RFRA.

Perhaps the best argument in favor of according free exercise rights to corporations is that the right to free speech already has been recognized as among those rights that corporations enjoy. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342, 130 S. Ct. 876, 899–900 (2010) (coll. cases); *Bellotti*, 435 U.S. at 780–81, 98 S. Ct. at 1417–18 (coll. cases). But beyond the fact that the free exercise clause, like the free speech clause, resides in the First Amendment, I find little, if anything, in the

speech cases that speaks to the nature of religion and why corporations, as a matter of history and logic, should be able to assert free exercise rights. *See Conestoga Wood Specialties*, 724 F.3d at 386 (noting distinct treatment of free speech and free exercise clauses in Supreme Court jurisprudence); *Gilardi*, 2013 WL 5854246, at *5 (op. of Brown, J.); *Autocam*, 730 F.3d at 627–28. Corporations, because they have property, financial, and political interests, of course have a free speech interest in protecting and promoting those interests and in pursuing their agendas, be their stated goals charitable, religious, political, or profit-making. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561–62, 100 S. Ct. 2343, 2349 (1980) (commercial speech); *Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 787–89, 108 S. Ct. 2667, 2672–73 (1988) (charitable solicitation); *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Straton*, 536 U.S. 150, 160–61, 122 S. Ct. 2080, 2086–87 (2002) (religious speech); *Citizens United*, 558 U.S. at 342–43, 130 S. Ct. at 900 (political speech)*.* Beyond those parochial interests, *Bellotti* (which struck down a law prohibiting a corporation from making expenditures to influence the outcome of any public referendum other than one which directly affected the property, business, or activities of the corporation), stressed the core First Amendment interest in a robust dialogue on issues of public concern, an interest which extends beyond a particular speaker's wish to express his views to include the public's right to hear his views and those of others. 435 U.S. at 776–77, 98 S. Ct. at 1415–16. The Court added that "[t]he inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its sources, whether corporation, association, union,

or individual." *Id.* at 777, 98 S. Ct. at 1416. Decisions recognizing the speech rights of corporations thus rest "not only on the role of the First Amendment in fostering individual self-expression but also on its role in affording the public access to discussion, debate, and the dissemination of information and ideas." *Id.* at 783, 98 S. Ct. at 1419.

Religion, by contrast, is a personal undertaking. *Conestoga Wood Specialties*, 724 F.3d at 385, 388. Certainly there is a collective societal interest in protecting religious liberty, and religion can and has influenced the public sphere in positive ways. *See Lynch v. Donnelly*, 465 U.S. 668, 674–78, 104 S. Ct. 1355, 1360–61 (1984) (recognizing longstanding role of religion in American life). But religious faith is, by its nature, an intensely individual experience, and for the reasons that follow, I believe it likely is one of those "purely personal" constitutional rights that the Supreme Court will not extend to corporations—certainly not to secular, for-profit corporations.

The fact that a corporation qualifies as a person under the Dictionary Act, 1 U.S.C. § 1, *see ante* at 36; *Hobby Lobby Stores*, 723 F.3d at 1129, 1132, is by no means dispositive. RFRA bestows its protection upon "[a] person *whose religious exercise* has been burdened." § 2000bb-1(c) (emphasis mine). Thus, "the focus on personhood is too narrow; instead, we must construe the term 'person' together with the phrase 'exercise of religion.'" *Gilardi*, 2013 WL 5854246, at *2 (op. of Brown, J.); *see also Autocam*, 730 F.3d at 626. In other words, we must consider whether it is possible for a corporation to exercise religion.

The First Amendment, of course, does not define "religion." More than a century ago, the Supreme Court said that "[t]he

term 'religion' has reference to one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will." *Davis v. Beason*, 133 U.S. 333, 342, 10 S. Ct. 299, 300 (1890), *abrogated on other grounds by Romer v. Evans*, 517 U.S. 620, 634, 116 S. Ct. 1620, 1628 (1996); *see also Cnty. of Allegheny v. A.C.L.U. Greater Pittsburgh Chapter*, 492 U.S. 573, 109 S. Ct. 3086 (1989) (Stevens, J., concurring in part & dissenting in part) (noting that "religion" as used in establishment clause was "understood primarily to mean '[v]irtue, as founded upon reverence of God, and expectation of future rewards and punishments,' and only secondarily '[a] system of divine faith and worship as opposite to others.'" (quoting S. Johnson, A DICTIONARY OF THE ENGLISH LANGUAGE (7th ed. 1785)). In *Fleischfresser v. Dirs. of Sch. Dist. 200*, 15 F.3d 680, 688 n.5 (7th Cir. 1994), we set forth a "general working definition of religion" for purposes of the free exercise clause that includes "any set of beliefs addressing matters of ultimate concern occupying a place parallel to that filled by God in traditionally religious persons." (quoting *Welsh v. United States*, 398 U.S. 333, 340, 90 S. Ct. 1792, 1796 (1970)) (internal quotation marks and ellipsis omitted). I note that the Second Circuit, in attempting to define the same term, invoked the renowned philosopher, psychologist, and professor William James, who described religion as "the feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine." *United States v. Moon*, 718 F.2d 1210, 1227 (2d Cir. 1983) (quoting Wm. James, THE VARIETIES OF RELIGIOUS EXPERIENCE: A STUDY IN HUMAN NATURE 31 (1910)); *see also Patrick v. LeFevour*, 745 F.2d 153, 158 (2d Cir. 1984). Each

of these definitions references an individual's understanding
of his relationship to a divine being, a necessarily personal and
subjective viewpoint. In that regard, they are consistent with
the views of both James Madison, a drafter of the First Amend-
ment, and Thomas Jefferson, who drafted its predecessor,
Virginia's Bill for Religious Freedom, in 1779 (the bill was
eventually adopted by the Virginia Assembly in 1786). Madi-
son, in his 1785 Memorial and Remonstrance Against Religious
Assessments, wrote that he opposed Patrick Henry's proposed
Virginia bill to levy a tax for the support of religion on fifteen
grounds, the first of which being:

> 1. Because we hold it for a fundamental and undeni-
> able truth, "that religion or the duty which we owe
> to our Creator and the Manner of discharging it, can
> be directed only by reason and conviction, not by
> force or violence. The Religion then of every man
> must be left to the conviction and conscience of
> every man; and it is the right of every man to exer-
> cise it as these may dictate. This right is in its nature
> an unalienable right. It is unalienable, because the
> opinions of men, depending only on the evidence
> contemplated by their own minds cannot follow the
> dictates of other men: It is unalienable also, because
> what is here a right towards men, is a duty towards
> the Creator. It is the duty of every man to render to
> the Creator such homage, and such only, as he
> believes to be acceptable to him. This duty is prece-
> dent, both in order of time and in degree of obliga-
> tion, to the claims of Civil Society. Before any man
> can be considered as a member of Civil Society, he

must be considered as a subject of the Governour of the Universe: And if a member of Civil Society, who enters into any subordinate Association, must always do it with a reservation of his duty to the general authority; much more must every man who becomes a member of a particular Civil Society do it with a saving of his allegiance to the Universal Sovereign … .

*See Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 64, 67 S. Ct. 504, 535 (1947) (App. to dissent of Rutledge, J.) (quoting 2 THE WRITINGS OF JAMES MADISON 183-91 (Gaillard Hunt ed. 1901)), also available at http://religiousfreedom.lib.virginia.edu/ sacred/madison_m&r_1785.html (last visited Nov. 7, 2013). Madison's articulation of religion as something that must be "left to the conviction and conscience of every man" obviously describes a highly personal experience of thought and belief. Likewise, Jefferson, in his 1802 letter to the Danbury Baptists, described religion in terms of individual conscience:

Believing with you that religion is a matter which lies solely between man and his God, that he owes account to none other for his faith or his worship, that the legitimate powers of government reach actions only, and not opinions, I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should "make no law respecting an establishment of religion, or prohibiting the free exercise thereof," thus building a wall of separation between church and State. Adhering to this expression of the supreme will of the nation in behalf of the rights of con-

> science, I shall see with sincere satisfaction the progress of those sentiments which tend to restore to man all his natural rights, convinced he has no natural right in opposition to his social duties.

Letter from President Thomas Jefferson to Nehemiah Dodge, et al., Danbury Baptist Association (Jan. 1, 1801), reproduced in *Braunfeld v. Brown*, 366 U.S. 599, 604, 81 S. Ct. 1144, 1146 (1961) (quoting 8 WORKS OF THOMAS JEFFERSON 113 (A. Lipscomb & A. Bergh eds. 1905)), also available at http://press-pubs.uchicago.edu/founders/documents/amendI_religions58.html (last visited Nov. 7, 2013).

Such remarks are consistent with the historical underpinnings of the free exercise clause. Neither the congressional record underlying the enactment of the First Amendment nor the records of the state legislatures which subsequently ratified the amendment provide any help in ascertaining what legislators meant by "religion" and the free exercise thereof. *See* Michael W. McConnell, *The Origins & Historical Understanding of Free Exercise of Religion*, 103 HARV. L. REV. 1409, 1481, 1483, 1485 (1990); Vincent Phillip Muñoz, *The Original Meaning of the Free Exercise Clause: The Evidence from the First Congress*, 31 HARV. J. L. & PUB. POL. 1083 (2008). But there are two reference points that reinforce the notion that religion was understood to be a matter of personal conscience.

First, by 1789, the constitutions of all thirteen states, save Connecticut, included religious liberty provisions, and many referenced the right as the freedom to worship one's God according to the dictate's of one's conscience. *See* McConnell, *Origins & Historical Understanding*, 103 HARV. L. REV. at 1457 n.

242 (reproducing text of state provisions); *City of Boerne v. Flores*, 521 U.S. 507, 553–54, 117 S. Ct. 2157, 2180 (1997) (O'Connor, J., dissenting) (discussing examples of such provisions). New Hampshire's 1784 constitution, for example, provided that "[e]very individual has a natural and unalienable right to worship GOD according to the dictates of his own conscience, and reason"; and the constitutions of Delaware, Massachusetts, New Jersey, North Carolina, Pennsylvania, and Virginia all contained very similar language. *See* McConnell, *Origins & Historical Understanding*, 103 HARV. L. REV. at 1456, 1457 n. 242. Other constitutions—those of New York and South Carolina—separately described the protected freedom of religion and then referred to the "liberty of conscience" thereby guaranteed. *See id.* "Conscience" was used in still other ways by the provisions of other state constitutions. *See id.*

These state provisions set the stage for the drafting, debate, and adoption of the First Amendment's free exercise clause. The clause as proposed and adopted by the House of Representatives incorporated language recognizing "freedom of conscience"; but the version adopted by the Senate, by the ensuing conference committee, and which was submitted to and ratified by the States, omitted that language. *See* McConnell, *Origins & Historical Understanding*, 103 HARV. L. R. at 1481–84. It is not clear why "conscience" was omitted from the adopted version of the free exercise clause, but it is doubtful that the elimination was meant to signify a different understanding of what the clause protected. As Professor McConnell and others observe, "freedom of religion" and "freedom of conscience" were terms that were used interchangeably in discussions of religious liberty. *E.g.,* McConnell,

*Origins & Historical Understanding*, 103 HARV. L. REV. at 1488,
1493–94; Philip A. Hamburger, *A Constitutional Right of
Religious Exemption: An Historical Perspective*, 60 GEO. WASH. L.
REV. 915, 933–34 & n.80 (1992). McConnell suggests that "rights
of conscience" was dropped either to eliminate a redundancy,
to the extent it signified the same thing as the free exercise of
religion, or to emphasize that it was only the freedom of
religious conscience, as opposed to the freedom of non-
religious belief, that was meant to be protected. McConnell,
*Origins & Historical Understanding*, 103 HARV. L. REV. at
1488–96. Either way, it is clear that the clause was intended to
protect the exercise of religious conscience. *Id.* at 1495–96. And
as shown by both the state provisions addressing the freedom
of religion and the other contemporaneous writings I have
cited, the exercise of religious conscience was understood to be
a matter between the individual and his God—not, perhaps, in
the more modern sense of believing whatever one wants, but
rather as a reflection that the individual owed his or her
obedience on moral matters directly to God. *Id.* at 1498–99;
Hamburger, *A Constitutional Right of Religious Exemption*, 60
GEO. WASH. L. REV. at 933, 938. The understanding that the
exercise of religion was a matter of the individual's relation-
ship with and obedience to God was also consistent with the
multiplicity of minority religions practiced in the United States
by the second half of the 18th century, and a consensus that the
country should move away from a Colonial history of officially
established religions (and officially disfavored religions)
toward religious pluralism. *Id.* at 946.

All of this reinforces what one would otherwise intuit about
religion: that it is inextricably intertwined with characteristics

that are uniquely human: conscience, belief, faith, and devotion. Religious beliefs have to do with such fundamental questions as the nature of mankind, where we came from, our place in the world, what happens when we die, and our relationships with and obligations to other people. Only the human mind can entertain such questions.

A corporation is a legal construct which does not have the sentience and conscience to entertain such ultimate questions. "In the words of Chief Justice Marshall, a corporation is 'an artificial being, invisible, intangible, and existing only in contemplation of law.'" *Browning-Ferris Indus. of Vt. v. Kelco Disposal, Inc.*, *supra*, 492 U.S. at 284, 109 S. Ct. at 2925 (quoting *Trustees of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 636 (1819)). It is a creature of man, not of God. It "believes," if it can be said to believe anything, only what the people who found, own, and/or manage the corporation believe. *See* Ira C. Lupu, *Keeping the Faith: Religion, Equality & Speech in the U.S. Constitution*, 18 Conn. L. Rev. 739, 766 (1986) ("By their nature, institutions cannot have a conscience or faith."); *Citizens United*, 558 U.S. at 466, 130 S. Ct. at 972 (Stevens, J., concurring in part & dissenting in part) ("It might also be added that corporations have no consciences, no beliefs, no feelings, no thoughts, no desires."); *Conestoga Wood Specialties*, 724 F.3d at 385; *Gilardi*, 2013 WL 5854246, at* 18 (Edwards, J., concurring in part & dissenting in part); *cf. Fleck & Assocs., Inc. v. City of Phoenix, an Ariz. Muni. Corp.*, 471 F.3d 1100, 1105 (9th Cir. 2006) (holding corporation does not possess right recognized in *Lawrence v. Texas*, 539 U.S. 558, 123 S. Ct. 2472 (2003), to make autonomous choices in intimate relations free of government interference: "Corporations are not self-defining autonomous

creatures worthy of respect and dignity in the relevant sense.").

Indeed, it strikes me as potentially demeaning to religious faith to say that a corporation should be said to possess the same right to free exercise of religion that a human being enjoys in this country. Inextricably bound as it is with a person's sense of himself, his origins, the world, and what life is, religious belief (including the lack of such belief) is a defining trait of humankind; and this is one reason why we view it as a core component of individual freedom: "At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State." *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 851, 112 S. Ct. 2791, 2807 (1992); *see also Conestoga Wood Specialties Corp. v. Sebelius*, 917 F. Supp. 2d 394, 407–08 (E.D. Pa. 2013); *Korte v. U.S. Dep't of Health & Human Servs.*, 912 F. Supp. 2d 735, 743–44 (S.D. Ill. 2012); *Hobby Lobby Stores, Inc. v. Sebelius*, 870 F. Supp. 2d 1278, 1291 (W.D. Okla. 2012), *rev'd en banc*, 723 F.3d 1114. To say, as the court does today, that the right to exercise one's religious faith may be asserted on the same terms by a legal construct—an incorporated currency exchange, accounting firm, or automobile repair shop, for example—as by a human being, is, to my mind at least, irreconcilable with the very essence of religious faith and, for that matter, humankind.

Perhaps there are good reasons to extend the right of free exercise to religious organizations, including not-for-profit corporations organized to pursue religious ends. *See Conestoga*

*Wood Specialties*, 724 F.3d at 386 (noting that churches are the "means by which individuals practice religion"); *see also Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 344–45, 107 S. Ct. 2862, 2872–73 (1987) (Brennan, J., concurring in the judgment) (recognizing that potential for government to chill religious exercise is greatest with respect to not-for-profit activities). As I have said, it is not entirely clear to me why even this step is necessary given the associational standing of such entities to assert the free exercise rights of their members. But, at the least, those entities are defined by a religious purpose, and so extending to them the protections of the free exercise clause could be seen as consistent with the purpose of that clause. But let us be clear: we are in this case being asked to extend the right beyond not-for-profit religious corporations to corporations not organized for any purpose connected with religion. *See Conestoga Wood Specialties*, 724 F.3d at 385 ("We will not draw the conclusion that, just because courts have recognized the free exercise rights of churches and other religious entities, it necessarily follows that for-profit, secular corporations can exercise religion.'"); *accord Autocam*, 730 F.3d at 627; *see also Gilardi*, 2013 WL 5854246, at *5 (opinion of Brown, J.) ("No such *corpus juris* exists to suggest a free-exercise right for secular corporations."); *Hobby Lobby*, 723 F.3d at 1168, 1169 (Briscoe, C.J., concurring in part & dissenting in part) ("during the 200-year span between the adoption of the First Amendment and RFRA's passage, the Supreme Court consistently treated free exercise rights as confined to individuals and non-profit religious organizations"; and "not a single case, until now, has extended RFRA's protections to for-profit corporations").

Certainly I agree that the wish to profit does not automatically disqualify an individual from asserting religious interests. *See ante* at 47–51; *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501–02, 72 S. Ct. 777, 780 (1952); *Beckwith Elec. Co. v. Sebelius*, 2013 WL 3297498, at *11 (M.D. Fla. June 25, 2013) (Kovachevich, J.). Individuals often have multiple reasons for acting, and simply because they have reasons in addition to a religious motive does not disqualify them from asserting free exercise rights. But that does not answer the question whether a corporation —again, an invention of the law—should be accorded religious rights, particularly when it is not organized for religious ends.[5]

---

[5] The majority postulates that if a for-profit business cannot assert free exercise rights, then theoretically a Jewish restaurant could be denied the right to observe dietary restrictions. *Ante* at 51. Three responses come to mind. First, the owner and operator of the restaurant, assuming that he is an observant Jew, might well have a meritorious contention that his own religious exercise is directly and substantially burdened by having to handle and serve non-kosher food; as I have said, I do not believe that the profit-motive disqualifies the owner from asserting his religious interests. Second, to the extent the restaurant's target clientele is Jewish, the business might have third-party standing to assert the free exercise rights of its customers. *See Craig v. Boren*, 429 U.S. 190, 194–97, 97 S. Ct. 451, 455–57 (1976) (vendor of "non-intoxicating" 3.2% beer had third-party standing to assert the equal protection rights of 18-20 year-old male customers, who were proscribed by state law from being sold beer whereas females of same age were not); *see also, e.g., Carey v. Population Servs., Int'l*, 431 U.S. 678, 683–84, 97 S. Ct. 2010, 2015 (1977) (distributor of contraceptive devices); *Doe v. Bolton*, 410 U.S. 179, 188, 93 S. Ct. 739, 745 (1973) (physicians providing abortion services). Third, to bring that hypothetical into line with facts of this case, the relevant question would be whether the free exercise rights of

(continued...)

On this point, I would also note the significance of the procedural posture this case is in. The plaintiffs are seeking preliminary injunctive relief. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Def. Council*, 555 U.S. 7, 24, 129 S. Ct. 365, 376 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90, 128 S. Ct. 2207, 2219 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 1867 (1997) (describing preliminary injunction as "extraordinary and drastic remedy") (quoting 11A C. Wright, A. Miller & M. Kane, *Fed. Prac. & Proc.* § 2948 at 129–30 (2d ed. 1995)). The burden, of course, is on the plaintiffs as the movants to make a clear showing demonstrating their entitlement to such relief. *See id.*; *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 870 (7th Cir. 2006) (quoting *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005)); *Chicago Dist. Council of Carpenters Pension Fund v. K&I Constr., Inc.*, 270 F.3d 1060, 1064 (7th Cir. 2001). The record at this stage of the litigation is, to put it generously, slender in terms of evidence illuminating the asserted religious interests of the two corporate plaintiffs and how those interests would be burdened by including coverage for contraceptives in their

---

[5] (...continued)

the kosher restaurant or its owners might somehow be substantially burdened by the private choice that a restaurant employee makes to consume non-kosher food. *See* Jonathan D. Sarna, *Constitutional Dilemma on Birth Control*, FORWARD.COM (March 16, 2012) ("We all might agree that kosher delis should not be coerced into selling ham, but hopefully we would also all agree that a deli's employees and customers should not be penalized for choosing to consume it."), http://foward.com/articles/152606/constitutional-dilemma-on-birth-control/ (last visited Nov. 7, 2013). For the reasons I set forth below, I do not believe they would be.

employee health care plans. I am thus far short of convinced that Grote Industries and Korte & Luitjohan Contractors have demonstrated a clear entitlement to preliminary injunctive relief protecting whatever free exercise rights they might have. *Hobby Lobby*, 723 F.3d at 1164–65 (Briscoe, C.J., concurring in part & dissenting in part); *id.* at 1183–84 (Matheson, J., concurring in part & dissenting in part). The notion that any type of corporation may possess its own free exercise rights is itself far from a settled proposition; and the plaintiffs' claim calls for a wholly unprecedented extension of such rights to secular, for-profit corporations.

There are, finally, significant logical difficulties posed by attributing religious rights to secular corporations. Whatever religious rights a corporation might theoretically exercise can only come from the people who establish, own, and manage a corporation. *See Conestoga Wood Specialties*, 724 F.3d at 385 ("General business corporations do not, separate and apart from the actions or belief systems of their individual owners or employees, exercise religion.") (quoting *Hobby Lobby Stores, Inc. v. Sebelius*, 870 F. Supp. 2d at 1291). And here, no one is saying that Korte & Luitjohan Contractors and Grote Industries are Catholic corporations; instead, I understand the individual plaintiffs to be saying that they run the corporations in a way that is consistent with, and expresses, the principles of their Catholic faith. But this poses some challenges in defining the religious beliefs and rights of the corporation.

First, to the extent that a corporation's religious principles and identity derive from its owners, what if the owners have diverse beliefs, diverse degrees of devotion, and diverse notions as to whether and how the corporation ought to reflect

their religious beliefs? *See Harris v. McRae*, *supra*, 448 U.S. at 320–21, 100 S. Ct. at 2690 (noting that where individual church members hold diversity of religious views as to challenged law, church itself lacks associational standing to claim infringement on their free exercise rights); *cf. Gilardi*, 2013 WL 5854246, at *22 (Edwards, J., concurring in part & dissenting in part) (noting extent to which theory that religious rights of corporate owners are burdened by requirement imposed on corporation with which they are inextricably bound tuns on unanimity of owners' beliefs; "there are no minority shareholders with different views"). What if, for example, one of a corporation's two equal owners is Catholic and the other is Protestant, Muslim, Jewish, or an atheist—are the beliefs of one or both attributed to the corporation, and if the beliefs of only one count, which does? Are the beliefs a conglomeration or neither? Or suppose that both owners are Catholic, but only one of them claims that his beliefs are burdened by some legal requirement (like the mandate at issue here) imposed on the company, whereas the other professes either indifference or support for that requirement. Are the beliefs of the one owner alone sufficient to define those of the corporation? *See* Elizabeth Sepper, *Contraception and the Birth of Corporate Conscience*, 17–18 (Wash. Univ. St. Louis Sch. of Law Legal Studies Research Paper Series, Paper No. 13-07-01) (July 2013), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id= 2289383, 22 AM. J. GENDER SOC. POL'Y & L. (forthcoming 2014) (discussing practical and doctrinal difficulties posed by treating corporation as alter ego of owners for purposes of free exercise claim).

Second, suppose that the company's ownership changes. What happens then to the beliefs we have attributed to the corporation based on its ownership? Are challenges such as the one presented in this case subject to re-litigation every time there is a change in corporation ownership?

Third, are the religious beliefs of corporate owners solely determinative of the corporation's religious principles? Suppose, for example, that a corporation's owners have entirely entrusted the management of the corporation to its longtime CEO, who is the public face of the corporation and who also happens to have strongly held religious beliefs about the way in which the corporation should be run. Are her beliefs attributable to the corporation? Or suppose that the owners of a corporation have no professed religious interest in the way in which a corporation is run, but the focus of the corporation is on serving members of a particular religion—selling kosher or halal food products, for example. *See ante* at 51. Can the corporation be said to hold the religious beliefs of its target market, even if its owners and managers do not?

At oral argument, Grote Industries' counsel conceded that if ownership of the company changed, as by death and inheritance, then a court might have to revisit the nature of the corporation's asserted religious interests. But why is that true if the corporation has its own free exercise rights? By permitting a corporation to assert its own religious rights, we are, I would think, saying that the corporation may possess such rights independent of what its owners believe and assert; a change in ownership by itself would theoretically portend nothing about the status of the corporation's religious interests.

The court has also limited its holding today to closely-held corporations. The reasons for that limitation are both pragmatic and obvious: When a company is owned and managed by a small number of people, it is easy to appreciate the overlap between the interests of owners and corporation. Thus, a firm that is owned and operated by a family united in its religious beliefs presents the strongest case for making the type of free exercise claim presented here. But if a corporation has free exercise rights because the Dictionary Act suggests it is among the "persons" to which RFRA grants the right to make such a claim, *ante* at 54 n.17, and if any distinctions between religious and secular corporations do not matter, *ante* at 47–54, then why does a corporation of large, diverse, or even public ownership not have free exercise rights also? And how would the beliefs of a public corporation be determined—by a vote at the annual shareholders' meeting, for example?

Although the court has held that Korte & Luitjohan Contractors and Grote Industries have free exercise rights, what it is saying, in the end, is that it is the religious beliefs of the Kortes and Grotes that matter; the corporations, in effect, embody the expression of their beliefs. *See ante* at 3, 59–60; *see also Autocam*, 730 F.3d at 620 (noting that plaintiffs characterize their corporation as "the business form through which [they] endeavor to live their vocation as Christians in the world"). Holding that the two corporations have their own religious interests is, as I said at the start, merely a means of circumventing the problem that while it is the beliefs of the Kortes and the Grotes that are at issue here, the duties imposed by the ACA upon the corporations do not significantly burden the free

exercise rights of the Kortes and Grotes themselves. I turn to that point next.

**4.**

RFRA provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb-1(a) & (b). By its reference to *substantial* burdens, RFRA expressly calls for a qualitative assessment of the burden that a challenged statute or other government action imposes on an individual's exercise of religion. As I discuss below, courts have long engaged in such assessments, distinguishing between direct and indirect, and between minor and meaningful burdens on the exercise of religion. Yet the court today rejects any such inquiry, departing from both historical practice and the language of RFRA.

Following the Tenth Circuit's lead in *Hobby Lobby*, the majority rejects any assessment of how direct or attenuated the burden imposed on the plaintiff's religious practices may be, *ante* at 57–60, reasoning that it is the equivalent of asking whether the burdened religious practice is central to the plaintiff's faith or whether the plaintiff is interpreting his religious beliefs correctly, *ante* at 55–56. Instead, the majority holds that the pertinent inquiry is whether the penalties for noncompliance with the government's mandate exert a sufficiently coercive influence on the plaintiffs. *Ante* at 56 (citing *Hobby Lobby*, 723 F.3d at 1137). This single-minded focus on the coercive aspect of the mandate is yet another means of

getting past the point that a number of courts have made previously: that because the mandate is imposed on the corporate employers rather than the owners themselves, and because it does not require the owners themselves to do anything in violation of their religious faith, it does not directly and substantially burden the owners' religious practices. *See Grote*, 708 F.3d at 858–59 (dissent) (coll. cases); *see also Gilardi*, 2013 WL 5854246, at *29–*31 (Edwards, J., concurring in part & dissenting in part). Per the majority's view, the individual plaintiffs need only cite an obligation imposed on the corporations that is inconsistent with their own religious beliefs and practices; so long as the corporations are coerced into compliance (as by the prospect of substantial fines if they do not comply) that is enough to establish a substantial burden on their free exercise rights, without further inquiry into whether the mandate genuinely and meaningfully interferes with their religious practices. *Hobby Lobby* reasons that it is not the court's business to assess whether the obligation imposed by the government is substantial in the sense of whether it directly burdens the plaintiffs' religious beliefs and practices or instead is attenuated, as the government claims it to be. That assessment is equated with a forbidden inquiry into the theological merit of the plaintiffs' claim. 723 F.3d at 1137. "Our only task is to determine whether the claimant's belief is sincere, and if so, whether the government has applied substantial pressure on the claimant to violate that belief." *Id.*

This coercion-only test is one of the Tenth Circuit's invention. It has the superficial support of language found in multiple court decisions, *see, e.g., Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 141, 107 S. Ct. 1046, 1049

(1987) (quoting *Thomas v. Review Bd. of the Indiana Employ. Sec. Div.*, 450 U.S. 707, 717–18, 101 S. Ct. 1425, 1431–32 (1981)); *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 997 (7th Cir. 2006); *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008), but it misapprehends both the context and relevance of coercion in free exercise jurisprudence, and as a result it writes RFRA's "substantial burden" provision out of the statute.

The coercion analysis addresses one way in which government may potentially interfere with a plaintiff's free exercise rights. *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1315 (10th Cir. 2010), cited and relied upon by *Hobby Lobby* for the coercion test, describes three ways in which a plaintiff's religious rights may be burdened: (1) the government compels the plaintiff to do something that is inconsistent with his religious beliefs; (2) the government forbids the plaintiff from doing something that his religion motivates him to do; or (3) the government does not directly compel the plaintiff to do something forbidden by his religious beliefs or to refrain from doing something commanded by those beliefs, but instead puts substantial pressure on the plaintiff to do so. *See also Sherbert v. Verner, supra*, 374 U.S. at 402, 83 S. Ct. at 1793) (describing in different terms the multiple ways in which the government might burden religious rights); *Mack v. O'Leary*, 80 F.3d 1175, 1179 (7th Cir. 1996) (same), *cert. granted & judgment vacated on other grounds*, 522 U.S. 801, 118 S. Ct. 36 (1997).

The third of the *Abdulhaseeb* categories is exemplified by *Thomas*, 450 U.S. 707, 101 S. Ct. 1425. The petitioner in *Thomas* was denied unemployment benefits because he had left his employment voluntarily: he quit after his employer gave him an assignment (producing military armaments) that he

believed he could not perform given his religious beliefs. In denying benefits to Thomas, the state unemployment board was not forcing him to act, or refrain from acting, contrary to his religious faith. Nonetheless, by placing him between a rock and a hard place—either stay on the job, and violate his religious beliefs, or quit, and surrender his right to unemployment compensation—the Supreme Court reasoned that the state was effectively coercing him to act contrary to his religious principles.

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

450 U.S. at 717–18, 101 S. Ct. at 1432. *See also Hobbie*, 480 U.S. at 139–41, 107 S. Ct. at 1048–49 (refusal to award unemployment benefits to plaintiff who refused for religious reasons to work on Sabbath violated free exercise clause); *Sherbert*, 374 U.S. at 403–04, 83 S. Ct. at 1793–94 (same). Likewise, in *Abdulhaseeb*, where a prisoner was complaining that the failure to provide him with a halal diet which included meat interfered with his right to the free exercise of religion,[6] the prison was not literally

---

[6] The prisoner filed suit under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a).

compelling him to violate his religious beliefs; nonetheless, by putting him to an unacceptable choice—eat a non-compliant diet or go hungry—he was being coerced into violating his religious principles. 600 F.3d at 1316–17; *see also Hunafa v. Murphy*, 907 F.2d 46, 47–48 (7th Cir. 1990).

To my mind, this is not a substantial pressure case like *Thomas*; rather, this is a more straightforward instance of the government overtly requiring a plaintiff to do something that he asserts is contrary to his religious beliefs. The ACA unambiguously requires the two corporate plaintiffs to include contraceptive coverage in their employee health plans. Even absent the substantial financial penalties for non-compliance, the two companies presumably would be subject to suit by the government or by an employee for injunctive relief ordering them to comply if they did not otherwise do so, *see ante* at 7 (citing 29 U.S.C. §§ 1132, 1185d); and, in any event, most individuals and corporations will not feel free to deliberately ignore what the law plainly requires them to do. So the entire inquiry into whether the ACA places substantial pressure on the plaintiffs to take action over their objections is unnecessary and beside the point. There is no dispute that it does.

What the coercion inquiry does not answer, and which the court must turn to next, is whether the government, by requiring the two companies to take action to which the companies and their owners object on religious grounds, is imposing a substantial burden on the plaintiffs' free exercise of religion. This is where the Tenth Circuit's decision in *Hobby Lobby*, now embraced by this court, goes awry. *Hobby Lobby* postulates that evaluating the nature and degree of the burden imposed by the mandate will require an impermissible inquiry

into whether the plaintiffs are correctly interpreting and following religious dogma. 724 F.3d at 1137; *see Thomas*, 450 U.S. at 715, 101 S. Ct. at 1430 ("We see … that Thomas drew a line, and it is not for us to say that the line he drew was an unreasonable one. Courts should not undertake to dissect religious beliefs because the believer admits he is 'struggling' with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ."); *United States v. Lee*, 455 U.S. 252, 257, 102 S. Ct. 1051, 1055 (1982); *Gilardi*, 2013 WL 5854246, at *7. *Hobby Lobby* thus concludes that once the plaintiff has shown the government has put substantial pressure on him to do something to which he sincerely objects on religious grounds, he has shown all that he needs to show to establish that his free exercise right is substantially burdened. 723 F.3d at 1137–38; *see ante* at 56–57.

This holding effectively rewrites RFRA. The statute does not prohibit the government from putting substantial pressure on a plaintiff to do anything, or to be a party to anything, to which he has an honest religious objection; rather, it states that the government "shall not *substantially burden* a person's exercise of religion … ." § 2000bb-1(a) (emphasis mine). Congress used the term "substantially" to modify "burden," and the relevant inquiry considers how that burden affects the individual's ability to believe, profess, and practice his religion. As Judge Edwards points out in *Gilardi*, RFRA was specifically drafted in that way to make clear that not every burden imposed by government on religious exercise need be justified by a compelling governmental interest. 2013 WL 5854246, at *27–*28 (Edwards, J., concurring in part & dissenting in part);

*see also Abdulhaseeb*, 600 F.3d at 1316 ("we do not intend to imply that every infringement on a religious exercise will constitute a substantial burden"). By its plain terms, then, the statute calls for a threshold inquiry into the nature of the burden placed on the plaintiff's free exercise of religion: "substantial" is a term of degree, which invites the court to distinguish large or considerable burdens from minor or incidental ones. *Cf. Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 196–97, 122 S. Ct. 681, 691 (2002); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491, 119 S. Ct. 2139, 2150–51 (1999) (both construing Americans With Disabilities Act's use of term "substantially" vis-à-vis limitations on major life activities). Otherwise, *any* honestly-perceived burden on religion resulting from government action would suffice to make out a prima facie free exercise claim under prong (a) of RFRA and trigger the strict scrutiny called for by prong (b). § 2000bb-1(a), (b). *See Employ. Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 888–89, 110 S. Ct. 1595, 1605–06 (1990); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003).

No doubt, assessing the substantiality of the claimed burden on one's free exercise of religion will sometimes call for difficult judgments, as the Supreme Court recognized in *Smith*, 494 U.S. at 887 n.4, 110 S. Ct. at 1605–06 n.4. Indeed, the difficulty of making such assessments is a key reason why the Court in *Smith* ultimately abandoned its earlier free exercise clause jurisprudence in favor of a simpler test focusing on the facial neutrality of the challenged law. *Id.* at 882–89, 110 S. Ct. at 1602–04. But prior to *Smith*, the Court often engaged in such qualitative assessments in evaluating the merits of free exercise

claims. *See*, *e.g.*, *Jimmy Swaggert Ministries v. Bd. of Equalization*, 493 U.S. 378, 391, 110 S. Ct. 688, 696 (1990) ("to the extent that imposition of a generally applicable tax merely decreases the amount of money appellant has to spend on its religious activities, any such burden is not constitutionally significant"); *Hernandez v. C.I.R.*, 490 U.S. 680, 699, 109 S. Ct. 2136, 2149 (1989) ("We do … have doubts whether the alleged burden imposed by the [tax] deduction disallowance on the Scientologists' practices is a substantial one."); *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 447, 108 S. Ct. 1319, 1324 (1988) ("It is undisputed that the Indian respondents' beliefs are sincere and that the Government's proposed actions will have severe adverse effects on the practice of their religion. Those respondents contend that the burden on their religious practice is heavy enough to violate the Free Exercise Clause unless the Government can demonstrate a compelling need to complete the G-O road or to engage in timber harvesting in the Chimney Rock area. We disagree."); *Bowen v. Roy*, 476 U.S. 693, 707, 106 S. Ct. 2147, 2156 (1986) ("the nature of the burden [on religious liberty] is relevant to the standard that the government must meet to justify the burden");*Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 303, 304–06, 105 S. Ct. 1953, 1962, 1963–64 (1985) (after observing that "[i]t is virtually self-evident that the Free Exercise Clause does not require an exemption from a governmental program unless, at a minimum, inclusion in the program actually burdens the claimant's freedom to exercise religious rights," the Court finds that minimum wage, overtime, and recordkeeping requirements imposed by Fair Labor Standards Act on religious foundation and its associates did not significantly burden associates' free

exercise rights); *Johnson v. Robison*, 415 U.S. 361, 385, 94 S. Ct. 1160, 1174 (1974) ("The withholding of educational benefits involves only an incidental burden upon appellees' free exercise of religion—if, indeed, any burden exists at all."); *see also Gilardi*, 2013 WL 5854246, at *25–26, *27–*28 (Edwards, J., concurring in part & dissenting in part); *see generally* Andy G. Olree, *The Continuing Threshold Test for Free Exercise Claims*, 17 WM. & MARY BILL OF RIGHTS J. 103 (2008). By adopting the Court's pre-*Smith* jurisprudence and making a "substantial burden" on the free exercise of religion the controlling criterion for the articulation of a prima facie case under RFRA, Congress has expressly called for just this sort of inquiry. *Gilardi*, 2013 WL 5854246, at *27–*28 (Edwards, J., concurring in part & dissenting in part).

And, in fact, when applying the substantial-burden requirement found in both RFRA and RLUIPA, 42 U.S.C. §§ 2000cc(a)(1), 2000cc-1(a), this circuit and others have always considered the nature and degree of the burden imposed by government action, holding in multiple cases that de minimis or otherwise insignificant burdens on the free exercise of religion do not warrant relief under these statutes. *E.g.*, *Eagle Cove Camp & Conf. Ctr., Inc. v. Town of Woodboro, Wisconsin*, 2013 WL 5820289, at *5, (7th Cir. Oct. 30, 2013) ("the burden must be truly substantial"); *id.* at *5–*7; *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 899–901 (7th Cir. 2005); *Rapier v. Harris*, 172 F.3d 999, 1006 n.4 (7th Cir. 1999); *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 95–97 (1st Cir. 2013); *McFaul v. Valenzuela*, 684 F.3d 564, 576–77 (5th Cir. 2012); *Abdulhaseeb*, 600 F.3d at 1316; *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058,

1068–1073 (9th Cir. 2008) (en banc); *Smith v. Allen*, 502 F.3d 1255, 1277–78 (11th Cir. 2007), *abrogated on other grounds by Sossamon v. Texas*, 131 S. Ct. 1651 (2011); *Norwood v. Strada*, 249 F. App'x 269, 272 (3d Cir. 2007); *McEachin v. McGuinnis*, 357 F.3d 197, 203 n.6 (2d Cir.2004)*; Weir v. Nix*, 114 F.3d 817, 821–22 (8th Cir. 1997); *cf. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, supra*, 546 U.S. at 426, 126 S. Ct. at 1217 (noting that for purposes of plaintiff's RFRA claim, government conceded law in question substantially burdened sincere free exercise of religion). These cases are flatly inconsistent with the notion that we cannot assess the nature or degree of any burden imposed on a plaintiff's free exercise rights by government action.[7]

Evaluating the nature of the burden imposed is not a test of the orthodoxy, consistency, or theological merit of a plaintiff's stated religious beliefs. Provided the plaintiff is sincere, *ante* at 55, we may accept that his objection is one grounded in his religious beliefs. But simply because someone has a good-faith objection, based in religion, to a particular government action does not mean that his right to the free exercise of religion is

---

[7] Some of the RLUIPA cases may be distinguished superficially, in that the plaintiffs were prisoners who sought damages for occasional denials of kosher or halal meals or other accommodations to their religious needs. *E.g.*, *Rapier*, 172 F.3d at 1006 n.4 (unavailability of non-pork food trays to prisoner at three of 810 meals). This suit, by contrast, involves a challenge to a statutory mandate that the plaintiffs contend is inconsistent with their religious beliefs. Nonetheless the cases remain relevant for the proposition that not all burdens on the free exercise of religion qualify as substantial. The nature of the claim (impingement on the free exercise of religion) is the same; the only difference is the context in which the claim is asserted.

actually and substantially burdened by that action. Courts routinely undertake examinations of the degree to which a given law, regulation, or other government action does or does not intrude upon an individual's constitutionally protected interests. *See Bowen v. Roy*, 476 U.S. at 706–07, 106 S. Ct. at 2155–56 (burdens on religious liberty); *see also, e.g., Scott v. Harris*, 550 U.S. 372, 383–84, 127 S. Ct. 1769, 1778 (2007) (use of force in seizure of the person); *United States v. Knights*, 534 U.S. 112, 118–19, 122 S. Ct. 587, 591 (2001) (searches of the home); *Planned Parenthood of Se. Pa. v. Casey, supra*, 505 U.S. at 874, 112 S. Ct. at 2819 (abortion regulations); *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S. Ct. 2059, 2063–64 (1992) (regulation of voting rights); *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 451–52, 110 S. Ct. 2481, 2486 (1990) (traffic stops); *Univ. of Penn. v. E.E.O.C.*, 493 U.S. 182, 198–201, 110 S. Ct. 577, 586–88 (1990) (compelled disclosure of confidential university faculty peer reviews); *Turner v. Safley*, 482 U.S. 78, 87–89, 107 S. Ct. 2254, 2261 (1987) (restrictions on prisoner's First Amendment rights); *Weatherford v. Bursey*, 429 U.S. 545, 557–58, 97 S. Ct. 837, 844–45 (1977) (violations of attorney-client privilege); *Branzburg v. Hayes*, 408 U.S. 665, 682–83, 92 S. Ct. 2646, 2657 (1972) (compelled disclosure of reporter's confidential sources). Without venturing into the content and merit of the plaintiffs' religious beliefs, we may still consider the nature of the act that the plaintiffs are called upon to perform, the connection between their beliefs and the compelled action, and the extent to which their ability to practice their religion is interfered with by that action.

Thus, for example, in assessing the substantiality of the burden imposed on a plaintiff's free exercise rights, we may

consider whether the burden is direct or indirect. *Braunfeld v. Brown, supra*, 366 U.S. 599, 81 S. Ct. 1144, makes this clear. *Braunfeld* sustained Pennsylvania's Sunday-closing law against a free exercise challenge notwithstanding the economic burden that the law imposed on Jewish merchants: because their religion proscribed them from doing business on Saturdays, requiring them to also close their doors on Sundays imposed an extra cost on them that it did not impose on other business-people. The court emphasized that the law imposed "only an indirect burden on the exercise of religion … ." *Id.* at 606, 81 S. Ct. at 1147.

> [I]t cannot be expected, much less required, that legislators enact no law regulating conduct that may in some way result in an economic disadvantage to some religious sects and not to others because of the special practices of the various religions. We do not believe that such an effect is an absolute test for determining whether the legislation violated the freedom of religion protected by the First Amendment.

*Id.* at 606–07, 81 S. Ct. at 1147–48. *Hobby Lobby* suggests that the Court in *Lee* subsequently abandoned consideration of whether the burden imposed by a statute on free exercise rights is direct or indirect. 723 F.3d at 1139–40. Yet, the government's argument in *Lee*—that an Amish businessman could contribute to the Social Security system without violating his religious belief that it is sinful for a family not to care for its own elderly—was not an argument about the direct or indirect effect of the law, but rather a quarrel with Lee's understanding of the Amish faith; and the Court's unwillingness to mediate a theological

dispute was what led it to reject the argument. 455 U.S. at 257, 102 S. Ct. at 1055. What is true is that the Court, subsequent to *Braunfeld*, rejected the directness or indirectness of the burden as a controlling factor in free exercise cases. *See Sherbert v. Verner*, *supra*, 374 U.S. at 403–04, 83 S. Ct. at 1794 ("[I]t is true that no criminal sanctions directly compel appellant to work a six-day week. But this is only the beginning, not the end, of our inquiry."); *see also Thomas*, 450 U.S. at 714, 101 S. Ct. at 1432 ("While the compulsion may be indirect, the infringement upon free exercise rights is nonetheless substantial."). But the Court's decision in *Bowen v. Roy*, *supra*, 476 U.S. at 706–07, 106 S. Ct. at 2156, decided four years after *Lee* and which I discuss below, makes clear that the Court still regards it as a relevant consideration. Lower court cases likewise confirm that the directness or indirectness of the burden imposed on the exercise of one's religious exercise right remains a material consideration. *Compare, e.g., D.L. ex rel. K.L. v. Baltimore Bd. of Sch. Com'rs*, 706 F.3d 256, 263–64 (4th Cir. 2013) (school district's policy requiring student to be enrolled in public school in order to receive services under section 504 of the Rehabilitation Act, 29 U.S.C. § 794, did not unduly burden parents' free exercise rights, although they wished to send him to private school and would have to bear full costs of the rehabilitation services for their son if they did so), and *Messiah Baptist Church v. Cnty. of Jefferson, Colo.*, 859 F.2d 820, 825–26 (10th Cir. 1988) (zoning ordinance which prohibited schools, community buildings, and churches from agricultural zone did not impermissibly burden free exercise rights of church and its members even if it made their exercise of religion more expensive, where, inter alia, any burden imposed by neutral

law was an indirect burden), *with Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 880–81 (9th Cir. 1997) (subjecting Jehovah's Witness church to tort damages for religious practice of "shunning" would violate free exercise clause, as imposition of damages could constitute a direct burden on religion).

Free exercise cases have also drawn a distinction between what a challenged law or practice requires the plaintiff himself to do, and what it permits another party—specifically, the government—to do to which plaintiff objects on religious grounds. For example, in *Bowen v. Roy*, a Native American man with a young daughter objected to a statutory requirement that he provide a Social Security number for each member of his household in order to obtain benefits from the Aid to Families with Dependent Children program ("AFDC") and to a companion requirement that state AFDC plans use such numbers in administering their plans. With respect to the latter requirement, he believed that if state agencies used an identifying number for his daughter, they would "rob" her spirit and "prevent her from attaining greater spiritual power," 476 U.S. at 696, 106 S. Ct. at 2150; he therefore contended that the requirement that state agencies use their daughter's Social Security number violated his right to the free exercise of his religion. The Supreme Court disagreed. It noted that the plaintiff was not complaining of an intrusion on his freedom of religious belief, which was absolute, or of an intrusion upon the liberty of his own conduct, which was less than absolute; instead, the plaintiff was invoking the free exercise clause in an effort to dictate how the government should transact its

business. *Id.* at 699, 106 S. Ct. at 2152. The Court rejected the notion that the reach of free exercise clause extended this far:

> Never to our knowledge has the Court interpreted the First Amendment to require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family. The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens. Just as the Government may not insist that appellees engage in any set form of religious observance, so appellees may not demand that the Government join in their chosen religious practices by refraining from using a number to identify their daughter. "[T]he Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can extract from the government." *Sherbert v. Verner*, 374 U.S. 398, 412, 83 S. Ct. 1790, 1798 (1963) (Douglas, J., concurring).

> As a result, Roy may no more prevail on his religious objection to the Government's use of a Social Security number for his daughter than he could on a sincere religious objection to the size or color of the Government's filing cabinets. The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual right to dictate the conduct of the government's internal procedures.

*Id.* at 699–700, 106 S. Ct. at 2152. (emphasis in original). *See also Lyng v. Nw. Indian Cemetery Protective Ass'n, supra*, 485 U.S. at 451–53, 108 S. Ct. at 1326–28 (government's decision to allow timber harvesting and road construction in area of national forest used for religious purposes by Native American tribes did not interfere with free exercise rights of tribes, notwithstanding potentially devastating impact government's decision might have on tribes' religious activities: "Whatever rights the Indians may have to the use of the area, … those rights do not divest the Government of its right to use what is, after all, *its* land.") (emphasis in original).

Building upon the Supreme Court's holding in *Roy*, the D.C. Circuit in *Kaemmerling v. Lappin, supra*, 553 F.3d 669, sustained the dismissal of a prisoner's claim under RFRA that the statutorily mandated collection and use of his DNA for purposes of a national law enforcement database substantially burdened his free exercise rights. Kaemmerling alleged that as an Evangelical Christian, he viewed DNA as the building block of God's creative work, and he believed that the collection, storage, and use of one's DNA was tantamount to laying the foundation for the rise of an anti-Christ. In rejecting the viability of Kaemmerling's claim, the court emphasized that the government was not forcing him to modify his own behavior:

> … Kaemmerling does not allege facts sufficient to state a substantial burden on his religious exercise because he cannot identify any "exercise" which is the subject of the burden to which he objects. The extraction and storage of DNA information are entirely activities of the FBI, in which Kaemmerling

plays no role and which occur after the [Bureau of Prisons] has taken his fluid or tissue sample (to which he does not object). The government's extraction, analysis, and storage of Kaemmerling's DNA information does not call for Kaemmerling to modify his religious behavior in any way—it involves no action or forbearance on his part, nor does it otherwise interfere with any religious act in which he engages. Although the government's activities with his fluid or tissue sample after the BOP takes it may offend Kaemmerling's religious beliefs, they cannot be said to hamper his religious exercise because they do not "pressure [him] to modify his behavior and to violate his beliefs." *Thomas*, 450 U.S. at 718, 101 S. Ct. 1425.

Kaemmerling alleges no religious observance that the DNA Act impedes, or acts in violation of his religious beliefs that it pressures him to perform. Religious exercise necessarily involves an action or practice, as in *Sherbert*, where the denial of unemployment benefits "impede[d] the observance" of the plaintiff's religion by pressuring her to work on Saturday in violation of the tenets of her religion, 374 U.S. at 404, 83 S. Ct. 1790, or in *Yoder*, where the compulsory education law compelled the Amish to "perform acts undeniably at odds with fundamental tenets of their religious beliefs," 406 U.S. at 218, 92 S. Ct. 1526. Kaemmerling, in contrast, alleges that the DNA Act's requirement that the federal government collect and store his DNA information requires the

> government to act in ways that violate his religious beliefs, but he suggests no way in which these governmental acts pressure him to modify his own behavior in any way that would violate his beliefs. *See* Appellant's Br. at 21 (describing alleged substantial burden as "knowing [his] strongly held beliefs had been violated by a[n] unholy act of an oppressive regime").

553 F.3d at 679. (The court went on to hold, alternatively, that even if the DNA mandate did impose a substantial burden on Kaemmerling's free exercise rights, it would nonetheless survive RFRA's step-two strict scrutiny analysis. *Id.* at 680–85.)

These lines of cases thus supply two criteria that can help us to determine whether the burden imposed by government action upon a plaintiff's free exercise rights is substantial. First, the *Braunfeld* line of cases instructs us to look at the burden resulting from government action and consider the way in which it purportedly interferes with an individual's exercise of religion: is the burden direct, such that it actually prevents a person from behaving in accordance with his religion, or does it impose only an indirect, incidental burden that, for example, makes the observance of his religion more costly but does not actually preclude his religious exercise? Second, the *Roy* line of cases draws a distinction between what the law requires a plaintiff himself to do, and what it permits or requires a third party to do. These cases recognize that although the plaintiff may have a religiously-based objection to what the government or another third party does with something that the law requires the plaintiff to provide (in *Roy*, a Social Security number, in *Kaemmerling*, his DNA), the free exercise clause

does not necessarily permit him to impose a restraint upon another's action.

Admittedly, neither line speaks directly to the issues before us now: the Supreme Court has never before considered whether and under what circumstances the statutorily-mandated provision of a particular benefit to an employee will substantially burden the employer's free exercise rights. (The precedent that is closest to that scenario is *United States v. Lee*, in which the Court held that the objecting Amish employer was obliged to pay Social Security taxes notwithstanding his religious objection to doing so, given the government's compelling interest in a uniform national system of retirement pay.) The cases I have just discussed are nonetheless relevant in two senses. First, like the various circuit cases finding certain burdens on free exercise rights to be insubstantial, *supra* at 110-111, they confirm that we can and in fact must examine the nature and degree of the burden resulting from government action to decide whether it constitutes a substantial burden for purpose of RFRA. Second, they demonstrate that in making that assessment, we must consider precisely how the objected-to action relates to the individual's exercise of his religious rights.

Taking my cue from these cases, I move on to consider precisely how the ACA's requirement that a corporate employer provide health insurance to its employees that includes contraceptive coverage does or does not burden the free exercise rights of its owners. Because the ACA does not actually require the individual plaintiffs themselves to do anything contrary to their religious beliefs, and because their desire not to have their companies facilitate the use of contra-

ception necessarily implicates the private choices of employees as to how they will use the insurance coverage they have earned as a benefit of their work, I am convinced that any burden imposed on the free exercise rights of the individual plaintiffs is too attenuated to qualify as a substantial burden.

**5.**

A substantial burden is one that bears direct, primary, and fundamental responsibility for making the plaintiff's religious exercise impracticable. *Ante* at 54–55; *Nelson v. Miller*, 570 F.3d 868, 878 (7th Cir. 2009); *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2008); *Civil Liberties for Urban Believers v. City of Chicago*, *supra*, 342 F.3d at 761. Here, the contention is not that the ACA proscribes any belief or interferes with any form of worship activity, but that the statute nonetheless requires the plaintiffs to lend material support to an activity (the use of contraception) that is inconsistent with the individual plaintiffs' Catholic faith. Specifically, the company health plans must provide insurance coverage which, by fully underwriting the cost of contraceptive care, facilitates what the Kortes and the Grotes view as a moral wrong (the use of contraception).

For two key reasons, the mandate poses no direct burden on the Kortes' and Grotes' exercise of religion. First, the mandate does not require them to alter their own practices in any way. As the court's articulation of the asserted burden makes clear, what they are objecting to is the use of contraception by third parties, which the plaintiffs do not wish to facilitate. Second, to the extent the Kortes' and the Grotes' concern has to do with facilitating what they believe to be immoral conduct by third parties, it is the corporate health

plans, not they, who fund the insurance which employees may use to procure contraception.

The first point is obvious, and I have made it before, but it cannot be repeated often enough. Nothing in the ACA requires the Kortes or the Grotes themselves to do anything that violates the Catholic Church's disapproval of contraception. They need not purchase, use, or dispense contraceptives; they need not promote or endorse the use of contraceptives; nor need they remain silent as to what their faith teaches them about the immorality of contraceptive use. *See Gilardi*, 2013 WL 5854246, at *29–*31 (Edwards, J., concurring in part & dissenting in part); *Goehring v. Brophy*, 94 F.3d 1294, 1300 (9th Cir. 1996) (use of university registration fee to fund student health insurance plan that included abortion coverage did not substantially burden free exercise rights of students who objected to abortion on religious grounds because, in part, "plaintiffs are not required to accept, participate in, or advocate in any manner for the provision of abortion services"), *overruled on other grounds by City of Boerne v. Flores*, *supra*, 521 U.S. 507, 117 S. Ct. 2157; *cf. Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1121 (9th Cir. 2009) (objection by pharmacy to dispensing emergency contraception); *Menges v. Blagojevich*, 451 F. Supp. 2d 992, 1000–02 (C.D. Ill. 2006) (same). Their only connection to the objected-to use of contraception is indirect: (a) the Grotes and the Kortes are both the owners of closely-held corporations; (b) which are now required by the ACA to provide standardized health-care coverage to employees; (c) which employees may elect, inter alia, to use to obtain contraception. Each step in this chain separates them by an additional degree from the objected-to practice of contraception.

It is the corporations, not the individual plaintiffs, which as the employers are obligated to provide the requisite coverage to employees of the firms. The Kortes and the Grotes incorporated their businesses for a reason. Business owners form corporations precisely to insulate themselves from the obligations of the corporation and to create a separate entity to carry on the business. The corporations and only the corporations bear the obligation to provide the insurance coverage to employees; the Kortes and the Grotes bear no personal obligation to pay for the coverage. Thus the money—the "material support," as the court describes it—comes from Korte & Luitjohan Contractors and Grote Industries, not from the pockets of the individual plaintiffs.[8]

Moreover, what the companies are providing is a form of employee compensation, like wages. Handing over a paycheck to an employee may materially facilitate the purchase of any number of (perfectly legal) goods and services—alcohol, lottery tickets, cigarettes, adult pornography, contraception,

---

[8] The sparse record before us does not reveal whether and to what degree the contraceptive mandate may increase the cost of health insurance to employers. Full coverage of contraception may (like the mandated coverage of other preventive services) save insurers and employers money in the long run by reducing the multiple costs associated with unplanned pregnancies. *See infra* at 144-145; Institute of Medicine, Committee on Preventive Services for Women, *Clinical Preventive Services for Women: Closing the Gaps*, 107 (2011) (costs of unintended pregnancies in United States in 2002 estimated to be $5 billion, while costs saved due to contraception estimated to be $19.3 billion), available at http://www.nap.edu/catalog.php?record_id=13181. In any case, the plaintiffs' argument here turns not on the additional cost of providing contraceptive coverage but to facilitating the use of contraceptives by providing that coverage, period.

abortion, and *Harry Potter* books, to name a few—that are contrary to an employer's religious beliefs. Of course, an employer typically does not know how an employee will spend his wages. (Neither does he typically know what healthcare decisions his employee is making.) But what if he does know? Suppose an employee announces, "As soon as I get my paycheck, I am going to have an abortion." Or suppose it is well known at the workplace that a particular employee drinks himself blind at a local tavern every Friday night after he gets paid. Can the employer withhold the paycheck on the grounds that turning it over will materially assist an act that he finds morally intolerable? Without explaining why, the plaintiffs concede that an employer cannot do this. They do not contend that the possibility, or even the foreknowledge, that an employee can and will use her wages to engage in an activity proscribed by the plaintiffs' religious beliefs substantially burdens their free exercise rights, notwithstanding that the payment of wages to the employees *will* facilitate the objected-to activity.[9] How is the provision of health insurance different? One difference is that the employer plays some role in establishing and administering the health care plan, as opposed to supplying the employee with a voucher that the employee can use to purchase his own insurance elsewhere. But the insur-

---

[9] As Judge Edwards put it in *Gilardi*, "the Gilardis are no more of an 'essential cause' of increasing the use of contraception when they authorize Freshway [their company] to pay for a benefits plan that employees *might* use to get contraception than when they authorize wages that an employee *might* use to purchase contraception she would not otherwise be able to afford." 2013 WL 5854246, at *29 (Edwards, J., concurring in part and dissenting in part) (emphasis in original).

ance is nonetheless a component of compensation that the employee has earned—an employee accepts less in salary or hourly pay in exchange for benefits like health insurance, and, in most cases, contributions have been withheld from the employee's paycheck to further defray the costs of that insurance. *See* Sepper, *Contraception and the Birth of Corporate Conscience*, *supra*, at 22.[10] The fact that the employer in administering the plan is treated as a fiduciary, with a corresponding obligation to act in the *employee*'s interest is consistent with the notion that the insurance, while provided by the employer, belongs to the employee. *See* 29 U.S.C. §§ 1002(21)(A)(I) (defining ERISA fiduciaries to include person with authority or control over plan assets); 1104(a)(1)(A) (ERISA fiduciaries must discharge duties to plan solely in interests of plan participants and beneficiaries, for exclusive purpose of providing benefits thereto).[11]

---

[10]  The record does not disclose what the plaintiffs' employees contribute toward the cost of their health insurance. The average employee currently contributes $999 toward the $5,884 cost of an employer-sponsored, single-coverage plan (roughly a 17-percent share), and $4,565 toward the $16,351 cost of an employer-sponsored, family-coverage plan (roughly a 28-percent share). *See* Henry J. Kaiser Family Foundation, *2013 Employer Health Benefits Survey*, Summary of Findings & Ex. B (Aug. 20, 2013), available at http://kff.org/report-section/2013-summary-of-findings/ (last visited Nov. 7, 2013).

[11]  *See generally Howell v. Motorola, Inc.*, 633 F.3d 552, 562 (7th Cir. 2011) (discussing when employer and plan sponsor act as fiduciaries); *see also, e.g., Orth v. Wis. State Emp. Union Counsel 24*, 546 F.3d 868, 871, 874 (7th Cir. 2008) (employer breached fiduciary duty to retiree by deducting 100 percent of cost of his insurance benefits from retirement pay rather than 10 percent as specified by contract); *Phelps v. C.T. Enters., Inc.*, 394 F.3d 213, 221–22 (4th

(continued...)

Although the plaintiffs cast their objection as one to the
provision of contraceptive coverage in and of itself, what they
are really objecting to is the private choices that employees and
their families might make in reliance on health care coverage
that includes contraceptive care. That the coverage is provided
does not mean that it will necessarily be used, or used in a way
that the plaintiffs find objectionable. This much is made clear
by the Korte firm's ethics policy, which itself recognizes that
the use of some contraceptive medications, for non-contracep-
tive purposes, is consistent with the Kortes' Catholic faith. *Ante*
at 12–13 & n.5. The court too recognizes this when it describes
the plaintiffs' objection as one to providing material assistance
to immoral conduct—*i.e.*, the use of contraceptives. *Ante* at 13,
60. And this is the point—that the objection turns not on the
coverage in isolation but the decision to use covered contracep-
tives for a particular purpose, *i.e.* to prevent procreation. *See*
Sepper, *Contraception and the Birth of Corporate Conscience*, at 18,
19 (noting that burden is non-existent if employees share
company's asserted religious values and therefore do not use
contraceptive coverage). That decision is merely one of many
that plaintiffs might find objectionable. For what the ACA
requires the plaintiffs to provide to their employees is not a
contraceptive insurance policy but a health care plan that
covers literally thousands of services. The potential ways in

---

[11] (...continued)
Cir. 2005) (evidence that employer diverted employee contributions to
health benefits plan to other corporate uses supported claim for breach of
fiduciary duty); *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997)
(company owner's diversion of pension contributions deducted from
employee pay to other uses constituted breach of fiduciary duty).

which employees might choose to use those services surely number many times more, and any number of those choices might be objectionable to one religion or another. *See Grote*, 708 F.3d at 866 (dissent).

This is the sense in which *Zelman v. Simmons-Harris*, 536 U.S. 639, 652–654, 122 S. Ct. 2460, 2467–68 (2002), and *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 233–35 120 S. Ct. 1346, 1356–57 (2000), are relevant: both emphasize the critical role that the independent decisions of third parties play in walling off an unwilling financier from activities or speech that he objects to subsidizing on constitutional grounds. In *Zelman*, the objectors were taxpayers who contended that the state's issuance of vouchers that parents could (and in overwhelming numbers did) use to send their children to parochial schools violated the First Amendment's establishment clause, in that public funds were being used for religious purposes. In *Southworth*, the objectors were public university students who argued that the use of their mandatory activity fees to support student groups whose missions and speech they opposed violated their own First Amendment right to free speech. The Supreme Court rejected the First Amendment claims in both cases. In *Zelman*, the Court emphasized that because the voucher program was neutral with respect to religion, and public money reached religious schools solely by way of "genuine and independent private choice," the protesting taxpayers did not have a valid Establishment Clause claim. 536 U.S. at 652, 122 S. Ct. at 2467. And in *Southworth*, the Court likewise stressed that because student activity funds were allocated on a viewpoint-neutral basis, ensuring that both minority and majority views would be heard, there was no

genuine risk that any student group would be perceived as speaking for the university and its students, and thus no meritorious claim that the objecting students were being compelled to "speak" in violation of their own beliefs and views. 529 U.S. at 233–35, 120 S. Ct. at 1356–57.

Yes, *Zelman* and *Southworth* can be distinguished from this case: *Zelman* involved an establishment clause claim, and *Southworth* involved a free speech claim, whereas this case presents a free exercise clause claim. But at the bottom of all three cases is the claim that forcing the plaintiff to give his financial aid to activity or speech that he finds objectionable cannot be reconciled with his First Amendment freedoms. Central to the rejection of this claim in *Zelman* and *Southworth* was official agnosticism, which permitted the funds to be used as third parties (in *Zelman*, the parents, and in *Southworth*, the student council) chose, with no reasonable perception that those choices were attributable to either the government or the objecting plaintiff. The same reasoning explains why mandatory, employer-sponsored insurance coverage which includes contraception as a covered service does not meaningfully burden the plaintiffs' free exercise rights. By including contraception in the required coverage, the government is in no way requiring any company owner to use, endorse, or dispense contraception in violation of his own religious beliefs; the choice whether and under what circumstances to use that coverage is left to the individual employee and her physician, to be made in private, with no participation by the employer. Although funds from the company health plan are being used to facilitate that choice, no objective observer would attribute that choice to the company, let alone its owner. *See Gilardi*, 2013

WL 5854246, at *30 (Edwards, J., concurring in part & dissenting in part).

Finally, it is worth considering the ramifications of deeming one choice that may be made by an employee using her workplace healthcare plan to be a burden on her employer's free exercise rights. Again, what the ACA compels a covered employer to provide is not a contraceptive care plan but a comprehensive health care plan that includes thousands of medical services, including contraceptive care. It may seem both possible and reasonable to carve out the coverage of contraceptives from the rest of the ACA-mandated insurance plan, in that the plaintiffs have a categorical objection to the use of contraceptives (insofar as they are used to prevent contraception) and the contraception mandate itself stands out in that it requires coverage of contraceptives without copayment by the employee.[12] (I suspect that as a matter of public discourse, if not judicial treatment, the fact that contraceptive care implicates both sex and women, also has something to do with the reason why the contraception mandate seems different from other provisions of the ACA.) However, as I have pointed out previously, a given employer might find any

---

[12] It is misleading, however, to say, as many reports do, that the mandate requires the coverage of contraceptives at no cost to the employee, given that most employees pay some portion of the cost of their workplace health insurance. *See supra* n.10. Many other preventive and screening healthcare services are likewise to be provided to the employee without a copayment under the ACA. *See* http://www.healthcare.gov/what-are-my-preventive-care-benefits (listing 15 categories of preventive care to be covered with no copayments for all insureds, 22 categories of such care for women, and 25 categories for children) (last visited Nov. 7, 2013).

number of those services, either categorically or situationally, inconsistent with his or her religious beliefs. If, as the court today holds, it is a substantial burden on an employer's free exercise rights to compel him to insure a form of medical care to which he objects on religious grounds, then all manner of insured medical services are subject to challenge under RFRA. *See Gilardi*, 2013 WL 5854246, at *32 (Edwards, J., concurring in part & dissenting in part).

Nor, logically, would the potential objections that employers could raise be limited to health insurance. Federal law grants any number of rights to employees, the recognition and accommodation of which an employer might find to be inconsistent with his religious beliefs. My hypothetical about extending FMLA leave to a gay parent is but one example. Likewise, beyond the employer-employee relationship, there may be any number of federal rights bestowed on third parties—customers, vendors, creditors, debtors—to which the owner of a business theoretically might pose a religious objection. Today's decision certainly opens the door to challenging the enforcement of those rights against a business as a burden on the free exercise rights of its owner.[13]

---

[13] The variety of government requirements that individuals, businesses, and religious organizations have challenged on free exercise grounds makes this clear. *See, e.g., Tony & Susan Alamo Found. v. Sec'y of Labor, supra*, 471 U.S. at 303–06, 105 S. Ct. at 1962–64 (minimum wage, overtime, and recordkeeping requirements of Fair Labor Standards Act); *Bob Jones Univ. v. United States*, 461 U.S. 574, 603–04, 103 S. Ct. 2017, 2034–35 (1983) (criteria for tax-exempt status); *United States v. Lee, supra*, 455 U.S. at 256–60, 102 S. Ct. at 1055–57 (Social Security taxes); *In re Young, supra*, 82 F.3d at 1418–20 (recovery of

(continued...)

What also should not be overlooked is that by exempting a corporation from a statute that grants a particular right to the corporation's employee or to another third party on the ground that the mandate impinges on the religious rights of the corporate owners, the court is depriving the third party of a right that Congress meant to give him. The Supreme Court has hinted at a reluctance to recognize a plaintiff's request for a religious exemption from a legal requirement when granting the exemption would burden the rights of others. *See Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 18 n.8, 109 S. Ct. 890, 901 n.8 (1989) (plurality) (noting significance, in free exercise and establishment clause jurisprudence, of extent to which proposed exemptions for religious groups would burden the rights of third parties); *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 630, 63 S. Ct. 1178, 1181 (1943) (noting that free exercise challenge to requirement that public school students salute American flag "does not bring [plaintiffs] into collision with rights asserted by any other individual."); *Braunfeld*, 366 U.S. at 604, 81 S. Ct. at 1146 (noting *Barnette*'s observation as a limit on free exercise rights); *see also South Ridge Baptist Church v. Indus. Comm'n of Ohio*, 911 F.2d 1203, 1211 (6th Cir. 1990) ("We respect the Church's objections to the workers' compensation system and its remarkable devotion to

---

[13] (...continued)

debtor's avoidable transfers in bankruptcy proceeding); *South Ridge Baptist Church v. Indus. Comm'n of Ohio*, 911 F.2d 1203, 1206–09 (6th Cir. 1990) (workers compensation premiums); *Elane Photography, LLC v. Willock*, 309 P.3d 53, 72–75 (N.M. 2013) (state human rights ordinance), *pet'n for cert. filed* (U.S. Nov. 8, 2013); *Koolau Baptist Church v. Dep't of Labor & Indus. Relations*, 718 P.2d 267, 271–73 (Hi. 1986) (unemployment insurance taxes).

its religious beliefs in every aspect of life. Where such beliefs clash with important state interests in the welfare of others, however, accommodation is not constitutionally mandated."); *Catholic Charities of Sacramento, Inc. v. Superior Court*, 85 P.3d 67, 93 (Cal. 2004) ("Strongly enhancing the state's interest is the circumstance that any exemption from the [state statute requiring employers to include contraceptive coverage in workplace health insurance plans] sacrifices the affected women's interest in receiving equitable treatment with respect to health benefits. We are unaware of any decision in which this court or the United States Supreme Court has exempted a religious objector from the operation of a neutral, generally applicable law despite the recognition that the requested exemption would detrimentally affect the rights of third parties."); Perry Dane, Note, *Religious Exemptions Under the Free Exercise Clause: A Model of Competing Authorities*, 90 YALE L. J. 350, 368 (1980) (injury to third parties may counsel against religious exemption). Whatever work-around might be possible to bestow that right through alternate means, there is no certainty that the government can or will implement the work-around or that it will do so on any given timeline, and in the meantime the corporate owner has vindicated its asserted rights at the expense of others. The statutory mandate at issue in this case implicates not only a constitutionally protected freedom to use contraception, but a range of other interests related to the health of women and their children and the ability of women to enter and remain in the workplace. It is not just the women who work for Korte & Luitjohan Contractors and Grote Industries who have those interests; the wives and daughters of employees who have family health insurance

coverage through those firms are also implicated. Whether the employees and family members who are affected by this court's ruling will be able to access contraception in the absence of a government work-around cannot be known; what is virtually certain is that they will have to pay 100 percent of the cost of contraception absent access to alternative coverage through a spouse's insurance plan, for example. To the extent that some employees will be unable to pay the out-of-pocket costs of contraception, the plaintiffs, based on their own religious beliefs, will have effectively narrowed the scope of healthcare that is available to those employees. This is the very scenario about which the Supreme Court has signaled concern; and given that the plaintiffs' own free exercise rights are at most modestly burdened by the contraceptive mandate, we tread on dangerous territory by exempting the plaintiffs from the statutory mandate.

I mentioned at the outset that the court's decision struck me as reminiscent of the *Lochner* era; let me explain why I think this is so. *Lochner* and its progeny struck down a host of wage, hour, and other workplace regulations on the theory that they impermissibility intruded on the rights of contract, property, and to engage in a lawful, private business as protected by the due process clauses of the Fifth and Fourteenth Amendments. *See, e.g., Lochner v. New York*, 198 U.S. 45, 57, 25 S. Ct. 539, 543 (1905) (state statute specifying that bakery employees could work no more than 10 hours per day or 60 hours per week impermissibly intruded on employer's and employee's freedom of contract: "There is no reasonable ground for interfering with the liberty of person or the right of free contract, by determining the hours of labor, in the occupation

of a baker."); *Coppage v. Kansas*, 236 U.S. 1, 11–14, 35 S. Ct. 240, 242–43 (1915) (state statute proscribing "yellow dog" contracts that forbade employees from joining a union interfered with rights of contract and private property); *Adkins v. Children's Hosp. of D.C.*, 261 U.S. 525, 557–59, 43 S. Ct. 394, 401–02 (1923) (federal statute establishing minimum wage standards for women and children working in District of Columbia interfered with freedom of contract by artificially restricting employer's side of wage negotiation); *New State Ice Co. v. Liebmann*, 285 U.S. 262, 278, 52 S. Ct. 371, 374 (1932) (state statute requiring a license to engage in manufacture, distribution, or sale of ice interfered with common right to engage in lawful private business).

One flaw of the *Lochner* jurisprudence is that while the Court purported to protect the constitutional rights of workers as well as employers, it blinded itself to the reality that employees frequently did not possess bargaining power enabling them to pursue and protect their own liberty interests, so that by invalidating regulations meant to protect workers, the Court was in fact depriving them of their contractual and other rights; substantive due process was being wielded as a club to defeat important workplace protections. When the Court signaled an end to the *Lochner* era with its decision in *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 57 S. Ct. 578 (1937), to uphold a state statute establishing a minimum wage for women and minors—and thus to overrule its decision in *Adkins*—it stressed that the concept of liberty enshrined in the due process clause also includes the right of government to enact legislation aimed at promoting the health and welfare of the public, including protection for the rights of employees:

The principle which must control our decision is not in doubt. The constitutional provision invoked is the due process clause of the Fourteen Amendment governing the states, as the due process clause invoked in the *Adkins* Case governed Congress. In each case the violation alleged by those attacking minimum wage regulation for women is deprivation of freedom of contract. What is this freedom? The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law. In prohibiting that deprivation, the Constitution does not recognize an absolute and uncontrollable liberty. Liberty in each of its phases has a history and connotation. But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals, and welfare of the people. Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interest of the community is due process.

*Id.* at 391, 57 S.Ct. at 581–82. In concluding that the minimum-wage law fell within this broad police power, and did not impermissibly intrude upon the rights of employers, the Court quoted approvingly from Justice Holmes' dissent in *Adkins*:

This statute does not compel anybody to pay anything. It simply forbids employment at rates below those fixed as the minimum requirement of health and right living. It is safe to assume that women will

> not be employed at even the lowest wages allowed
> unless they earn them, or unless the employer's
> business can sustain the burden. In short the law in
> its character and operation is like hundreds of so-
> called police laws that have been up-held.

*Id.* at 396–97, 57 S. Ct. at 584 (quoting *Adkins*, 261 U.S. at 570, 43 S. Ct. at 406 (Holmes, J., dissenting).

What the plaintiffs' claim has in common with the *Lochner* jurisprudence is that it elevates the daily affairs of a secular, for-profit corporation to constitutional status, treating the business as the embodiment of its owners' religious principles, such that a burden on the corporation is conceived of as a burden on the religious rights of the corporate owners. In this way, a statutory mandate that is amply justified by the government's police power, which falls solely on the corporation, and which requires the owners to do absolutely nothing in their personal lives that is inconsistent with their religious beliefs, is nonetheless deemed to be an impermissible intrusion upon the exercise of their constitutionally protected religious beliefs. The burden, so conceived, is then used as the springboard for overruling a neutral, generally-applicable statutory provision that Congress has deemed necessary to protect the rights of others.

When the Kortes and the Grotes chose to enter the business world, they did not surrender their free exercise rights, but they did assume responsibility for the regulatory obligations imposed on all like businesses, including statutory obligations to their employees. *See Lee*, 455 U.S. at 261, 102 S. Ct. at 1057; *Gilardi*, 2013 WL 5854246, at *34 (Edwards, J., concurring in

part & dissenting in part); *cf. Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 259–61, 85 S. Ct. 348, 358–60 (1964) (rejecting contention that federal prohibition of racial discrimination in public accommodations violated motel's right to choose its customers and operate business as it wished, given well established powers of both Congress and the States to regulate inter- and intra-state commerce). They chose to form corporations that legally separated them from the assets and obligations of their businesses. *See Cedric Kushner Promotions, Ltd.*, *supra*, 533 U.S. at 163, 121 S. Ct. at 2091. Like any secular employer in a religiously pluralistic nation, the Kortes and the Grotes must realize that their companies employ individuals who do not share their own religious beliefs and who may choose to use their wages and benefits in ways that are offensive to those beliefs. As a matter of both common sense and legal reasoning, no one would plausibly treat those choices as the Kortes' and Grotes' own decisions, or as a meaningful burden on the exercise of their religious rights. What the ACA imposes on employers is an obligation to provide employee health insurance that covers a standard, comprehensive set of benefits. How an individual employee uses those benefits is up to her; she not only earns the insurance through her labor but typically contributes a significant portion of her wages to pay for it. Her choices will be guided by, among other things, her own religious principles. Although an employer, in conveying the benefits she has earned, no doubt facilitates those choices, her freedom to make choices that are inconsistent with the employer's own religious beliefs imposes nothing like a

substantial burden on the employer's practice of religion.[14] Only by extending the scope of an employer's exercise of religion far beyond his own belief, worship, and conduct to the conduct of his employees, can we conceive of the insurance benefits provided to employees as an undue burden on the free exercise rights of the company owners. This is, in my view, far beyond what Congress had in mind when it enacted RFRA.

**6.**

If it were necessary to reach the second prong of the RFRA inquiry, I would find that the contraception mandate is supported by a compelling governmental interest. The court chides the government for not making more of a case in this respect. But, to my mind, the nature and the weight of the interests supporting the mandate are obvious. In this regard, I view this case as materially no different from *Lee*, in which the court found the government's interest in a national social security system sufficiently compelling to warrant infringement on an Amish employer's religious interests by requiring him to pay into the system.

---

[14]   As Judge Edwards has pointed out:

No Free Exercise decision issued by the Supreme Court has recognized a substantial burden on a plaintiff's religious exercise where the plaintiff is not *himself* required to take or forgo action that violates his religious beliefs, but is merely required to take action that *might* enable other people to do things that are at odds with the plaintiff's religious beliefs.

2013 WL 5854246, at *29 (emphasis in original).

The government has an obvious and compelling interest in broadening Americans' access to health insurance. That all Americans have a keen interest in access to medical goods and services is beyond question. As the costs of both health care and health insurance have risen substantially in recent decades and the number of workplace insurance plans has declined, the need for health insurance reform has become more urgent. In 2010, the year that the ACA was enacted, some 50 million Americans lacked health insurance—roughly 18 percent of the non-elderly population. *See* Dep't of Health & Human Servs., Office of the Ass't Sec'y for Planning & Evaluation, ASPE Issue Brief - *Overview of the Uninsured in the United States: A Summary of the 2011 Current Population Survey*, available at http://aspe. hhs.gov/health/reports/2011/cpshealthins2011/ib.shtml (last visited Nov. 7, 2013). Obtaining insurance in the individual market was expensive: In 2010, average monthly per-person premiums in the individual market for health insurance ranged from a low of $136 in Alabama to $437 in Massachusetts, for a nationwide average of $215 (more than $2,500 per year). Henry J. Kaiser Family Foundation, *State Health Facts*, *Average Monthly Per Person Premiums in the Individual Market*, available at h t t p : / / h t t p : / / k f f . o r g / o t h e r / s t a t e - i n d i c a t o r / individual-premiums/ (last visited Nov. 7, 2013). Needless to say, many individuals and families—those who could afford the premiums—spent far more. At the same time, medical debtors—whether uninsured or underinsured—were becoming a much larger share of those filing for bankruptcy. *See* David U. Himmelstein, et al., *Medical Bankruptcy in the United States, 2007: Results of a National Study*, 122 AM. J. MED. (No. 8) 741 (Aug. 2009). Uncompensated hospital care (including both

charity care and services for which hospitals expected compensation but did not get it) had increased tenfold over the prior three decades, from $3.9 billion in 1980, to $39.3 billion in 2010. American Hospital Association, *Uncompensated Hospital Care Cost Fact Sheet* at 3 (January 2013), available at http://www.aha.org/content/13/1-2013-uncompensated-care-fs.pdf (last visited Nov. 7, 2013).

The ACA's employer mandate, coupled with an individual mandate applicable to all persons not covered by employer-sponsored health plans and otherwise not eligible for Medicare or Medicaid, was a logical, although certainly not the only, means of moving the country toward universal health insurance. It builds upon the American tradition of employer-sponsored health insurance that began in the early 20th century. *See, e.g.*, David Blumenthal, *Employer-Sponsored Health Ins. in the U.S.—Origins and Implications*, 355 NEW ENGLAND J. MED. No. 1, 82 (July 6, 2006). It takes advantage of risk-spreading, economies of scale, quality control, and other features of employer-procured insurance. And, although this was the work of a Democratic President and Congress, it had the advantage of having been first proposed by a Republican President—Nixon—nearly 40 years ago. *See* Special Message from President Richard M. Nixon to the Congress Proposing a Comprehensive Health Insurance Plan (Feb. 6, 1974), available at http://www.presidency.ucsb.edu/ws/index.php?pid=4337 (last visited Nov. 7, 2013). My intention here is neither to validate nor endorse the ACA as policy—that is not within my purview—but merely to recognize that it embodies rational choices and that the road leading to those choices has been a long and difficult one.

Compelling government interests in both preventive health care and gender equality support the inclusion of contraceptives within the mandated coverage that insurance plans—including employer-sponsored plans—must provide without copayment by the insured. As the court has noted, included with the standard coverage required of all non-grandfathered health plans are a series of preventive services that must be provided to all adults without copayment, including immunizations for tetatanus, meningitis, measles, influenza, hepatitis B, and other communicable diseases; screening for high cholesterol, diabetes, HIV infection, high blood pressure, colorectal cancer, and other potentially life-threatening conditions; and both screening and counseling for alcohol abuse, tobacco use, and obesity. *See* http://www.healthcare.gov/what-are-my-preventive-care-benefits (last visited Nov. 7, 2013). The rationale behind requiring coverage of such services without copayment is obvious: these are services which either prevent illness altogether or facilitate detection at an earlier stage when it is more amenable to treatment, thereby reducing the direct and indirect costs of illness otherwise borne by the insured, his family, his employer, his insurer, medical providers, and the government. The Women's Health Amendment to the ACA, spearheaded by U.S. Senator Barbara Mikulski, expanded the range of requisite preventive care to include a separate set of preventive services for women. In proposing the amendment, Senator Mikulski noted that many women forego preventive screenings for the conditions that statistically are most likely to result in their death—breast, cervical, colorectal, ovarian and lung cancer, and heart and vascular disease—either because

they lack insurance, the services are not covered by their insurance plans, or because the large copayments required by their insurance companies for these screenings are beyond their financial means. "Women of childbearing age incur 68 percent more out of pocket health care costs than men," she pointed out. "My amendment guarantees access to critical preventive screening and care for women to combat their number one killers and provides it at no cost. This amendment eliminates a big barrier of high copayments." Press release: *Mikulski Puts Women First in Health Care Debate* (November 30, 2009), available at http://www.mikulski.senate.gov/media/pressrelease/11-30-2009-2.cfm (last visited Nov. 7, 2013); *see also* Jessica Arons & Lindsay Rosenthal, Center for American Progress, *Facts About the Health Insurance Compensation Gap* (June 2012) ("Even with employer-based coverage, women have higher out-of-pocket medical costs than men. Overall, women of reproductive age spend 68 percent more out of pocket than men on health care, in part because their reproductive health care needs require more frequent health care visits and are not always adequately covered by their insurance. Among women insured by employer-based plans, oral contraceptives alone account for one-third of their total out-of-pocket health care spending."), available at http://www.americanprogress.org/issues/healthcare/news/2012/06/01/11666/facts-about-the-health-insurance-compensation-gap/ (last visited Nov. 7, 2013). As the court has noted, with the passage of the Women's Health Amendment, a panel of experts convened by the Institute of Medicine determined based on evidence-based criteria what preventive services were necessary to promote and protect women's health and

therefore ought to be included—at no additional cost to the insured individual—in the standard health coverage required of all non-grandfathered insurance plans. Covered services now include, in addition to contraception: breast cancer mammography, genetic screening, and chemoprevention counseling; screening for a variety of sexually-transmitted diseases including chlamydia, gonorrhea, syphilis, HIV, and human papillomavirus; and screenings for hepatitis B, cervical cancer, gestational diabetes, osteoporosis, and urinary tract infections. *See* http://www.healthcare.gov/what-are-my-preventive-care-benefits (last visited Nov. 7, 2013); *see also* U.S. Dep't of Health & Human Servs., Health Resources & Servs. Admin., *Women's Preventive Services Guidelines*, available at http://www.hrsa. gov/womensguidelines/ (last visited Nov. 7, 2013).

It should come as no surprise that contraceptive care was included in the set of preventive services that the Institute of Medicine panel deemed essential to women's health. Ninety-nine percent of American women aged 15 to 44 who have engaged in sex with men have used at least one form of birth control. Institute of Medicine, Committee on Preventive Services for Women, *Clinical Preventive Services for Women: Closing the Gaps*, 103 (2011), available at http://www. nap.edu/catalog.php?record_id=13181; Guttmacher Institute, Fact Sheet: *Contraceptive Use in the United States*, at 1 (Aug. 2013), available at http://www.guttmacher.org/pubs/ fb_contr_usc.pdf (last visited Nov. 7, 2013); William D. Mosher & Jo Jones, Centers for Disease Control, Nat'l. Ctr. for Health Statistics, *Use of Contraception in the United States: 1928-2008*, 5, 15, & Table 1 (Aug. 2010), available at http://www.cdc.gov/

nchs/data/series/sr_23/sr23_029.pdf (last visited Nov. 7, 2013. A woman's ability to control whether and when she will become pregnant has highly significant impacts on her health, her child's health, and the economic well-being of herself and her family. Unintended pregnancies pose risks to both mother and fetus in that a woman, neither planning to be pregnant nor realizing that she is, may both delay prenatal care and continue practices (including smoking and drinking) that endanger the health of the developing fetus. *Id.* at 103. Pregnancy is contraindicated altogether for women with certain health conditions. *Id.* at 103–04. Intervals between pregnancies also matter, as pregnancies commencing less than eighteen months after a prior delivery pose higher risks of pre-term births and low birth weight. *Id.* at 103. An unintended pregnancy may also put financial strain on the woman and her family, to the extent that the birth will require her to take time off from work, may cause her to quit work altogether if she does not have or cannot afford to pay for alternate childcare, and adds substantial, unplanned-for expenses to the family budget. Unintended pregnancies resulting in birth also impose large costs on the public fisc: In 2008, for example, 65 percent of births resulting from unintended pregnancies were paid for by public insurance programs (primarily Medicaid) and resulted in total estimated costs of $12.5 billion. Guttmacher Institute, Fact Sheet: *Facts on Unintended Pregnancy in the United States* (Oct. 2013), available at http://www.guttmacher.org/pubs/ FB-Unintended-Pregnancy-US.html (last visited Nov. 7, 2013). Finally, unintended and unwanted pregnancies naturally account for the lion's share of induced abortions. Currently, nearly one-half (49 percent) of all pregnancies in the United

States are unintended, and roughly 40 percent of those pregnancies (22 percent of all pregnancies) end in abortion, resulting in more than 1.2 million abortions annually as of 2008. Guttmacher Institute, *In Brief: Facts on Induced Abortion in the United States* (Oct. 2013), available at http://www.guttmacher.org/pubs/fb_induced_abortion.html (last visited Nov. 7, 2013). Abortions themselves have economic costs (roughly 20 percent are paid for by Medicaid, for example, *see id.*), and, as important, because many Americans oppose abortions on moral grounds, the government has a legitimate interest in reducing the abortion rate. *See Planned Parenthood of Se. Penn. v. Casey*, *supra*, 505 U.S. at 883, 112 S. Ct. at 2824 (state may express preference for childbirth over abortion); *Michael M. v. Superior Ct. of Sonoma Cnty.*, 450 U.S. 464, 470–71 & n.5, 101 S. Ct. 1200, 1205 & n.5 (1981) (noting that statutory rape law was justified by state's "strong interest" in preventing out-of-wedlock teenage pregnancies and thereby, inter alia, reducing abortion rate); *Choose Life Illinois, Inc. v. White*, 547 F.3d 853, 868 (7th Cir. 2008) (Manion, J., concurring); *but see Gilardi*, 2013 WL 5854246, at *12 (although government's asserted interests in abortion cases have been described as "legitimate and substantial," they have never been described as compelling). Ready access to contraception thus not only maximizes the ability of women to become pregnant only if and when they and their partners are prepared to shoulder the responsibilities of parenthood, but could well lower the rate of abortion. *See* Institute of Medicine, *Clinical Preventive Services for Women*, at 109 (eliminating or reducing out-of-pocket costs of contraception makes it more likely women will use more effective methods of contraception) (citing Debbie

Postlethwaite, et al., *A comparison of contraceptive procurement pre-and post-benefit changes*, CONTRACEPTION 76(5): 360–365 (2007)); Jeffrey F. Peipert, et al., *Preventing Unintended Pregnancies By Providing No-Cost Contraception*, 120 Obstetrics & Gynecology 1291 (Oct. 2012); Amy Deschner & Susan A. Cohen, *Contraceptive Use Is Key to Reducing Abortion Worldwide*, 6 GUTTMACHER REPORT ON PUBLIC POLICY No. 4 (Oct. 2003), available at http://www.guttmacher.org/pubs/tgr/06/4/gr060407.html (last visited Nov. 7, 2013); John Bongaarts & Charles F. Westoff, *The Potential Role of Contraception in Reducing Abortion*, 31 STUDIES IN FAMILY PLANNING 193 (Sept. 2000).

The right to use contraception is, of course, constitutionally protected. *See Griswold v. Connecticut*, 381 U.S. 479, 485–86, 85 S. Ct. 1678, 1682 (1965) (state statute forbidding use of contraceptives impermissibly intrudes on right of marital privacy); *Eisenstadt v. Baird*, 405 U.S. 438, 453–55, 92 S. Ct. 1029, 1038–39 (1972) (state statute forbidding distribution of contraceptives to unmarried persons violates equal protection clause of Fourteenth Amendment). As the Court put it in *Eisenstadt*, "If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Id.* at 453, 92 S. Ct. at 1038.

I am also convinced that making contraceptive coverage part of the standardized insurance that non-grandfathered employers must provide to their employees is the least restrictive means of furthering these compelling interests. I have my doubts about the feasibility of creating, let alone

enacting, a publicly-funded contraception plan, or establishing a system of tax credits to contraceptive manufacturers or the women who use contraception, given that it has taken more than 60 years to enact a health insurance reform effort on the scale of the Affordable Care Act, and given the controversies that inevitably surround the reproductive rights of women. At the very least, it is unlikely that any such plan will be established in the near future. Putting that aside, we must consider that the entire point of the Women's Health Amendment to the ACA was to redress a history of gender-based inequalities in healthcare and health insurance. Carving out from the standard insurance coverage mandated by the ACA a type of healthcare that a panel of experts has determined to be vital to the health needs of women, and saying that it must be provided for separately, reinforces the very disparities that motivated the Amendment. Additional transaction costs surely will attend the creation of a separate plan devoted to contraception, be it a public option or a set of tax incentives, and the segregation of this form of healthcare from standard insurance coverage will stigmatize both these services and the employees who wish to access them.[15] This could hardly be more inconsistent with the intent underlying the Women's Health Amendment. *Cf. Romer v. Evans*, *supra*, 517 U.S. at 630–31, 116 S. Ct. at

---

[15]  A woman would either have to enroll in a government program dedicated to providing contraceptive insurance coverage, establish a relationship with a government-subsidized contraceptive manufacturer, or claim credits for the purchase of contraception on her income tax return. Each alternative, aside from imposing extra burdens on her to obtain contraceptive coverage, singles her out as a sexually-active woman who wishes to use contraception.

1626–27 (observing that state constitutional provision foreclosing to gays and lesbians the protections of nondiscrimination laws imposes a unique disability on that class of individuals); *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) (reasoning that denying federal recognition to same-sex marriages authorized by state law "impose[s] a disadvantage, a separate status, and so a stigma on all who enter same-sex marriages made lawful by the unquestioned authority of the States").

Nor can we view the contraception provisions of the ACA in isolation. As I have now pointed out several times, the contraception mandate is merely one requirement in a comprehensive set of requirements that the statute imposes on all health plans, and as I have discussed, there are any number of medical services that health plans cover and medical choices that an insured might make to which a particular employer might object on religious grounds. Logically, the court's decision to relieve Korte & Luitjohan Contractors and Grote Industries of the contraception mandate cannot be limited to contraception alone. The relevant question, then, is not whether the government feasibly may ensure access to contraceptive care through other means, but whether it may feasibly ensure access to all types of care to which employers might object on religious grounds. The answer to that is obvious: it is not feasible to expect the government to establish a public insurance option that picks up responsibility for the crazy-quilt of individual services that any individual employer might find incompatible with his individual religious beliefs.

The Supreme Court remarked in *Lee* that "[r]eligious beliefs can be accommodated, but there is a point at which accommodation would 'radically restrict the operational latitude of the

legislature.'" 455 U.S. at 259, 102 S. Ct. at 1056 (quoting *Braunfeld*, 366 U.S. at 606, 81 S. Ct. at 1147) (additional citations omitted). In a pluralistic society with many religions and even more variants of religious beliefs, it would be impossible to move toward a system of universal healthcare that relies substantially on employer-sponsored health insurance while permitting corporate owners with objections to particular types of health services or specific decisions about how to use those services to exclude them from workplace health plans. Even if the government chose instead to pursue universal healthcare through the means of an entirely publicly-funded, single-payer system of health insurance, corporate owners as taxpayers would still be facilitating contraception and other healthcare services to which they object. The decision in *Lee* makes clear that the government would not be required to accommodate religious-based objections where the program in question is funded through general revenues. Indeed, the Kortes' counsel conceded at oral argument that even an employer tax dedicated to a public program underwriting contraception might be upheld under *Lee*'s analysis. Taxpayer funding facilitates contraception just as much as any other means of financing. Granted, by making the government the middleman, taxpayer financing separates a corporate owner from his employee's use of contraception. But as I have already pointed out, in the context of employer-financing of insurance, the corporate form, the health plan's separate identity, third-party administration of the health plan, and the private choices of employees and their physicians, similarly place corporate owners at a remove from an employee's decision to use contraception. Insisting on an exception in one setting but not the other makes no sense,

when in both cases corporate owners are lending support to a type of healthcare they find objectionable, but in neither case are they in any meaningful sense a party to an individual's decision to use that service.

The exemptions already provided for in the ACA neither undermine the compelling nature of the government's interests in broadening Americans' access to healthcare and ensuring that women have comprehensive healthcare nor do they make religious-based exemptions any more reasonable or feasible. First, given the financial burdens associated with workplace health plans, exempting employers with fewer than 50 full-time employees from the obligation to provide insurance is an entirely practical, logical, and justifiable accommodation to the financial needs of small employers, particularly in the first phase of a national effort to expand access to healthcare. Individuals who work for those employers, like part-time employees, self-employed individuals, and unemployed individuals are steered to the insurance exchanges established under the ACA, where the government offers subsidies to those who cannot shoulder the full cost of insurance on their own. Likewise, grandfathering existing workplace health plans follows a time-honored and common-sensical path in expediting the implementation of a new, complex, and potentially burdensome regulation. Employees participating in those plans by definition already have health insurance, so the accommodation to employers represented by this exemption does not unduly burden employees nor undermine the central goal of the legislation. Existing plans will lose the benefit of this exemption as they make major changes to their health plans that, inter alia, reduce benefits or increase costs to

employees. 45 C.F.R. § 147.140(g). There is no reason to think this will take long for most employers,[16] given the cost and complexity of insuring a broad range of healthcare and the market forces which prompt employers to make such revisions on a regular basis; and, again, in the absence of such changes, employees remain covered by the grandfathered plans, so the goal of access to health insurance is served. Odds are, many of these grandfathered plans already cover contraceptive care to some degree. *See* Institute of Medicine, *Clinical Preventive Services for Women*, 49, 108–09 (as of 2010, 85% of large and 62% of small health plans covered contraception) (citing Gary Claxton, et al., Kaiser Family Found., ANNUAL SURVEY OF EMPLOYER HEALTH BENEFITS, 186 (2010), available at http://kaiserfamilyfoundation.files.wordpress.com/2013/04/8085.pdf (last visited Nov. 7, 2013)); *see also* Guttmacher Institute, STATE POLICIES IN BRIEF, *Insurance Coverage of Contraceptives* (surveying state laws which require insurers to cover contraceptives), available at http://www.guttmacher.org/statecenter/spibs/spib_ICC.pdf (last visited Nov. 7, 2013). Finally, the fact that the ACA contains an exemption for religious employers—which is the *sole* permanent exemption from the contraception mandate, *see Gilardi*, 2013 WL 5854246, at *33 (Edwards, J., concurring in part & dissenting in part)—by no means demonstrates that an exemption is required for any

---

[16]   The government's mid-range estimate is that "66 percent of small employer plans and 45 percent of large employer plans will relinquish their grandfather status by the end of 2013." Interim Final Rules for Group Health Plans and Health Insurance Coverage Relating to Status as a Grandfathered Health Plan Under the Patient Protection and Affordable Care Act, 75 Fed. Reg. 34,538, at 34,552 (June 17, 2010).

employer with a potential religious objection to contraception or any other type of healthcare. That type of exemption is a feature common to any number of federal statutes, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1(a), and the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12113(d), 12187; *see Gilardi*, 2013 WL 5854246, at *33–*34 (Edwards, J., concurring in part & dissenting in part). And there is a demonstrable difference between a not-for-profit employer whose mission is expressly defined by religious goals and a secular corporation whose business is commerce for profit.

### 7.

Speaking for the Court in *Lyng v. Nw. Indian Cemetery Protective Ass'n*, Justice O'Connor had this to say about the limited reach of the free exercise clause:

> However much we might wish that it were other-wise, government simply could not operate if it were required to satisfy every citizen's religious needs and desires. A broad range of government activities—from social welfare programs to foreign aid to conservation projects—will always be considered essential to the spiritual well-being of some citizens, often on the basis of sincerely held religious beliefs. Others will find the same activities deeply offensive, and perhaps incompatible with their own search for spiritual fulfillment and with the tenets of their religion. The First Amendment must apply to all citizens alike, and it can give to none of them a veto over public programs that do not prohibit the

> free exercise of religion. The Constitution does not, and courts cannot, offer to reconcile the various competing demands on government, many of them rooted in sincere religious belief, that inevitably arise in so diverse a society as ours. That task, to the extent it is feasible, is for the legislatures and other institutions.

485 U.S. at 452, 108 S. Ct. at 1327 (citation omitted).

What the plaintiffs seek accommodation for here is a demand on their conduct, rather than their religious beliefs; and the Court has always recognized that "the freedom to act, even where the action is in accord with one's religious convictions, is not totally free from legislative restrictions." *Braunfeld*, 366 U.S. at 603, 81 S. Ct. at 1146 (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303–04, 306, 60 S. Ct. 900, 903–04 (1940)); *see also, e.g.*, *Employ. Div. v. Smith, supra*, 494 U.S. at 878–80, 110 S. Ct. at 1600; *Bowen v. Roy, supra*, 476 U.S. at 699, 106 S. Ct. at 2152; *Wisconsin v. Yoder, supra*, 406 U.S. at 219–20, 92 S. Ct. at 1535; *Baird v. State Bar of Ariz.*, 401 U.S. 1, 5–6, 91 S. Ct. 702, 705–06 (1971); *Sch. Dist. of Abington Twp., Pennsylvania v. Schempp*, 374 U.S. 203, 217–18, 83 S. Ct. 1560, 1569 (1963); *Sherbert v. Verner, supra*, 374 U.S. at 402–03, 83 S. Ct. at 1793; *United States v. Ballard*, 322 U.S. 78, 86, 64 S. Ct. 882, 886 (1944). Furthermore, the conduct for which the Kortes and the Grotes seek an exemption is their conduct as corporate owners in the commercial world; moreover, it is also conduct that implicates the rights of third parties—their employees. The reach of the free exercise clause in this setting is quite limited, whereas the government's interests in pursuing the uniform application of

a religiously-neutral statute promoting the rights of employees is quite strong.

The court's holding granting the Kortes and the Grotes, along with their two secular corporations, a religiously-based exemption from an insurance mandate represents a dramatic turn in free exercise jurisprudence for all of the reasons I have discussed. It bestows a highly personal right to religious exercise on two secular, for-profit corporations that have no facility of thought, conscience, or belief. It deems the religious rights of the plaintiffs burdened by the contraceptive mandate without consideration of the indirect and minimal intrusion on their exercise of religion. And it disregards the extent to which the exemption from the mandate burdens the rights of the plaintiffs' employees. Finally, it establishes a precedent which invites free-exercise challenges to a host of federal laws by secular corporations which, in reality, have no religious beliefs of their own and cannot exercise religion.

For all of these reasons I have set forth here, in my prior dissents, *Korte v. Sebelius*, 2012 WL 6757353, at *5–*6 (7th Cir. Dec. 28, 2012), *Grote v. Sebelius*, 708 F.3d at 855–867, and in the well-reasoned opinions of Judge Reagan, *Korte v. U.S. Dep't of Health & Human Servs.*, *supra*, 912 F. Supp. 2d 735, and Judge Barker, *Grote Indus., LLC v. Sebelius*, 914 F. Supp. 2d 943 (S.D. Ind. 2012), below, I would affirm the district courts' decisions to deny the plaintiffs' requests for preliminary injunctive relief.

I respectfully dissent.